## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MAJ. MATTHEW SEEGER,<br>c/o Cohen Milstein Sellers & Toll, PLLC, 1100 New<br>York Ave. NW, Suite 500, Washington, DC 20005;<br><br>MICHAEL SCHWARTZ,<br>c/o Cohen Milstein Sellers & Toll, PLLC, 1100 New<br>York Ave. NW, Suite 500, Washington, DC 20005;<br><br>CHERYL BORMANN,<br>c/o Cohen Milstein Sellers & Toll, PLLC, 1100 New<br>York Ave. NW, Suite 500, Washington, DC 20005;<br><br>and<br><br>EDWIN PERRY,<br>c/o Cohen Milstein Sellers & Toll, PLLC, 1100 New<br>York Ave. NW, Suite 500, Washington, DC 20005;<br><br>       Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE,<br>1400 Defense Pentagon, Washington, DC 20301<br><br>HON. SEAN J. STACKLEY, in his official capacity<br>as Acting Secretary of the United States Navy,<br>Office of the Secretary of the Navy, 1000 Navy<br>Pentagon, Room 4D652, Washington, DC 20350<br><br>and<br><br>HARVEY RISHIKOF, in his official capacities as<br>Director, Office of Military Commissions and<br>Convening Authority,<br>4800 Mark Center Drive, Suite 11F09-02, Alexandria,<br>VA 22350-2100;<br><br>      Defendants. | Case No. _____ |

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      Plaintiffs are attorneys employed by the United States Department of Defense ("DoD") to defend their client against the death penalty in military commissions proceedings at Camp Justice, Naval Station Guantánamo Bay, Cuba.  Under the Administrative Procedure Act ("APA"), they challenge the Navy's inadequate investigation of environmental hazards present at Camp Justice, in violation of DoD and Navy regulations and policy; the Navy's unreasonable delay in completing its investigation; the Navy's arbitrary and capricious determination that Camp Justice is safe and habitable; and Defendants' arbitrary and capricious determination that military commissions personnel must live and work in contaminated areas of Camp Justice before a proper investigation and appropriate remediation are completed, particularly when alternative housing is available in uncontaminated areas of the Naval Station.

2.      Plaintiffs and other members of the defense and prosecution teams and support staff travel regularly to Naval Station Guantánamo Bay for military commissions proceedings administered by the Office of Military Commissions ("OMC") through the Convening Authority (collectively, the "Convening Authority"), living and working in the area of the base designated as Camp Justice.  The Convening Authority, among other things, assigns military commissions personnel to particular housing and workspaces at or near Camp Justice.

3.      Camp Justice is located on the site of a former airfield, last in use in the 1970s. Camp Justice opened in 2008 and is comprised of permanent structures dating to the time period when the airfield was in use—repurposed for Camp Justice's needs—as well as temporary structures and tents.  Upon information and belief, Defendants conducted no meaningful environmental review or cleanup when they converted the airfield into the housing and workspaces at Camp Justice.

4.      In July 2015, the DoD Inspector General received a hotline complaint from a former military commissions attorney, who had worked at Camp Justice, asking DoD to

investigate whether conditions at Camp Justice were linked to seven cases of cancer suffered by military and civilian personnel who previously worked or served at Camp Justice.  These cases included that of Navy Lt. Cmdr. Bill Kuebler, a former Camp Justice attorney who died of cancer on July 19, 2015, at the age of 44.

5.      Since that time, the Navy—which has control over the infrastructure and grounds at Naval Station Guantánamo Bay, including Camp Justice—has conducted a deeply flawed investigation of the environmental hazards present at Camp Justice.  Although this investigation found and documented the presence of hazardous conditions and cancer-causing chemicals, ranging from formaldehyde to heavy metals and mold, the investigation is inadequate to determine how great a risk they pose to human health, much less to determine appropriate remedial measures.

6.      Based on its flawed and inadequate investigation, the Navy has repeatedly and inaccurately concluded that Camp Justice is safe and habitable for personnel to live and work there, despite evidence to the contrary and significant flaws and data gaps in its investigation. Defendants have failed to take reasonable steps to protect personnel from the known and unknown risks posed by environmental hazards at Camp Justice until the Navy completes a proper investigation and takes appropriate remedial measures.  Instead, Defendants have continued to require personnel to live and work in buildings at Camp Justice that are known to be contaminated, or where contamination levels have not been adequately investigated or fully understood.

7.      The Navy's inadequate investigation and flawed decisions, and Defendants' failure to protect Camp Justice personnel, place Plaintiffs and others in an untenable position. They are obligated—by the responsibilities of their jobs and the ethical duties of their profession—to continue living and working in facilities that pose documented and material

threats to their health.  Defendants have forced them to choose between protecting their health and defending their clients.

8.      Under the Administrative Procedure Act, the Navy's conclusions regarding the safety and habitability of Camp Justice, and Defendants' decision to require Plaintiffs and other personnel to live and work there, should be set aside as arbitrary and capricious.  This Court should order Defendant Stackley to conduct a thorough, scientifically-sound investigation of Camp Justice's environmental hazards that fully complies with all DoD and Navy regulations and policies.  And until Camp Justice can be deemed safe and habitable based on a proper investigation and appropriate remediation, Plaintiffs are entitled to an injunction that protects them from the known and unknown risks of living and working at Camp Justice.  Specifically, Plaintiffs seek an injunction that provides them with alternative living and working accommodations at Naval Station Guantánamo Bay outside of Camp Justice—accommodations that exist and are available—when military commissions proceedings and other professional obligations require them to be there.

## I.    PARTIES

9.      Plaintiff Major Matthew Seeger is an attorney and active duty officer in the United States Army JAG Corps.  He was detailed to represent Walid bin 'Atash, a detainee facing capital charges before a military commission at Naval Station Guantánamo Bay, in 2015. He is Mr. bin 'Atash's military counsel of record and is one of five counsel of record in Mr. bin 'Atash's case.

10.     Plaintiff Michael Schwartz is an attorney and civilian employee of the DoD.  He was detailed to represent Mr. bin 'Atash in 2011, while serving on active duty in the United States Air Force JAG Corps.  He separated honorably from the Air Force in 2016 as a Major and continued as a civilian attorney of record in Mr. bin 'Atash's case until he filed a motion to

withdraw shortly before this complaint was filed.  Plaintiff Schwartz continues to serve as a DoD civilian attorney for the Military Commissions Defense Organization.

11.     Plaintiff Cheryl Bormann is a civilian attorney in private practice in Chicago, Illinois.  She is experienced in the representation of capital defendants and is under contract with the DoD to represent Mr. bin 'Atash.  She was detailed to represent Mr. bin 'Atash in 2011 and is his lead counsel.

12.     Plaintiff Edwin Perry is an attorney and a civilian employee of the DoD.  He was detailed to represent Mr. bin 'Atash in 2015.  He is counsel of record in Mr. bin 'Atash's case.

13.     Defendant United States Department of Defense is the federal agency that, through the United States Navy, operates Naval Station Guantánamo Bay and controls the facilities and grounds at Camp Justice.

14.     Defendant Sean J. Stackley is Acting Secretary of the United States Navy.  He is sued in his official capacity.  The Navy is a Component of the Department of Defense and acts on the Department's behalf.

15.     Defendant Harvey Rishikof is the Convening Authority for military commissions and the Director of OMC.  OMC, which includes the Convening Authority, is a Component of the Department of Defense and acts on Department's behalf.  Mr. Rishikof is sued in his official capacity.

## II.     JURISDICTION AND VENUE

16.     This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq*. ("APA"), which waives Defendants' sovereign immunity.

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

18.     Venue lies in the District of the District of Columbia pursuant to 28 U.S.C. § 1391(e).

### III.     BACKGROUND

19.     Camp Justice was constructed in 2007 to serve as the site of military commissions convened to try alien unprivileged enemy belligerents accused of war crimes and other crimes triable by military commission, currently pursuant to the Military Commissions Act of 2009. Located on the site of the abandoned McCalla airfield at Naval Station Guantánamo Bay, Camp Justice is comprised primarily of prefabricated structures, trailers, and tents.  Camp Justice also uses existing buildings at the airfield, including a hangar and several administrative buildings. Although most of its structures were designed to be temporary and portable, Camp Justice has been consistently in use for nearly ten years.

20.     The Expeditionary Legal Complex ("ELC") is a temporary structure at Camp Justice, containing courtrooms and workspaces for the legal teams.  Hearings are conducted in the ELC, and attorneys and support staff work in offices within the ELC.

21.     The "Cuzcos" are temporary housing units—essentially, trailers—that are used as both office space and housing for personnel at Camp Justice.  Each Cuzco consists of two units, each housing one person, and one shared bathroom.  There are 100 Cuzco units at Camp Justice.

22.     Camp Justice also includes a "tent city," located on the former airstrip, which primarily houses members of the press and observer representatives from non-governmental organizations.

23.     Buildings AV-29 and AV-34 are administrative buildings at Camp Justice, currently used as office space for personnel.

24.     Hangar AV-32 is a former airplane hangar within Camp Justice, which is currently used as a workspace for members of the press, press conferences, and regular meetings

between defense counsel and family members of victims who died in the September 11, 2001 attacks.

25.     Plaintiffs represent a military commissions defendant originally charged in 2008. The process was suspended for a time, but resumed in 2012.  Hearings are regularly held at Camp Justice, requiring attorneys and support staff, including Plaintiffs, to travel to Camp Justice for a week or more at a time, several times a year.  For 2017, the presiding Military Judge has set seven sets of hearings requiring twelve weeks of on-site pretrial litigation proceedings. As the cases near trial, Plaintiffs and others will spend weeks at a time at Camp Justice, and the trial itself will likely last several months.

26.     Each time military commissions hearings are scheduled at Camp Justice, the legal teams and support personnel request travel arrangements from the Convening Authority and receive orders from the Convening Authority assigning them to specific housing.  Although the Convening Authority makes these housing assignments, the Navy controls the housing at the Naval Station and can reject the Convening Authority's requests for particular housing.  The Convening Authority permits civilian attorneys to stay in "hard housing" (*e.g.*, townhouses, hotel rooms) located at the Naval Station outside of Camp Justice, if such housing is available and they choose it instead of the Cuzcos.

27.     The Navy also does not always make hard housing available to civilian attorneys who request it.  On information and belief, the Naval Station assigns a lower priority to providing hard housing to military commissions personnel than to other individuals residing at the Naval Station, such as base contractors, visitors, and other temporary personnel.

28.     Since learning in July 2015 of the existence of toxins at Camp Justice, Plaintiffs have consistently requested that the Convening Authority assign hard housing to themselves and all members of their defense team.  As the basis for these requests, Plaintiffs have stated their

concern regarding the safety and habitability of the Cuzcos at Camp Justice. These requests have been denied.

29.     Plaintiffs' inability to secure hard housing for their support staff has forced them at times to instruct support staff not to accompany them to Guantánamo Bay for military commissions proceedings, in order to protect their health, notwithstanding the importance of their work to the defense team.

30.     In addition, the Convening Authority has assigned Plaintiffs and members of other legal teams at Camp Justice to the ELC and administrative buildings within Camp Justice to do their work, including preparing for and participating in hearings, meeting with clients, and conducting legal team meetings.

## IV.     EXISTING HEALTH IMPACTS FROM ENVIRONMENTAL CONTAMINATION AT CAMP JUSTICE

31.     Nine individuals who have worked in the military commissions at Camp Justice, many of them in their thirties and forties, have been diagnosed with cancer following their work at Camp Justice. Three have died since 2015.

32.     The environmental contamination at Camp Justice has had, and unless remediated or avoided, will continue to have, serious and negative impacts on Plaintiffs and other military commissions personnel, including:

- Increased risk of developing cancer or other serious diseases;

- Emotional distress, and distraction from discharging their professional duties, due to a legitimate fear of developing cancer or suffering other serious health consequences;

- Upper respiratory symptoms and infections;

- Headaches, including migraines;

8

- Itchy and burning skin and eyes; and

- Lack of support in performing their professional duties due to the absence of certain team members who did not travel to Guantánamo Bay to avoid staying in the Cuzcos.

## V. FLAWED AND INCOMPLETE INVESTIGATION OF ENVIRONMENTAL CONDITIONS AT CAMP JUSTICE

33. For years, personnel have raised concerns regarding conditions and environmental contamination in and around the buildings and temporary structures at Camp Justice.

34. The Navy, through the Navy and Marine Corps Public Health Center ("NMCPHC"), has conducted investigations of these conditions between 2011 and the present, finding evidence of unsafe levels of contamination and other unhealthful conditions at Camp Justice. Despite these findings and the inadequacy of its investigations, NMCPHC has used flawed analyses to support its position that Camp Justice is safe and habitable for personnel. This position is unsupported by, and fundamentally inconsistent with, the (insufficient) factual record upon which it is based.

35. Additionally, NMCPHC has conducted its investigation in a manner that is inconsistent and non-compliant with DoD and Navy regulations and policies.

### A. The July 2015 Inspector General Complaint

36. In July 2015, the DoD Inspector General received a hotline complaint from a former Camp Justice attorney, asking DoD to investigate whether conditions at Camp Justice were linked to seven cases of cancer suffered by military and civilian personnel who previously worked or served at Camp Justice. This complaint alleged that since 2004, military and civilian members working for OMC had been exposed to carcinogens in the areas surrounding the trailers, tents, offices, and courtrooms at Camp Justice.

37.     Shortly thereafter, on July 17, 2015, one of those individuals—Navy Lt. Cmdr. Bill Kuebler—died from cancer at age 44.  Lt. Cmdr. Kuebler, an attorney, had represented a detainee in legal proceedings at Camp Justice between 2008 and 2009.

38.     On July 23, 2015, the Commander Navy Region Southeast asked the NMCPHC to conduct a public health review of the buildings located on Camp Justice.

39.     On July 27, 2015, a Navy spokesperson told reporters that the Navy was aware of the issue and was "looking into this to identify whatever steps may be necessary to address these concerns."

40.     Also on July 27, 2015, the *Miami Herald* reported that it had identified nine individuals who worked at Camp Justice and suffered cancer diagnoses, including lymphoma, brain cancer, appendix cancer, and colon cancer.  Three had died in the 13 months preceding the Inspector General complaint.

**B.     The Navy's "Preliminary Investigation"**

41.     From August 4-8, 2015, the NMCPHC conducted a "preliminary investigation" that included an industrial hygiene and habitability survey of Camp Justice's buildings, tents, and trailers where people live and work.  It documented its findings in the "Navy and Marine Corps Public Health Center Public Health Report for Camp Justice, 21 August 2015."  This survey consisted of a review of available documents and a walk-through survey of these facilities.  The NMCPHC acknowledged that environmental records for Camp Justice were limited and did not include any environmental site assessment or environmental sampling.  It also recognized that there was limited historical information regarding the former operations on the site—which included hangar use, maintenance, flight line activities, fuel storage, and the use, storage, and disposal of solvents—and that this information was not sufficient to reveal the origins and sources of chemical contamination.

42.     The NMCPHC thus opined that "there was insufficient evidence available to address the potential environmental exposures to carcinogens that were alleged in the [Inspector General] complaint" and recommended environmental sampling to assess health risks and appropriately address the Inspector General complaint.  Nonetheless, the NMCPHC determined that the buildings, tents, and trailers surveyed were habitable for occupancy, simply stating that "the buildings of concern have been deemed habitable."  The Convening Authority continued to require Plaintiffs and other personnel to live and work at Camp Justice, and the Navy continued to permit it.

43.     The NMCPHC also reviewed military health records to assess the significance of the seven cases of cancer highlighted in the Inspector General complaint.  The NMCPHC concluded that the number and types of cancer cases found in its investigation did not meet the Center for Disease Control's definition of a "cancer cluster" and, therefore, did not warrant a formal cluster investigation.  The NMCPHC further concluded that it was "unlikely" that an environmental or occupational exposure from Camp Justice was associated with these cancer cases.  However, it noted that its conclusion was uncertain due to the lack of a complete environmental site assessment at Camp Justice.  The NMCPHC stated that this review was ongoing, but it has provided no update.

44.     On September 26-28, 2015, Resolution Consultants—a consulting firm retained by the Naval Facilities Engineering Command, Southeast in response to NMCPHC's August 2015 Public Health Review Report—completed an Indoor Air Quality Assessment.  This assessment included observing the condition of asbestos-containing material and lead-based paint, performing tests of indoor air quality in a sample of occupied buildings, and performing a limited inspection above drop ceilings, where readily accessible, in Buildings AV-34 and AV-29.

Resolution Consultants recorded the results of this assessment in an Indoor Air Quality
Assessment Report dated January 12, 2016.

45.     During this assessment, the consultants observed asbestos-containing floor tile in
poor condition with broken fragments in AV-32, paint chips assumed to contain lead on the
hangar floor, relative humidity measurements in AV-29 and AV-34 that exceeded OSHA
recommendations, evidence of moisture and water damage in AV-34, and visible suspected
microbial growth in AV-29.  The consultants also concluded, based on their observations of
damaged asbestos-containing floor tiles, that an operations and maintenance plan previously
recommended for management of asbestos-containing materials had not been implemented.

46.     The consultants recommended airborne asbestos sampling in AV-32 to determine
whether the asbestos was properly contained and managed.  To address other concerns, the
consultants also recommended remediation, including reducing high moisture and humidity
levels in AV-29 and AV-34 and cleaning areas with suspected microbial growth.  The Navy has
never suggested in any report that it has taken these recommended steps to address moisture and
humidity.

### C.     October 2015 Sampling and Investigation

47.     On September 25-29, 2015, the Commander Navy Region Southeast, NMCPHC,
and consultants from Resolution Consultants and Pioneer Technologies conducted a site visit to
develop an environmental investigation plan.  On October 11-14, 2015, they conducted an
environmental site assessment, including collecting water, soil, and indoor air samples.  The air
samples tested positive for mercury and formaldehyde, and the soil samples tested positive for
benzo(a)pyrene—all carcinogenic substances.

48.     NMCPHC then conducted a "preliminary screening risk assessment" using the
data collected,  to determine what actions were needed to protect human health.  NMCPHC

relied on U.S. Environmental Protection Agency ("EPA") health-based action levels, or "screening levels," to determine safe levels of the contaminants found in the air and soil samples for four types of workers at Camp Justice: a 9-month active-duty military worker who lives and/or works at Camp Justice, a 3-year active-duty military worker who works (but does not live) at Camp Justice, a 6-year active duty military worker who works (but does not live) at Camp Justice, and a 25-year commercial worker who works (but does not live) at Camp Justice. By adopting these standards, the Navy implicitly accepted the EPA's science-based conclusion that exposure to higher levels of the identified toxic substances poses unacceptable risk to human health, necessitating remedial or other protective action. The exposure experienced by a 9-month active-duty military worker is most comparable to the exposure experienced by Plaintiffs.

49.     NMCPHC detailed its findings in a report entitled "Navy and Marine Corps Public Health Center Public Health Preliminary Public Health Screening Risk Assessment Report – Camp Justice, 23 February 2016."

50.     NMCPHC determined that the mercury, formaldehyde, and benzo(a)pyrene found in the samples exceeded screening levels for a 9-month active duty military worker. NMCPHC also found levels of contamination that exceeded screening levels for the other exposure scenarios it identified. NMCPHC concluded that "at this time the potential cancer risk and non-cancer health effects associated with Camp Justice and any final conclusions (and resulting risk management actions) cannot be determined."

51.     NMCPHC also identified the need for further sampling, including:

(a)     Sampling the air in Building AV-29 for mercury.

(b)     Testing to determine the full area and degree of benzo(a)pyrene contamination in soil near Building AV-34.

13

In addition, the NMCPHC report called for adoption of a plan for managing all existing asbestos-containing materials at Camp Justice.

52.    Although multiple carcinogens exceeded screening levels, the NMCPHC identified data gaps, and it admitted its inability to assess the cancer and non-cancer health risk based on its limited investigation, Defendants took no steps to protect military commissions personnel from the risks associated with the carcinogens found at Camp Justice.

53.    Moreover, the Navy did not disclose the NMCPHC report to the personnel at Camp Justice who were living and working in the areas of the identified carcinogens until April 2016.  Similarly, Resolution Consultants, which conducted the testing in October 2015, did not issue its Environmental Investigation Report detailing its methodology and results until about six months later, on April 11, 2016.  NMCPHC eventually made this report public.

**D.    Temporary Order Forbidding Legal Teams to Stay in Cuzcos**

54.    Eventually, on April 1, 2016, the general overseeing the Camp Justice defense teams—Marine Brigadier Gen. John Baker—received a copy of the February 2016 NMCPHC report.  In response, he issued an order on April 8, 2016 prohibiting his teams from staying in the Cuzcos at Camp Justice "until [he was] provided a clearer explanation of the health risk associated with living at Camp Justice, and how any remedial measures will mitigate those risks."  This prohibition was in place for approximately one month, and the Navy and Convening Authority housed Camp Justice teams in uncontaminated housing near Camp Justice without any apparent logistical or operational problems.

55.    Approximately one month later, Brig. Gen. Baker lifted this order based upon representations made to him by the NMCPHC that the Cuzcos were safe for occupancy, following steps taken to lower formaldehyde levels in the air through improved ventilation.

However, as shown below, these representations were not supported—indeed, were contradicted—by the Navy's investigation.

### E.   April 2016 Sampling and Analysis

56.   In April 2016, NMCPHC conducted additional sampling and analysis for particular contaminants previously identified at Camp Justice, including:

- Background samples of soil (previously collected in October 2015) were analyzed for arsenic;

- Additional soil samples were collected and analyzed for benzo(a)pyrene in the areas surrounding Building AV-34; and

- Indoor air samples were collected from the same locations as before, plus three new locations, and tested for formaldehyde.

57.   Although NMCPHC again found that benzo(a)pyrene and formaldehyde exceeded screening levels, it again baselessly concluded that "conditions are safe for individuals to live and work in Camp Justice."

58.   To date, NMCPHC has not issued (or at least not made public) a report detailing these findings.  Rather, NMCPHC presented these findings in slide presentations, some of which the Navy made public later in 2016.

59.   This slide presentation also provided an update on NMCPHC's Camp Justice Epidemiology Study.  It stated that NMCPHC was able to confirm nine cases of cancer among current or former Camp Justice personnel, but it again concluded that these cases did not meet the Center for Disease Control ("CDC") definition of a cancer cluster.  It also indicated that it was reviewing the medical history of all military personnel assigned to Camp Justice.

60.   NMCPHC's slide presentation also identified several tasks it intended to complete, including:

- the Final Human Health Risk Assessment;

- the Epidemiological Evaluation; and

- the Final Public Health Review Report.

To Plaintiffs' knowledge, NMCPHC has not completed any of these tasks, nearly two years after the potential cancer cluster was reported to the DoD Inspector General.

### F.     Flawed Testing and Analysis of Carcinogenic and Other Dangerous Contaminants

61.     The NMCPHC's sampling and analysis have used scientifically unsound methods, applied inappropriate regulatory standards, and reached unsupported conclusions regarding the safety and habitability of Camp Justice.

62.     Although several contaminants have been found in samples taken from Camp Justice that exceed EPA screening levels—the regulatory standard that is applicable in this type of analysis, under Navy policy and regulations—NMCPHC has largely disregarded these findings.  Instead, it has inappropriately relied upon occupational health standards (which are inapplicable in this type of investigation, per Navy regulations) and background levels of contaminants in geographically remote locations (which is both scientifically unsound and contrary to Navy policy) to justify its conclusion that Camp Justice is safe and habitable and that no remediation or other protective measures are necessary to address the dangerous contaminants found.

63.     Furthermore, there are significant data gaps regarding the extent of these contaminants at Camp Justice, which prevent NMCPHC from completing a proper health risk assessment.

64.     NMCPHC's repeated conclusion that Camp Justice is safe and habitable for personnel to live and work there, and the Convening Authority's orders to Plaintiffs and other

personnel to live and work at Camp Justice, which the Navy has accommodated, are based on an

inadequate investigation conducted in violation of DoD and Navy regulations and policy, are

contradicted by NMCPHC's own findings, and thus are arbitrary and capricious and contrary to

law.

### 1.     Applicable Regulatory Standards

65.     DoD Directive No. 4715.1E states that DoD policy is "[t]o protect DoD personnel

from accidental death, injury, or occupational illness."  This Directive requires the heads of the

DoD components to implement an Environment, Safety, and Occupational Health management

system.

66.     Pursuant to DoD Directive 4715.1E, the DoD promulgated DoD Instruction No.

6055.01 (DoD Safety and Occupational Health (SOH) Program) and DoD Instruction No.

6055.05 (Occupational and Environmental Health (OEH)).  These Instructions require the heads

of the DoD Components to establish, maintain, and fund occupational and environmental health

and safety programs. DoD Instruction No. 6055.05 specifically directs them to "[a]ccept no

unnecessary risks."

67.     Pursuant to these DoD Instructions, the Chief of Naval Operations issued OPNAV

Instruction ("OPNAVINST") No. 5100.23G (Navy Safety and Occupational Health Program

Manual).

68.     OPNAVINST 5100.23G states that Navy policy is to "provide a safe and

healthful workplace for all personnel" and that the Navy achieves this condition through a

program that, among other things, achieves "[p]rompt abatement of identified hazards."

69.     OPNAVINST  5100.23G also authorizes commands having significant safety and

occupational health responsibilities to provide  appropriate supplemental guidance.

70.     Pursuant to OPNAVINST 5100.23 Series (including OPNAVINST 5100.23G), the Navy has issued an Industrial Hygiene Field Operations Manual, which "provides the Navy's standard practice of the technical aspects of Industrial Hygiene."

71.     The Industrial Hygiene Field Operations Manual distinguishes environmental contamination, such as that found at Camp Justice, from occupational hazards, which are evaluated differently, through an industrial hygiene survey.  The Manual specifies that "[e]nvironmental exposure assessments and sampling are based on environmental (generally Environmental Protection Agency (EPA)) standards, screening levels and risk assessment processes and not on occupational health standards, OELs and exposure assessment strategies."

72.     The Navy has also issued a Policy on the Use of Background Chemical Levels. Although this Policy specifically applies to the Navy's Environmental Restoration Program, it contains environmental standards and procedures, which apply to this type of investigation pursuant to the Industrial Hygiene Field Operations Manual.  *See* para. 71 above.  By acknowledging that "[i]n some cases, there may be risk from chemical levels below background levels," the Policy on Background Chemical Levels makes clear that a comparison to background chemical levels is not proof that a chemical level is safe.  When background chemical levels are relevant—to determine how much the Navy's activities added to the background level—this Policy explains that the background level should be determined for the base at which the clean-up is occurring, and not for an off-base location.

73.     Thus, DoD and Navy rules, policies, and guidance require Defendants to provide military commissions personnel working and living at the Naval Station with safe accommodations, to protect them from occupational illness, to promptly abate identified hazards, and to follow environmental (generally EPA) standards, screening levels, and risk assessment

processes when performing environmental exposure assessments.  The Navy's investigation and risk assessment at Camp Justice failed to comply with these rules, policies, and guidance.

### 2.   Formaldehyde

74.     EPA has classified formaldehyde as a "probable human carcinogen."  The CDC has concluded that formaldehyde concentrations found in homes can pose a health risk.  Other acute health effects from exposure to formaldehyde include damage to genetic material, damage to a developing fetus, and toxicity.

75.     Formaldehyde is often present in the air inside temporary structures, because the structures or their components, furniture, or fixtures contain formaldehyde and release it into the air over time.  Many of the structures in which Plaintiffs and other personnel at Camp Justice live and work are temporary structures.

76.     During the October 2015 testing, formaldehyde was found in indoor air at levels that exceeded the screening level for a 9-month military worker in 20 of 29 samples, which were taken in workspaces—in Buildings AV-29 and AV-32 and the Expeditionary Legal Complex— and in a small subset of Cuzcos.  In some sampling locations, formaldehyde levels significantly exceeded this screening level.  For example, one-third of the samples contained formaldehyde at levels between three and ten times the screening level.

77.     Twelve of the samples obtained during the October 2015 testing also exceeded the National Institute for Occupational Safety and Health ("NIOSH") recommended exposure limit for formaldehyde.[1]

---

[1] NIOSH is a part of the U.S. Centers for Disease Control and Prevention, in the U.S. Department of Health and Human Services.  It was established by the Occupational Safety and Health Act of 1970 as a research agency for conducting research and making recommendations for the prevention of work-related injury and illness.

78.     Only 16 of the 100 Cuzco units at Camp Justice were tested for formaldehyde. Formaldehyde levels in the remaining 84 Cuzco units at Camp Justice remain unknown.

79.     Following the October 2015 testing, the Navy took certain steps to reduce formaldehyde levels in the indoor air in the Cuzcos:  wiring bathroom exhaust fans to run continuously, cleaning the coils of air conditioner units, re-caulking air gaps, and instructing occupants to keep bathroom doors closed during and immediately after showering and to leave air conditioners running at all times at 72 degrees or lower.  None of the Cuzcos was replaced or taken out of service.

80.     After implementing these measures, NMCPHC again tested the indoor air in April 2016, in the same 16 Cuzco units that were tested in October 2015.  It found, overall, that formaldehyde levels had dropped.  However, these levels still remained above the screening level for a 9-month military worker in five Cuzco units—nearly one-third of the units tested. These results clearly demonstrate that the Navy's efforts to reduce formaldehyde levels were insufficient, as dangerous levels remained.

81.     Again, NMCPHC did not test the other 84 Cuzco units in use at Camp Justice.

82.     At no time has the Navy taken any steps to address formaldehyde levels in the workspaces where elevated levels were found.

83.     In April 2016, NMCPHC also re-tested the indoor air in the workspaces that had been tested in October 2015.  It also tested the indoor air in three new sampling locations (two located in the ELC and one in Building AV-29).  It found that, in some locations, formaldehyde concentrations in the indoor air had increased.  In five of the 15 workspace sampling locations, formaldehyde concentrations exceeded the screening level for a 9-month military worker.

84.     Plaintiffs and others have been directly exposed to formaldehyde when living and working in structures where formaldehyde has been found in the indoor air.  The Navy has no

basis in the factual record to conclude that the buildings in which the air contains formaldehyde above EPA screening levels are safe for human occupation. Nonetheless, following the April 2016 testing, NMCPHC concluded and represented to Camp Justice personnel that the formaldehyde issues had been resolved. It stated that "[c]oncentrations in these [sampled] buildings are safe for occupancy."

85.     NMCPHC asserted that the levels identified "were within typical range of formaldehyde concentrations reported by the CDC for homes in the United States." NMCPHC characterized this as a "typical background range" for formaldehyde. This analysis is flawed and contrary to Navy regulations and policies for several reasons:

(a)     As the Navy Policy on the Use of Background Chemicals acknowledges, background levels of a contaminant have no relevance to whether a particular level of contamination is safe; indeed, background levels themselves can be unsafe. Background levels are not relevant here as they do not determine impact, or lack of impact, on human health. They are properly used only to determine the amount of a contaminant released in a spill or other release.

(b)     Even if background levels were to be used, which would be inappropriate, the Navy's Policy on the Use of Background Chemical Levels provides that background levels of a contaminant are to be determined at the naval base where a clean-up is being conducted. Here, the background level of formaldehyde typical in the United States is irrelevant, and the NMCPHC's reliance on that data has no scientific basis.

(c)     Even if it were relevant, the "typical background range" on which NMCPHC relied is inaccurate, even according to NMCPHC's own information. NMCPHC represented in its public reports regarding the results of its testing at Camp Justice

that, according to the CDC, typical background levels of formaldehyde in indoor air range from 10 – 50 ppb.  However, in NMCPHC's more detailed Fact Sheet on this topic, it stated that background levels of formaldehyde in outdoor air range from 0.6 to 6 ppb in rural and suburban areas and 0 to 20 ppb in urban areas. Both of these ranges are significantly lower than the 10-50 ppb range that NMCPHC describes as the "CDC Background in U.S. Air" and relies upon in its analysis.

(d)     NMCPHC's conclusion that these structures are "safe for occupancy" is unfounded, given that many of the tested structures exceeded the screening level for a 9-month military worker, and some also exceeded the NIOSH recommended exposure limit for formaldehyde.

(e)     NMCPHC's conclusion that all Cuzcos and workspaces are "safe for occupancy" is additionally unfounded, because only a small sub-set of these structures has been tested for formaldehyde.

86.     NMCPHC also supported its "safe for occupancy" conclusion by asserting in its February 23, 2016, report that "[a]ll formaldehyde concentrations were less than the OSHA [Permissible Exposure Limit]."  However, OSHA standards are occupational health and safety standards, which are intended to protect workers exposed to chemicals in the course of an eight-hour work shift.  These standards should not be applied to an investigation of chemicals present in living spaces.  OSHA standards, moreover, fail to consider the cumulative effect on Plaintiffs and others of being exposed to formaldehyde at Camp Justice both in buildings where they work and in structures where they live.  The formaldehyde levels found at Camp Justice cannot reasonably be considered safe, if levels in living spaces exceed EPA screening levels and if levels in work spaces exceed the NIOSH recommended exposure limit.

### 3.    Benzo(a)pyrene

87.    Benzo(a)pyrene is a known carcinogen.  Exposure to benzo(a)pyrene—through direct contact or through vapor intrusion into occupied structures—is linked to cancer.

88.    During the October 2015 testing, benzo(a)pyrene was found in two soil samples near building AV-34.  In one sample, the level of benzo(a)pyrene exceeded the screening level for a 9-month military worker.  Nonetheless, NMCPHC concluded that these findings were "similar to concentrations typically found in urban areas in the U.S."  It recommended that additional samples be taken to ensure that they, too, were "consistent with background."

89.    An additional nine samples were collected in April 2016 in the areas surrounding the two sample locations where benzo(a)pyrene had been identified.  Of these nine samples, three exceeded the screening level for a 9-month military worker.

90.    Furthermore, the levels of benzo(a)pyrene found in the April 2016 samples were, in several cases, even higher than the levels identified in October 2015, demonstrating that NMCPHC had not yet ascertained the full scope and extent of the benzo(a)pyrene contamination near Building AV-34.  Without knowing the scope and extent of the release, the Navy cannot accurately determine the exposure or risk levels and cannot know whether Plaintiffs (and others) are being exposed to dangerous levels of benzo(a)pyrene.  Moreover, without this information, the Navy cannot take appropriate remedial steps as it does not know the entire area where benzo(a)pyrene is located or at what concentrations.  Thus, the Navy's investigation of benzo(a)pyrene is incomplete and inadequate.

91.    Despite these findings, NMCPHC has concluded that no further testing for benzo(a)pyrene is needed.  While stating that the level of total risk was still to be determined, it nonetheless concluded that "conditions are safe for individuals to live and work in Camp Justice per EPA Guidance."  The stated basis for this conclusion was that "[c]oncentrations [of

benzo(a)pyrene] detected at Camp Justice are similar to concentrations typically found in urban areas in the U.S."

92.     This conclusion is flawed and contrary to Navy regulations and policy for several reasons:

(a)     As the Navy Policy on the Use of Background Chemicals acknowledges, background levels of a contaminant have no relevance to whether a particular level of contamination is safe. Background levels are properly used only to determine the amount of a contaminant released in a spill or other release.

(b)     Even if background levels were to be used, which would be inappropriate, the Navy's Policy on the Use of Background Chemical Levels provides that background levels of a contaminant are to be determined at the naval base where a clean-up is being conducted.  Here, the background levels of benzo(a)pyrene typical in U.S. urban areas have no relevance, and the Navy's reliance on this data has no scientific basis.

(c)     Even if this comparison were relevant, NMCPHC's assertion that the levels of benzo(a)pyrene it found in the soil near Building AV-34 were "consistent with typical U.S. Urban Background Concentrations" is false and unsupported by the record.  Of the 11 samples taken, four were found to have a level of benzo(a)pyrene that exceeds the top of the range cited by NMCPHC for "typical U.S. Urban Background Concentrations."  Furthermore, the source that NMCPHC appears to have relied upon for this "typical" range of background concentrations—a December 2008 study performed by the Electric Power Research Institute—did not conclude that "typical" background levels ranged from 0.002 to 7.9 mg/kg, as NMCPHC represented.  Rather, these figures

represented the total range of findings from *every* sample in the study, which generated a very broad range of data.  The median (0.13 mg/kg) and mean (0.48 mg/kg) levels found in this study are a much better reflection of "typical" background levels in U.S. urban areas.  Nearly every sample taken by NMCPHC near Building AV-34 exceeded these levels.

(d)     NMCPHC's conclusion that no further testing is needed to evaluate the benzo(a)pyrene contamination near Building AV-34 is contrary to EPA guidance and, therefore, also contrary to Navy regulations and policy that require NMCPHC to use environmental (generally EPA) standards and procedures when assessing risks to personnel associated with environmental exposures.  EPA guidance requires determination of the full extent of contamination by sampling outward in all directions until negative results are obtained.  Otherwise, it cannot be known whether the highest levels of contamination or the source of the contamination have been detected or where the boundaries of the contamination lie.  NMCPHC's conclusion also contravenes the Navy's Policy for Conducting Human Health Risk Assessments for Environmental Restoration Projects, and is inconsistent with sound science and recognized best practices.

(e)     NMCPHC's conclusion that "conditions are safe for individuals to live and work in Camp Justice"—despite finding benzo(a)pyrene at levels exceeding the screening level for a 9-month military worker in four of 11 total samples taken— is unfounded and unsupported by the available facts.  That these samples exceed the applicable screening level precludes the conclusion on the existing factual record that Camp Justice is safe.  Furthermore, NMCPHC's failure to determine the full scope and extent of the contamination means that the true scope and

extent of this risk remains unknown.  There is no basis in this factual record to

support NMCPHC's conclusion that "conditions are safe."

**G.     Other Hazardous Conditions Documented in NMCPHC's Reports**

93.     In addition to the contamination discussed in Section F above, NMCPHC's

investigation also found and documented other conditions at Camp Justice that are hazardous to

the health of the personnel who live and work there:  lead, mold, and asbestos.

94.     These conditions pose a risk to the health of personnel living and working at

Camp Justice.  During its investigation, NMCPHC observed these conditions and documented

them in its reports.  However, NMCPHC has not adequately investigated or remediated these

conditions.  Thus, NMCPHC's conclusion that Camp Justice is safe and habitable, and the

Convening Authority's orders for Plaintiffs and other personnel to live and work at Camp

Justice, which the Navy has accommodated, are unsupported —and in fact, contradicted—by the

record.

**1.     Lead**

95.     Exposure to lead—through inhalation, ingestion, or absorption through the skin—

is linked to serious negative health effects.  Prolonged exposure to lead can cause abdominal

pain, constipation, depression, irritability, and nausea.  Personnel with prolonged exposure may

also be at increased risk for high blood pressure, heart disease, kidney disease, and reduced

fertility.  Exposure of pregnant women to lead can harm their unborn children, as lead can cross

the placental barrier.  Even low levels of lead exposure can damage a developing fetus's nervous

system, affect behavior and intelligence, and cause miscarriage and stillbirths.  Lead dust can

also be carried home on parents' clothing and cause lead poisoning in children at home.

96.     NMCPHC's investigation of conditions at Camp Justice identified chipping paint on building AV-32—a workspace for members of the press and, occasionally, legal personnel—which is assumed to contain lead, based on its age.

97.     A number of the buildings at Camp Justice where personnel work (including AV-29, AV-32, and AV-34) were constructed in 1941 and 1942 and have been in ongoing use until the present time.  Lead-based paint was used widely until the late 1970s.  Over time, paint chips can flake off of buildings due to weathering, and very high lead concentrations can build up in the surrounding soils.

98.     Despite its findings, NMCPHC has not sampled the soil around AV-32 or investigated other buildings constructed at the same time.  Therefore, NMCPHC cannot determine the risk to personnel traveling near these buildings and whether remediation is appropriate.

99.     The Navy has taken no steps to address the paint on, or the paint chips surrounding, AV-32.

### 2.     Mold Growth

100.     Exposure to indoor mold is linked to upper respiratory symptoms, including nasal congestion, coughing, and wheezing, as well as eye and skin irritation.  Such exposure can also prompt asthma symptoms in people with asthma or more serious lung infections in people with chronic conditions or sensitivities.

101.     NMCPHC's investigation identified several buildings with mold growth.  It also found high relative humidity levels in these buildings, which, in many cases, exceed OSHA recommendations and which foster mold growth.

102.    Despite these findings, NMCPHC has not determined whether any of the mold types present in these buildings are toxic, nor has it looked behind walls and in false ceilings and HVAC ducts to determine the full extent of the mold growth.

103.    In January 2016, Resolution Consultants recommended that the Navy take specified steps to eliminate the mold and high humidity.  However, to Plaintiffs' knowledge, none of these steps has been taken.

104.    Until the toxicity and extent of the mold in these buildings is determined, and appropriate measures are taken to remediate the mold and high humidity levels, the buildings with mold growth cannot be presumed safe for human occupancy.

### 3.    Asbestos

105.    Asbestos is a known carcinogen.  Exposure to asbestos can cause lung cancer and mesothelioma, as well as asbestosis (an inflammatory condition affecting the lungs) and other non-malignant lung and pleural disorders.

106.    Buildings at Camp Justice are known to have asbestos-containing materials ("ACM").

107.    In the indoor air quality assessment performed in September 2015, Resolution Consultants identified asbestos-containing floor tile on the second floor west mezzanine of Building AV-32 in poor condition, with many broken tiles and tile chips, which can cause the asbestos to become friable and able to be respirated.  These tiles had previously been identified as non-friable ACM in a 1991 report, meaning that they were found to be unlikely to emit breathable asbestos fibers into the air.  However, once ACM has degraded to the point that it can be crumbled with hand pressure, it is considered "friable" and poses a greater risk.  Broken tiles and tile chips—as observed by Resolution Consultants in its September 2015 assessment—are evidence of friable materials.

108.    Because of the damage to the asbestos-containing floor tiles, the consultants recommended that airborne asbestos sampling be performed to determine if the asbestos was properly contained.

109.    The consultants also noted that the condition of these floor tiles indicated that the Operations and Maintenance plan previously recommended by another consultant, to monitor and maintain ACM to ensure it remains in a non-friable state, had not been fully implemented. Resolution Consultants recommended that the plan be reviewed, but there is no indication that this has occurred.

110.    Resolution Consultants memorialized its findings in its January 12, 2016, Indoor Air Quality Assessment Report.

111.    Despite these findings, NMCPHC concluded in its February 23, 2016 Preliminary Public Health Screening Risk Assessment Report that the ACM in buildings AV-29, AV-32, and AV-34 were all "non-friable" and, therefore, "generally non-hazardous if [ ] not disturbed."  This report did not acknowledge the observations and findings in the Resolution Consultants report, nor did it address the risks associated with the apparently friable ACM that Resolution Consultants had identified.

112.    NMCPHC acknowledged in its February 2016 report that asbestos Operations and Maintenance plans are "critical for tracking the status of existing locations of ACM, and for having a work order system in place to prevent contract or maintenance activities from disturbing ACM and subsequently exposing workers and building employees to airborne asbestos." However, NMCPHC did not address the observation in the Resolution Consultants Indoor Air Quality Assessment that the Operations and Maintenance plan did not appear to have been fully implemented.  Rather, NMCPHC simply indicated that it had requested the status of such a plan from OMC and Naval Station Guantánamo Bay, but had not received it to date.

113.     Resolution Consultants subsequently collected air samples to determine if airborne asbestos particles were present.  It noted that "[l]ow-level detections" were found in some samples that "did not exceed an OSHA standard."  The Navy has not released the results underlying this finding.

**H.     Investigation Progress from April 2016 to Present**

114.     Since April 2016, the Navy has done little to complete the public health review requested in July 2015.

115.     At a town hall meeting held on July 15, 2016, NMCPHC personnel stated that a final report would be issued in fall 2016.  This estimate was later extended to the end of 2016.  No report has issued to date.

116.     Counsel to Plaintiffs sent a letter to the Honorable Paul L. Oostburg Sanz as the Convening Authority on December 21, 2016, detailing Plaintiffs' concerns with the findings and methodology of the public health review and attaching a report addressing and analyzing these issues prepared by an environmental engineer, Dr. Mark A. Killen, Ph.D., P.E.  No substantive response has been received.

117.     Counsel to Plaintiffs forwarded a copy of this letter to the then-interim Convening Authority, Robert O. Work, on March 3, 2017.  No response has been received.

118.     On February 7, 2017, Plaintiffs received notice that the Naval Station Guantánamo Bay Industrial Hygienist had approached the Chief Defense Counsel to propose an undefined "walk-through survey" apparently as a follow-up to the NMCPHC's investigation.  Plaintiffs offered to send a representative to Guantanamo Bay "on the next flight" to escort the industrial hygienist into confidential defense workspaces.  To date, Plaintiffs have not received a response to this offer and are not aware of any further analysis of the habitability of work or living spaces.

## VI.     ARBITRARY AND CAPRICIOUS DECISIONS TO ASSIGN AND PERMIT PERSONNEL TO LIVE AND WORK AT CAMP JUSTICE

119.     In 2007, when Camp Justice was constructed, Defendants made the decision to hold military commissions proceedings there and to assign personnel associated with those proceedings to living and working spaces there.

120.     At each stage of the NMCPHC's investigation of toxins at Camp Justice, NMCPHC has concluded that Camp Justice is safe and habitable.  Defendants have relied unreasonably on that unsupported conclusion in continuing to require military commissions personnel to live and work at Camp Justice.

121.     The Navy's decision that Camp Justice is safe and habitable and Defendants' decision to require Plaintiffs and other military commissions personnel to live and work in contaminated areas at Camp Justice are arbitrary and capricious.  The evidence on which these decisions are based provides wholly inadequate support.  As described in Section V above, (a) the evidence has very limited probative value because it comes from a highly flawed investigation and risk assessment, and (b) to the extent the evidence has probative value, it undercuts rather than supports these decisions.

122.      Further, the Navy acted contrary to its own regulations, policies, and guidance in deciding that the contaminated areas of Camp Justice are safe and habitable by considering factors that it was expressly required not to consider, such as "background levels" of contamination from distant locations, as described in Section V(F) above.

123.     Defendants failed to consider factors they were required by regulations, policies and guidance to consider in deciding whether to assign and permit military commissions personnel to live and work in contaminated areas at Camp Justice.  In making that decision, Defendants were required to balance the risks posed by the contamination, the protections

required to minimize or eliminate the risks, and their operational needs.  Defendants did no such

balancing.  If they had, they would not have required military commissions personnel to live and

work in contaminated areas.

(a)     The Navy and the Convening Authority are "DoD Components," for purposes of
DoD Directive 4715.1E and DoD Instruction 6055.05.

(b)     Pursuant to DoD Instruction 6055.05, the Navy and the Convening Authority
were required to conduct occupational and environmental health risk assessments
at Camp Justice.

(c)     DoD Instruction 6055.05 required the Navy and the Convening Authority to
investigate potential risks and the extent of personnel exposure to those risks,
including through sampling.  The Navy conducted a flawed investigation, as
alleged above.  The Convening Authority conducted no investigation and acted
unreasonably in relying on the Navy's investigation given its manifest flaws.  The
Convening Authority's reliance on the Navy's investigation was even more
unreasonable after it received Plaintiffs' letter and their expert's report detailing
the investigation's flaws.

(d)     Once the data were collected and the exposure assessed, the Navy and the
Convening Authority were required to "develop controls and make risk
decisions."

(e)     DoD Instruction 6055.05 required the Navy and the Convening Authority to
develop recommendations for controlling exposures to health hazards, including
(in priority order) engineering controls, administrative controls, and personal
protective equipment.  Neither the Navy nor the Convening Authority has
developed recommendations for controlling exposures for most of the

documented health hazards at Camp Justice, including exposures to benzo(a)pyrene, chipping lead paint, potentially friable asbestos-containing material, and mold growth.  NMCPHC's recommended controls for formaldehyde have been unsuccessful in reducing levels below EPA screening levels.  Although NMCPHC and its consultants have recommended some measures to ascertain or manage the health risks from potentially friable asbestos-containing material and from mold and high humidity, there is no indication that the Navy implemented any of these recommendations.  Thus, in disregard of DoD instructions, the Navy and the Convening Authority have not developed, or have ignored, options for controlling exposures to known hazardous substances.

(f)    DoD Instruction 6055.05 also required the Navy and the Convening Authority to "determine which risks are acceptable and unacceptable by balancing operational benefits against the potential for adverse health effects (i.e., severity and likelihood of occurrence)."

(1)    The Navy has not conducted this balancing analysis when permitting Plaintiffs and other military commissions personnel to live and work in contaminated areas.  None of the Navy reports identifies or discusses any operational benefits from exposing military commissions personnel to toxic substances, nor do any such reports balance operational benefits against the potential for adverse health effects.  The Naval Station derives no operational benefits from military commissions personnel living and working in contaminated areas rather than permitting them to live and work in non-contaminated areas until a proper investigation and appropriate remediation are completed.  Certain military commissions personnel have been provided routinely with hard housing

outside of Camp Justice, without disrupting any Naval Station operations.  Any
minor operational benefits there may be to assigning military commissions
personnel to contaminated living and working spaces at Camp Justice, as opposed
to another location, are significantly outweighed by the potential for serious
adverse health effects from exposure to the toxins and other unhealthy conditions
present at Camp Justice.

(2)     The Convening Authority has not conducted this balancing analysis when
assigning Plaintiffs and other military commissions personnel to live and work in
contaminated areas.  The military commissions proceedings at Camp Justice
derive no operational benefits from the Convening Authority assigning military
commissions personnel to live and work in contaminated areas rather than non-
contaminated areas.  Certain military commissions personnel routinely have been
provided with hard housing outside of Camp Justice, without disrupting the
military commissions proceedings.  Furthermore, the military commissions
proceedings, and the legal and administrative work related to them, do not need to
be conducted at Camp Justice at all.  These are legal proceedings, not military
operations.  They could be held elsewhere at Naval Station Guantánamo Bay or at
another DoD property altogether.  Any minor operational benefits there may be to
assigning military commissions personnel to contaminated living and working
spaces at Camp Justice, as opposed to another location, are significantly
outweighed by the potential for serious adverse health effects from exposure to
the toxins and other unhealthy conditions present at Camp Justice.

(g)     DoD Instruction 6055.05 directs DoD's occupational and environmental health
personnel to "[a]ccept no unnecessary risks."  Defendants' decision to assign and

permit personnel to live and work in contaminated areas at Camp Justice—in the

face of known, documented toxins and unhealthy conditions, and when there are

ready alternatives elsewhere on the base—is an unnecessary risk.

### VII.    UNREASONABLE DELAY IN COMPLETION OF INVESTIGATION

124.    The Navy and the Convening Authority have an obligation to complete a

thorough occupational and environmental health risk assessment at Camp Justice under DoD

Instruction 6055.05.

125.    DoD was notified in July 2015 through the Inspector General complaint of the

possible presence of a cancer cluster among current and former Camp Justice personnel.

126.    NMCPHC began to investigate in August 2015.  NMCPHC did additional

investigation and sampling in October 2015 and April 2016.  NMCPHC representatives initially

promised another report[2] by fall 2016, then revised their estimate to the end of 2016.  To date,

the NMCPHC has issued no further report.  Other than limited efforts to reduce formaldehyde

levels in the Cuzcos, the Navy has undertaken no remediation.  Nor has any Defendant taken any

other step to protect Camp Justice personnel from the known, documented hazards present at

Camp Justice.

127.    The length of time it has taken for NMCPHC to complete its investigation and

risk assessment process—nearly two years and counting—is unreasonable.  This is particularly

so given the severity of the health risks and DoD's affirmative "policy to . . . [p]rotect DoD

---

[2] Although NMCPHC claims that it will issue another report, it has provided unqualified, unequivocal statements throughout the risk assessment process that Camp Justice is safe and habitable, and throughout the process and continuing to date, the Convening Authority has assigned, and the Navy has permitted, Plaintiffs and others to live and work in contaminated areas of Camp Justice.

personnel from accidental death, injury, and illness caused by hazardous occupational or environmental exposures."

128.    The Convening Authority has done no investigation and risk assessment, much less a timely one.

## VIII.    FIRST CAUSE OF ACTION

### Violation of APA - Arbitrary and Capricious Decision

129.    Paragraphs 1 through 128 of this Complaint are incorporated as if fully set forth herein.

130.    5 U.S.C. § 706(2) grants courts the power to hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, or that are made without observance of procedure required by law.

131.    The Navy's decision that Camp Justice is safe and habitable, and Defendants' decision that Plaintiffs and other personnel must live and work in contaminated areas at Camp Justice are based on an inadequate investigation and are unsupported and contradicted by the available facts, and thus are incorrect, arbitrary, capricious, an abuse of discretion, and contrary to law.  *See* 5 U.S.C. § 706(2)(A).

132.    As a result of these decisions, Plaintiffs and other personnel at Camp Justice have been exposed to dangerous and harmful conditions, including carcinogenic materials, while working and living within Camp Justice.

## IX.    SECOND CAUSE OF ACTION

### Violation of APA - Unreasonable Delay

133.    Paragraphs 1 through 132 of this Complaint are incorporated as if fully set forth herein.

134.    5 U.S.C. § 706(1) grants courts the power to compel an agency to act when its delay or inaction is deemed unreasonable, providing, "[t]he reviewing court shall – (1) compel agency action unlawfully withheld or unreasonably delayed . . . ."

135.    Defendants have unreasonably delayed completing the risk assessment and implementing controls to address environmental contamination and other unhealthy conditions at Camp Justice.  Consequently, Defendants have failed to take steps timely to protect personnel from these dangerous and harmful conditions, including exposure to carcinogenic materials, while they are living and working at Camp Justice.

136.    The delay in completing the risk assessment and implementing controls at Camp Justice is unreasonable in light of the requirements imposed by military regulations and policies, the severe risk to human health and welfare, and the ready availability—with no impact on Naval Station or military commissions operations—of measures to protect Plaintiffs and other military commissions personnel from these risks.

137.    As a result of this delay, Plaintiffs and other personnel at Camp Justice have continued to be exposed to dangerous and harmful conditions, including carcinogenic materials, while living and working at Camp Justice.

## X.    THIRD CAUSE OF ACTION

### Mandamus

138.    Paragraphs 1 through 137 of this Complaint are incorporated as if fully set forth herein.

139.    Pursuant to 28 U.S.C. § 1651, this Court should issue a writ of mandamus, requiring Defendants to complete the investigation and risk assessment at Camp Justice, and to implement appropriate remediation or other protective measures, in accordance with DoD and Navy regulations and guidance.

## XI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1)      Declare that the challenged decisions, actions and delay by Defendants are arbitrary, capricious, and unlawful, and set them aside;

2)      Order Defendants to conduct a thorough and timely investigation and risk assessment in connection with the contaminants found at Camp Justice in compliance with all DoD and Navy regulations and policies;

3)      Order Defendants to timely implement appropriate remediation or other controls, in compliance with all DoD and Navy regulations and policies, to address the risks identified in their investigation and risk assessment;

4)      Enjoin Defendants from assigning or permitting Plaintiffs to live or work at Camp Justice until Defendants conclude, based on a proper investigation and risk assessment and appropriate remediation, that Camp Justice is safe and habitable;

5)      Reserve jurisdiction over this case to monitor and enforce compliance with the Court's injunctive relief;

6)      Award Plaintiffs their attorneys' fees and costs; and

7)      Grant Plaintiffs such other and further relief as the Court may deem proper.

April 11, 2017                              Respectfully submitted,


                                           /s/  Daniel A. Small
                                           Daniel A. Small (#465094)
                                           Johanna M. Hickman (#981770)
                                           Cohen Milstein Sellers & Toll PLLC
                                           1100 New York Ave. NW  ● Fifth Floor
                                           Washington, DC  20005
                                           Telephone:  (202) 408-4600
                                           dsmall@cohenmilstein.com
                                           jhickman@cohenmilstein.com


                                           /s/  Michael C. Davis
                                           Michael C. Davis (#485311)
                                           Margaret K. Kuhn (#1013495)
                                           Venable LLP
                                           600 Massachusetts Ave. NW
                                           Washington, DC  20001
                                           Telephone:  (202) 344-4000
                                           MCDavis@Venable.com
                                           MKFalwal@Venable.com


                                           *Attorneys for Plaintiffs*