**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MAJ. MATTHEW SEEGER, *et al*. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-639 |
| | ) | |
| UNITED STATES DEPARTMENT OF DEFENSE, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

I.  **PRELIMINARY STATEMENT** ....................................................................................1

II.  **STATEMENT OF FACTS AND PROCEDURAL POSTURE** ...................................3

III.  **ARGUMENT** ...........................................................................................................9

    A.  Plaintiffs Have Demonstrated A Likelihood Of Success On The Merits because Defendants clearly violated the APA ..............................................................................11

    B.  Irreparable Injury Will Occur If Preliminary Equitable Relief Is Not Granted ...............14

    C.  Granting the Injunction Would Not Substantially Injure Other Interested Parties and the Public Interest Would Be Furthered by the Injunction .....................................................20

IV.  **CONCLUSION**..........................................................................................................**21**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barth v. Firestone Tire Rubber Co.*,
  673 F. Supp. 1466 (N.D. Cal. 1987) ....................................................................15

*Bond v. United States*,
  47 Fed. Cl. 641 (2000) ..........................................................................................11

*Citizens for Responsibility & Ethics in Washington v. Cheney*,
  577 F. Supp. 2d 328 (D.D.C. 2008) .....................................................................11

*City of McHenry v. Suvada*,
  920 N.E. 2d 1173 (Ill. App. Ct. 2009) .................................................................16

*Doe v. Rumsfeld*,
  341 F. Supp. 2d 1 (D.D.C. 2004) ..........................................................................17

*EDF Res. Capital, Inc. v. U.S. Small Bus. Admin.*,
  910 F. Supp. 2d 280 (D.D.C. 2012) .......................................................................9

*Fraternal Order of Police Library of Cong. Labor Comm. v. Library of Cong.*,
  639 F. Supp. 2d 20 (D.D.C. 2009) ........................................................................15

*Huynh v. Carlucci*,
  679 F. Supp. 61 (D.D.C. 1988) ............................................................................17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 27 (1983) .................................................................................................11

*Reilly's Wholesale Produce v. U.S.*,
  83 Fed. Cl. 705 (2006) ..........................................................................................17

*United States Ass'n of Reptile Keepers, Inc. v. Jewell*,
  103 F. Supp. 3d 133 (D.D.C. May 12, 2015) .......................................................20

*United States v. Apex Oil*,
  No. 05-CV-242-DRH, 2008 U.S. Dist. LEXIS 58873 (S.D. Ill. July 28, 2008) ....................14

*United States v. Conservation Chemical Co.*,
  619 F. Supp. 162 (W.D. Mo. 1985) ......................................................................16

*United States v. Power Eng'g Co.*,
  10 F. Supp. 1145 (D. Colo. 1998), *aff'd* 191 F.3d 1224 (10th Cir. 1999) ..............16

*Wilson v. Amoco Corp.*,
    989 F. Supp. 1159 (D. Wyo. 1998) ................................................................ 15, 16

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................... 9

**Statutes**

5 U.S.C. § 704 ........................................................................................................... 14

5 U.S.C. § 706(2)(A), (D) ...................................................................................... 11, 14

Administrative Procedure Act ........................................................................... *passim*

I.      **PRELIMINARY STATEMENT**

Plaintiffs and others on their team, such as paralegals, investigators and other staff (along with Plaintiffs, collectively the "Plaintiffs' Team") play an essential, government-mandated, role in the military commissions underway at Naval Station Guantánamo Bay ("Guantánamo" or the "Naval Station"), in an area of the Naval Station referred to as "Camp Justice."  Unfortunately, the Defendants (sometimes also collectively referred to herein as the "Navy") unreasonably and unnecessarily <u>require</u> Plaintiffs' Team to do so while living and working in locations which directly (and unnecessarily) expose them to various cancer causing and otherwise hazardous chemicals and materials such as formaldehyde, asbestos and mold.  Defendants have not adequately investigated the risks posed by environmental contamination in and near the living and working areas at Camp Justice, and their own findings demonstrate that these risks exist.  They have applied inapplicable and irrelevant standards in their investigation and failed to consider other factors they were expressly directed to consider by Department of Defense ("DoD") rules, policies, and guidance, when making risk assessments about the use of this site.  Yet, despite the risks documented in the record before them and the material data gaps in their investigations, Defendants baselessly concluded that Camp Justice is safe and habitable and have continued to assign Plaintiffs and other personnel to living and working spaces there.  Plaintiffs' Complaint in this case seeks a declaration that these actions and decisions are arbitrary and capricious and should be set aside.  In the meantime, this motion seeks an order that will provide temporary protection for Plaintiffs and other military commissions personnel from these documented hazards, while the litigation is pending.

Plaintiffs and other military commissions personnel face a real, credible risk of harm, due to Defendants' actions.  Defendants require members of Plaintiffs' Team and other military

commissions personnel to regularly live and work at Camp Justice.  Due to the presence of known carcinogens and other hazardous substances in many areas of at Camp Justice (sometimes referred to herein as the "Contaminated Areas"), much of which is constructed on top of an old military runway, there is a serious risk that it does not offer Plaintiffs safe living and working conditions.[1] The Navy has itself confirmed the presence of carcinogenic and otherwise dangerous materials in the Contaminated Areas.  However, based on its flawed and inadequate investigation, the Navy has concluded that Camp Justice's buildings and temporary structures are safe and habitable. Under the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq*. ("APA"), Plaintiffs challenge the Navy's insufficient investigation of environmental hazards present at Camp Justice, its unreasonable delay in completing its investigation, its arbitrary and capricious determination that Camp Justice is safe and habitable, and its senseless and ongoing requirement that Plaintiffs and other military commissions personnel must live and work in contaminated areas of Camp Justice before a proper investigation and appropriate remediation are completed, particularly when alternative housing is available in uncontaminated areas of the Naval Station.  Until Camp Justice can be deemed safe and habitable based on a proper investigation and appropriate remediation, Plaintiffs are entitled to an injunction that protects them from the known and unknown risks of living and working at Camp Justice.  Specifically, Plaintiffs seek an injunction that provides them with alternative living and working accommodations at Guantánamo outside of Camp Justice— accommodations that exist and are available.  Indeed, recently, when the Navy conceded that the very same Cuzco housing at issue in this case did not meet applicable fire codes, it required that

---

[1] When used herein, the Contaminated Areas at issue at Camp Justice refers to all of the Cuzco units, the Expeditionary Legal Complex ("ELC"), AV-29, AV-32, and AV-34, all of which are discussed in greater detail in the Complaint.

other housing at Guantánamo be utilized.  *See* Ex. 2 (2/2/17 email Subject: "Housing at NSGB"). Plaintiffs know of no reason this alternative, uncontaminated housing could not be made available at other times as well.

Defendants' failure to protect Plaintiffs places them in an untenable position.  Plaintiffs are obligated by the responsibilities of their jobs and the ethical duties of their profession to live and work in facilities posing material threats to their health.  Defendants are forcing Plaintiffs to choose between protecting their health and defending their clients.  No attorney, or anyone else, should be placed in this position.

Prompt judicial action to require uncontaminated living and work space is necessary.  The environmental contamination at Camp Justice has had, and unless remediated or avoided, will continue to have, serious and negative impacts on Plaintiffs and other military commissions personnel, including:

- Increased risk of developing cancer or other serious diseases;

- Emotional distress, and distraction from discharging their professional duties, due to a legitimate fear of developing cancer or suffering other serious health consequences;

- Upper respiratory symptoms and infections;

- Headaches, including migraines;

- Itchy and burning skin and eyes; and

- Lack of support in performing their professional duties due to the absence of certain team members who did not travel to Guantánamo Bay to avoid staying in the Cuzcos.

Should the requested injunction not issue, Plaintiffs will suffer irreparable harm, including continued exposure to substances known to cause cancer and other significant health risks. The Navy will not be prejudiced or harmed by an injunction, which is also in the public interest.  Thus, this motion should be granted.

## II.    STATEMENT OF FACTS AND PROCEDURAL POSTURE

For some time, personnel have raised concerns regarding unhealthy conditions and environmental contamination in and around the buildings and temporary structures at Camp Justice.  The Navy—through the Navy and Marine Corps Public Health Center ("NMCPHC")—conducted limited and incomplete investigations of these conditions between 2011 and the present. This investigation found and documented evidence of unsafe levels of contamination and other unhealthful conditions at Camp Justice.  Despite these findings, NMCPHC has falsely and unreasonably decided that Camp Justice is safe and habitable, and Defendants have continued requiring military commissions personnel—including Plaintiffs and their legal team—to live and work in areas believed to be contaminated.

The flaws in the Navy's investigation are significant.  First, as discussed in more detail in the report of Dr. Mark Killen[2], a highly qualified and experienced environmental expert, the Navy's investigation is, at best, incomplete.  It is axiomatic that an incomplete assessment can provide no reliable assurance of safety.  Second, the Navy's investigation is fundamentally flawed, and its conclusions incorrect.  Dr. Killen concludes:

> In my opinion, held to a reasonable degree of scientific certainty and based on well-established factors routinely relied upon by environmental professionals, this conclusion [of the Navy that Camp Justice is habitable] (a) is wrong, as potentially dangerous hazardous chemicals/materials exist in locations whereby pathways of exposure are

---

[2] Dr. Killen is eminently qualified.  He has over 42 years of experience in environmental and engineering consulting.  A copy of his CV is appended to his attached report as Attachment 2. Ex. 3 at Att. 2 (12/20/16 Report of Dr. M. Killen).

complete such that exposure to individuals could occur and (b) is not supported by the test results/documents provided by the Navy for this Site. *See* Ex. 3 at 1 (12/20/16 Report of Dr. M. Killen) (brackets added).

To date, despite being provided with Dr. Killen's report, the Navy has provided no substantive response.

Third, the Navy failed to follow its own internal rules, policies, and guidance in conducting this investigation at Camp Justice.  As described in the Complaint at paragraphs 65 to 73, Defendants are required to provide military commissions personnel working and living at the Naval Station with safe accommodations, to protect them from occupational illness, to promptly abate identified hazards, and to follow certain environmental (generally Environmental Protection Agency ("EPA")) standards designed to be protective of human health when performing environmental exposure assessments.  The Navy failed to comply with these requirements when it conducted an inadequate investigation, relied upon standards it was expressly directed not to rely upon, failed to remediate the hazards it identified, and opined repeatedly that Camp Justice was safe and habitable.  For example, NMCPHC recommended over thirteen months ago that the Navy take certain steps to protect against asbestos and mold exposure, but there is no indication that the Navy has done so. *See* Ex. 17 at 4-1 and 11 (1/12/16 Resolution Consultants, *Indoor Air Quality Assessment Report*).  OPNAVINST 5100.23G requires that Navy policy is to "provide a safe and healthful workplace for all personnel" and that the Navy achieves this condition through a program that, among other things, achieves "[p]rompt abatement of identified hazards."  Yet, here, the Navy flatly refuses to provide uncontaminated work and living space and has failed to incomplete its investigation, which has dragged on since at least July 2015.  To take another example, pursuant to OPNAVINST 5100.23 Series, the Navy has issued an Industrial Hygiene Field Operations Manual, which specifies that "[e]nvironmental exposure assessments and sampling are based on

- 5 -

environmental (generally Environmental Protection Agency (EPA)) standards, screening levels and risk assessment processes and not on occupational health standards, OELs and exposure assessment strategies." Yet, the Navy has refused to follow EPA standards, apparently in an attempt to justify its baseless conclusion that Camp Justice is safe.

Defendant Rishikof—the Convening Authority and head of the Office of Military Commissions ("OMC"), which oversees the proceedings at Camp Justice—has acted arbitrarily and capriciously in continuing to assign Plaintiffs' Team to contaminated living and working spaces at Camp Justice. This decision is factually unsupported and contradicted by the record before him, given the significant evidence of contamination at Camp Justice emerging from the NMCPHC's investigation. Furthermore, the Convening Authority failed to consider the factors he was expressly required to consider, under DoD Instruction 6055.05, when assessing the risks at Camp Justice: balancing operational benefits against the potential for adverse health effects, to "determine which risks are acceptable and unacceptable." Nonetheless, OMC has continued assigning Plaintiffs' Team to living and working spaces at Camp Justice when their work requires them to travel there—ignoring their concerns regarding the safety of these accommodations and rejecting their requests for alternative housing for team members.

The pollutants identified by the Navy at Camp Justice are toxic and dangerous. For example, EPA has classified formaldehyde, which is present in the Cuzcos where many members of Plaintiffs' Team are required by Defendants to live, as well as in other facilities in which they are required to work, as a "probable human carcinogen." During the Navy's October 2015 testing, formaldehyde was found in indoor air at levels that exceeded the safety level identified by the Navy for a 9-month military worker in 20 of 29 samples; these samples were taken in workspaces—in Buildings AV-29 and AV-32 and the Expeditionary Legal Complex—and in some

Cuzcos used as living space.[3]  Moreover, even <u>after</u> the Navy implemented limited measures to increase airflow in the Cuzco units (which is the inadequate "remediation" it elected to perform), the formaldehyde levels in Cuzco units <u>still</u> remained above the screening level for nearly one-third of the units tested.[4]  The Navy's own test results clearly demonstrate that the Navy's efforts to reduce formaldehyde levels were insufficient, as potentially dangerous levels remain in Cuzco units used to house military commissions personnel are not being further addressed by the Navy. Moreover, only 16 of the 100 Cuzco units at Camp Justice were ever tested for formaldehyde. Formaldehyde levels in the remaining 84 Cuzco units at Camp Justice remain unknown.  How the Navy can possibly conclude those untested Cuzco units are "safe" is unexplained and unexplainable.

Various buildings at Camp Justice also are known to the Navy to have asbestos-containing materials ("ACM").  Asbestos is a known carcinogen.  Exposure to asbestos can cause lung cancer and mesothelioma, as well as asbestosis (an inflammatory condition affecting the lungs) and other non-malignant lung and pleural disorders.  The Navy's own investigation found that the ACM was broken or otherwise damaged, which can cause the asbestos to become friable and able to be respirated.  However, the Navy has not remediated the damaged ACM, not taken appropriate steps to prevent exposure, and not implemented an asbestos management plan as recommended by its consultants.

---

[3] In some sampling locations, formaldehyde levels significantly exceeded this screening level.  For example, one-third of the samples contained formaldehyde at levels between three and ten times the screening level.  *See* Ex. 3 at 9 (12/20/16 Report of Dr. M. Killen).

[4] The Navy has not taken <u>any</u> steps to address formaldehyde levels in the workspaces where elevated levels were found.

Benzo(a)pyrene, found in two soil samples near building AV-34, is also a known carcinogen.  During the Navy's October 2015 testing, the level of benzo(a)pyrene in one sample exceeded the screening level for a 9-month military worker.  An additional nine samples were collected in April 2016 in the areas surrounding the two sample locations where benzo(a)pyrene had been identified.  Of these nine samples, three exceeded the screening level for a 9-month military worker.   Despite its own results showing a health risk, the Navy has done nothing to remediate the benzo(a)pyrene or to prevent exposure to it by Plaintiffs or others in the area.

Additionally, a number of the buildings at Camp Justice where personnel work (including AV-29, AV-32, and AV-34) are assumed by the Navy to have lead based paint, which can chip off and accumulate in soils and other areas.  Exposure to lead—through inhalation, ingestion, or absorption through the skin—is linked to serious negative health effects such as high blood pressure, heart disease, kidney disease, and reduced fertility.  Exposure of pregnant women to lead can harm their unborn children.  Even low levels of lead exposure can damage a developing fetus's nervous system, affect behavior and intelligence, and cause miscarriage and stillbirths.  Despite its findings, the Navy has not sampled the impacted areas or addressed the chipping paint in any other appropriate manner.

Lastly, the Navy's investigation also identified several buildings used by Plaintiffs to have mold growth.  It also found high relative humidity levels in these buildings, which, in many cases, exceed OSHA recommendations and which foster mold growth.  Exposure to indoor mold is linked to upper respiratory symptoms, including nasal congestion, coughing, and wheezing, as well as eye and skin irritation.  Such exposure can also prompt asthma symptoms in people with asthma or more serious lung infections in people with chronic conditions or sensitivities.

Despite these findings, the Navy has essentially taken no action.  It has not determined whether any of the mold types present in these buildings are toxic, nor has it looked behind walls and in false ceilings and HVAC ducts to determine the full extent of the mold growth.  Moreover, the Navy has ignored its own internal recommendations to take specified steps to eliminate the mold and high humidity.

Despite all this evidence of potentially hazardous materials and conditions in the living and working areas of Camp Justice, the Navy concluded that these areas were safe and habitable. In doing so, it ignored or misstated facts in the record and relied upon standards—such as background levels for certain contaminants—in a way that is scientifically unsound and violates Navy regulations and policy.  The OMC, relying upon the Navy's deeply flawed analysis and conclusions, failed to conduct an appropriate risk assessment or to evaluate and consider other options for housing and workspaces at the Naval Station.  As a result of these unsupported, arbitrary, and capricious actions, Plaintiffs and other military commissions personnel have continued to be assigned to living and working spaces at Camp Justice—over their repeated objections and requests for alternative housing—exposing them to unnecessary and potentially serious risks.

## III.   ARGUMENT

To be entitled to preliminary injunctive relief, a moving party must demonstrate: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord EDF Res. Capital, Inc. v. U.S. Small Bus. Admin.*, 910 F. Supp. 2d 280, 283 (D.D.C. 2012) (citing *Chaplaincy of Full Gospel Churches v.*

*England,* 454 F.3d 290, 297 (D.C. Cir .2006)).  Plaintiffs satisfy each element of this Circuit's four-part balancing test used to determine whether to grant a preliminary injunction.

First, Plaintiffs have a substantial likelihood of prevailing on the merits of each of their causes of action under the APA because the factual record does not support—and, indeed, contradicts—Defendants' conclusions, and because Defendants have not complied with their own rules and procedures, or sound scientific practice, in purporting to conclude that Camp Justice is safe.  Instead, the available, record evidence (much of which was generated by the Navy itself) demonstrates that the Contaminated Areas of Camp Justice have not been adequately investigated and cannot be deemed safe for either living quarters or workspace.   Second, Plaintiffs will suffer irreparable injury if the Navy's decision regarding housing and work areas is allowed to continue as they will continue to be compelled to live and work in contaminated locations in which they are exposed to dangerous chemicals and materials, including those which cause cancer.   Third, granting an injunction here will not injure the Navy in the slightest, as substantial uncontaminated work and housing facilities are available at Guantánamo.  Recognizing this, the Navy recently closed the Cuzco housing area at Camp Justice for a period of time because, the Navy stated, they did not comply with the fire Code.[5]  *See* Ex. 2 (2/2/17 email Subject: "Housing at NSBG).  During this closure, the Navy made available "hard housing" in uncontaminated areas of Guantánamo for Plaintiffs and others, which the Navy can continue to do while the contamination at Camp Justice is addressed.  Fourth, granting the injunction will not injure the public interest.  Indeed, it is in the

---

[5] *See* Ex. 2 (2/2/17 email Subject: "Housing at NSBG).  In addition, the Cuzco units also were not used for a period of approximately one month in April/May, 2016, based on an order issued by Marine Brigadier Gen. John Baker, as described in more detail in paragraphs 54-55 of the Complaint, without any apparent logistical or operational problems.  These examples prove that alternative facilities are readily available at Guantánamo.

public interest to provide Plaintiffs, and others, safe and pollution-free places to work and live while they are employed by the United States.  There is absolutely no countervailing public interest in exposing Plaintiffs or anyone on their staff to potentially dangerous contamination.

**A.**     **Plaintiffs Have Demonstrated A Likelihood Of Success On The Merits because Defendants clearly violated the APA**

The D.C. Circuit has recognized that "[t]o justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, […] it will ordinarily be enough that the plaintiff has raised substantial questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation . . . ."  *Citizens for Responsibility & Ethics in Washington v. Cheney*, 577 F. Supp. 2d 328, 335 (D.D.C. 2008) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C. Cir. 1977)).

Plaintiffs have met this burden on their APA claims.  The APA requires the Court to "hold unlawful and set aside" any governmental "action, findings, and conclusions" that are: (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" or (2) "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) and (D).  The "arbitrary and capricious" standard requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 27, 43 (1983) (internal citation omitted).  Defendants have not done so here.  There is simply no reasonable or rational justification for requiring Plaintiffs and others to live and work in dangerous, contaminated areas, particularly where, as here, uncontaminated alternatives exist.

The process by which an agency arrives at its decision is subject to review under the APA because agencies are required to follow their own regulations.  *See Bond v. United States*, 47 Fed.

Cl. 641 (2000).  Under Navy regulations and implementing guidance, NMCPHC is required to apply "environmental (generally Environmental Protection Agency (EPA)) standards, screening levels and risk assessment processes" when assessing the risks associated with personnel exposures to environmental contamination.  Pursuant to DoD Directive No. 4715.1E (March 19, 2015), the heads of each DoD Component (including the Navy) are required to "[e]nsure through host-tenant agreements or otherwise that all DoD tenants and non-DoD tenants are required to comply with applicable [environmental safety and occupational health] laws, regulations, and DoD policies."  It is DoD policy to (1) "Protect DoD personnel from accidental death, injury, and illness caused by hazardous occupational or environmental exposures" (*See* DoD Instruction No. 6055.05, at 4(a)) and (2) "[P]rotect the public from risk of death, injury, illness, or property damage because of DoD activities" (DoD Directive No. 4715.1E (March 19, 2015) at 4.8).  As explained above, the Navy has ignored these requirements.  The Navy's decision that Camp Justice is safe and habitable, and Defendants' decision to require Plaintiffs and other military commissions personnel to  continue to live and work in contaminated areas at Camp Justice, are based on factors  which materially deviate from the Navy's own regulations, policies, and guidance (as well as recommendations from its own consultants).

For example, from August 4-8, 2015, the NMCPHC conducted a "preliminary investigation" that included an industrial hygiene and habitability survey of Camp Justice's buildings, tents, and trailers where people live and work.  The NMCPHC opined that "there was insufficient evidence available to address the potential environmental exposures to carcinogens that were alleged in the [Inspector General] complaint."  *See* Ex. 16 at 33 (08/21/15 NMCPHC Report).  The NMCPHC also identified a number of data gaps and recommended additional environmental sampling be performed at Camp Justice to assess health risks and appropriately

address the Inspector General complaint, and it continued its epidemiological investigation. *Id.* None of this work was performed.  Nonetheless, the NMCPHC somehow purported to have determined that the buildings, tents, and trailers surveyed were habitable for occupancy, stating that "the buildings of concern have been deemed habitable." *Id at 4.*

Similarly, in September 2015, consultants hired by the Navy recommended remediation to address other concerns, including addressing high moisture and humidity levels, and cleaning areas with suspected microbial growth.[6] *See* Ex. 17 at 4-1 (1/12/16 Resolution).  The Navy has never suggested in any of its subsequent reports that it has taken any of the recommended steps.

Similarly, in February 2016, NMCPHC issued a report containing its findings that formaldehyde and benzo(a)pyrene found in the samples <u>exceeded</u>  the screening levels it had established for a 9-month active duty military worker.  Despite the NMCPHC's finding that these carcinogens exceeded screening levels, the data gaps it identified, and its admitted inability to assess the cancer and non-cancer health risk based on its limited investigation, Defendants took inadequate steps to protect military commission personnel from the risks associated with the carcinogens found at Camp Justice.  Although several contaminants have been found in samples taken from Camp Justice that exceed EPA screening levels—the regulatory standard that is applicable in this type of analysis, under Navy policy and regulations—NMCPHC has largely disregarded these findings.  Instead, it has inappropriately relied upon occupational health standards (which are inapplicable in this type of investigation, per Navy regulations) and background levels of contaminants in geographically remote locations (which is both scientifically unsound and contrary to Navy policy) to justify its conclusion that Camp Justice is safe and

---

[6] *See* Exhibit 21 at 4.0 (01/12/16 Resolution Consultants Indoor Air Quality Assessment Report.

habitable and that no remediation is necessary to address the dangerous contaminants found. Furthermore, there are significant data gaps regarding the extent of these contaminants at Camp Justice, which prevent NMCPHC from completing a proper health risk assessment.  In light of the extensive evidence revealing that the Contaminated Areas should not be used for housing or workspace, the Defendants' decision to continue to assign Plaintiffs to contaminated work and living spaces are "final agency action for which there is no other adequate remedy in a court."  *See* 5 U.S.C. § 704.

The extensive, documented findings of contamination in the NMCPHC's reports, the inadequacy of NMCPHC's investigation, the lack of support for NMCPHC's conclusion that Camp Justice is safe and habitable, and the information and analysis submitted on behalf of Plaintiffs to the Convening Authority, make clear that the Defendants' decisions are unsupported, arbitrary, and capricious, and they should be set aside under the APA.  *See* 5 U.S.C. § 706(2)(A).

### B.  Irreparable Injury Will Occur If Preliminary Equitable Relief Is Not Granted

The Navy's decision causes both ongoing and imminent irreparable injury to Plaintiffs, who, while they are in Camp Justice, are exposed to carcinogenic and otherwise dangerous chemicals and substances on a daily basis.  As explained in more detail in the Complaint, which is incorporated by reference, carcinogenic substances including formaldehyde, benzo(a)pyrene and asbestos have all been detected at Camp Justice in areas where the Plaintiff are required to live and work.  These substances have been found in the environment or in the construction materials used for the Cuzcos.  "Exposure to benzene has been associated with development of cancer, especially acute myeloid leukemia."  *United States v. Apex Oil*, No. 05-CV-242-DRH, 2008 U.S. Dist. LEXIS 58873, *81 (S.D. Ill. July 28, 2008).  In addition to these potentially fatal substances at Camp Justice, the Navy has detected other serious health hazards, including lead and mold.  These

hazards create risk of developing heart disease, kidney disease, lung infections, problems with pregnancies leading to stillbirths, and numerous other negative health effects.[7]

For an injury to constitute irreparable harm, it "must be 'certain and great,' 'actual and not theoretical,' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Fraternal Order of Police Library of Cong. Labor Comm. v. Library of Cong.*, 639 F. Supp. 2d 20, 24 (D.D.C. 2009) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). "[H]arm and risk to human life constitutes the very essence of irreparable harm. Postponing or foregoing action that, if taken now, might result in the saving of human life would constitute irreparable harm." *Barth v. Firestone Tire Rubber Co.*, 673 F. Supp. 1466, 1478 (N.D. Cal. 1987).

Environmental exposure to potentially dangerous chemicals and substances clearly constitutes "irreparable injury" supporting the granting of preliminary injunctive relief. Indeed, the exposure itself, before it results in disease or other harmful heath effect, is an actionable injury. *See, e.g.*, *Wilson v. Amoco Corp.*, 989 F. Supp. 1159 , 1175-77 (D. Wyo. 1998) (finding that there was an imminent and substantial endangerment where asbestos, lead, benzo(a)pyrene, and mercury contaminated the soil and flowed through the groundwater injuring the public health and environment); *United States v. Apex Oil Co.*, 2008 U.S. Dist. LEXIS 58873, *204-05 (finding that benzene vapors emanating from contaminated soil and in groundwater present or may present an imminent and substantial *endangerment* to health, where "residents who are exposed to chemicals contained in those vapors may suffer adverse health effects [and] may be harmed by fires or explosions caused by those vapors") (emphasis added); *United States v. Conservation Chemical*

---

[7] *See* https://www.cdc.gov/niosh/topics/lead/health.html; https://www.cdc.gov/mold/faqs.htm#affect; Ex. 3 at 2 and 8 (12/20/16 Report of Dr. M. Killen).

*Co.*, 619 F. Supp. 162, 195 (W.D. Mo. 1985) ("Because hazardous substances are, by definition, capable of causing serious harm, a substantial endangerment may exist whenever the circumstances of a release or threatened release of a hazardous substance are such that the environment or members of the public may become exposed to such substances and are therefore put at risk. For very hazardous substances, such as those which are toxic at low concentrations or known or suspected carcinogens, a substantial endangerment *will* arise when small amounts are released or threatened to be released." (emphasis added)); *United States v. Power Eng'g Co.*, 10 F. Supp. 1145, 1149-51, 1163 (D. Colo. 1998), *aff'd* 191 F.3d 1224 (10th Cir. 1999) (finding an injunction necessary to halt injury to public health and environment where hazardous waste including known carcinogens leaked into the soil, the groundwater, and was discharged through air ducts); *Barth*, 673 F. Supp. at 1478 (agreeing with the plaintiff that equitable relief is necessary where he and the putative class was exposed to benzene and other toxic chemicals and where denying equitable relief would allow the putative class to "suffer harms such as: misdiagnosis and mistreatment [and] further unknowing exposure to the same toxins"). Moreover, the Defendants have not completed an "assessment of the known or potential releases of hazardous […] constituents [which] in itself presents a *risk* to human health . . . ." *Wilson v. Amoco Corp.*, 989 F. Supp. at 1175 (emphasis added).

In the housing context a preliminary injunction is appropriate to bar habitation in unsafe or unhealthy conditions. *See City of McHenry v. Suvada*, 920 N.E. 2d 1173 (Ill. App. Ct. 2009). In *Suvada*, the court "ordered that the premises shall not be occupied until [the subject property is] in compliance" with the city's regulations. *Id.* at 1179. The harm considered in *Suvada* consisted of, among other issues, unsound structural support, deteriorating exterior, deteriorating electrical panels, and standing water in the basement, which resulted in the likelihood that the housing was

"unsafe, unsanitary, or dangerous to the health, morals, safety, or general welfare of the people of the City." *Id.* at 1176-78.

That the Defendants are governmental, or are part of the Department of Defense, does not alter the foregoing analysis. This court does not hesitate to enjoin the DoD from policies injuring its employees. *See, e.g.*, *Reilly's Wholesale Produce v. U.S.*, 83 Fed. Cl. 705 (2006); *Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004); *Huynh v. Carlucci*, 679 F. Supp. 61 (D.D.C. 1988). In *Doe # 1 v. Rumsfeld*, the court entered an injunction to prevent the DoD from subjecting the military to a particular inoculation for which significant health risks were identified. 297 F. Supp. 2d 119, 135 (D.D.C. 2003). The court rejected DoD's position that potential side effects were "hypothetical or, at best, unlikely to occur." *Id.* Rather, the court recognized the "United States cannot demand that members of the armed forces" who "preserve and safeguard the freedoms that all Americans cherish and enjoy" be forced to put their health and safety at risk. *Id.*

These findings militate in favor of finding that irreparable harm also exists here. Plaintiffs, who are employed by DoD, will be irreparably harmed if they are required to litigate their APA claims without an injunction in place. Plaintiffs already have been forced to instruct support staff on Plaintiffs' Team not to accompany them to Guantánamo Bay for military commission proceedings, in order to protect those team members' health by protecting them from living and working in the Contaminated Areas. Plaintiffs continue to represent their client with the handicap of lacking the full support of their team while knowing that they are subjected to the exposure of carcinogens and serious health risks. Moreover, Plaintiffs complain of suffering upper respiratory symptoms and infections, headaches, migraines, itchy and burning skin and eyes, among other problems including the emotional distress and distraction from discharging their professional duties, due to a legitimate fear of developing cancer or suffering other negative health

consequences.  Nine individuals (if not more) who worked at Camp Justice have been reported to have suffered cancer diagnoses, including lymphoma, brain cancer, appendix cancer, and colon cancer.  Despite these health problems, the Navy has forced Plaintiffs to put their physical safety at risk in order to fulfill their crucial role to our justice system.  It is reprehensible for the Navy to ask the Plaintiffs to relinquish their health and safety in order to serve the DoD and bear the tremendous responsibility of representing their client.

As explained above, harmful working and living conditions have been identified in Camp Justice, including:

- High levels of formaldehyde (in excess of EPA nine-month resident cancer exposure risk levels), which is associated with a number of different types of cancer (such as myeloid leukemia),[8] have been detected at the Cuzcos and within the ELC.  Although the Navy has taken steps to ventilate some of these areas, as noted above, follow-up testing has shown that levels <u>above</u> EPA nine-month resident cancer exposure risk remain in certain tested areas even after these remediation efforts.  *Id.* at 8-9.  Of even greater concern, is that most Cuzcos have not been tested at all, and the Navy has failed to conduct ongoing monitoring of formaldehyde levels.  *See id.*

- Asbestos was found to be in a friable or potentially friable condition.  Asbestos in a friable condition causes serious health effects. *See* Ex. 3 at 2 (12/20/16 Report of Dr. M. Killen).  Asbestos is a known carcinogen, causing both lung cancer and

---

[8] *See* National Institute of Health, National Cancer Institute, Formaldehyde and Cancer Risk, available at https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/formaldehyde/formaldehyde-fact-sheet.

mesothelioma.  Exposure to asbestos may also lead to asbestosis (an inflammatory condition affecting the lungs) and other non-malignant lung and pleural disorders.[9]

- Benzo(a)pyrene has also been detected, and the extent of such contamination has not been sufficiently determined.  *Id. at* 12-13.  Exposure to benzo(a)pyrene (through direct contact and through vapor intrusion into occupied structures) is also linked to cancer.[10]

- Mold was documented in several buildings.  In addition, high levels of humidity were documented throughout the buildings—a condition that promotes additional mold growth. *Id.* at 7.  Exposure to indoor mold is linked to upper respiratory illnesses, from which many in Camp Justice suffer.[11]

Despite these well-documented health risks, based on the Navy's own data, these buildings and areas of Camp Justice continue to be used regularly by personnel, including our clients, and in fact are <u>required</u> to be used by them, despite the Navy's admission that its investigation is not complete.  The decision the Navy has taken at each step of the investigatory process—that Camp Justice should continue to be used while the investigation is taking place and that it is safe and

---

[9] *See* National Institute of Health, National Cancer Institute, Asbestos Exposure and Cancer Risk, available at https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/asbestos/asbestos-fact-sheet#q3.

[10] *See* Center for Disease Control, Agency for Toxic Substances & Disease Registry, Toxic Substances Portal – Polycyclic Aromatic Hydrocarbons, available at https://www.atsdr.cdc.gov/phs/phs.asp?id=120&tid=25.

[11] *See* Center for Disease Control, Mold, Basic Facts, available at http://www.cdc.gov/mold/faqs.htm#affect.  *See also* Ex. 4 at ¶ 4 (Declaration of E. Perry); Ex. 5 at ¶ 5 (Declaration of M. Seeger); Ex. 6, at ¶9 (Declaration of J. Jackson); Ex. 7 at ¶ 6, 7 and 8 (Declaration of M. Paradis); Ex. 8 at ¶ 19 and 20 (Declaration of M. Schwartz); Ex. 9 at ¶ 4, 10 and 11 (Declaration of V. Nixon); Ex. 10 at ¶ 3 (Declaration of R. Kincaid III); Ex. 11 at ¶ 9, 10 and 11 (Declaration of D. Nevin); Ex. 12 at ¶ 7 (Declaration of J. Pollio); Ex. 13 at ¶ 7 and 8 (Declaration of M. Spears); Ex. 14 at ¶ 8 and 9 (Declaration of J. Harrington); Ex. 15 at ¶ 6 (Declaration of C. Bormann).

habitable—is arbitrary and capricious, given this record of documented contamination at the site, the associated risk to the people who live and work there, and the availability of alternative work and housing options on-base that would not pose this risk.  Dr. Killen concludes:

> [C]ontinuing to use the impacted areas as living and working quarters <u>exposes those using the facilities to an unnecessary and potentially substantial health risk</u>.  In my opinion, this risk warrants <u>preventing</u> (or, if this is not possible for some reason, limiting) <u>use of the impacted facilities until appropriate mitigation measures are implemented and a comprehensive human health risk assessment is completed</u>.  In particular, I <u>strongly conclude</u> that the <u>impacted facilities should not be used as living space</u>, particularly if, as I understand to be the case, other unaffected/un-impacted housing accommodations are readily available at the Guantánamo Bay facility.

*See* Ex. 3 at 2 (12/20/16 Report of Dr. M. Killen)

## C.   Granting the Injunction Would Not Substantially Injure Other Interested Parties and the Public Interest Would Be Furthered by the Injunction

Both the balance of equities and the public interest[12] favor enjoining Defendants from putting Plaintiffs and their teams at significant risk due to the exposures summarized herein.  There can be no dispute that Plaintiffs, and others serving as part of the teams working and living at Camp Justice, should not be exposed to dangerous chemicals, especially where, as here, such exposure can be readily avoided.  Adequate alternative facilities are readily available at Guantánamo, as shown by the fact that the Navy recently determined that the Cuzcos could not be used (as they were in violation of the fire code) and arrangements for housing were provided elsewhere at Guantánamo.

By contrast, the Defendants will not be harmed by the entry of an injunction.  An easy solution is available that would have no discernible effect on the operations of the Navy or

---

[12] In cases where relief is sought against the government, the final two factors of the preliminary injunction analysis merge.  *United States Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133 (D.D.C. May 12, 2015) (citing *Nken v. Holder,* 556 U.S. 418, 435 (2009)).

OMC—allowing military commissions personnel to use housing and other facilities outside of Camp Justice, such as "hard housing" located at the Naval Station outside of Camp Justice, at least until evaluation and testing demonstrates that Camp Justice is safe.  This solution has already been proven to work.  Plaintiffs know of no reason this alternative, uncontaminated housing could not be made available now.  Other lodging, like "hard housing," is generally not reserved at full capacity, further indicating that providing alternative available housing to Plaintiffs would not have any adverse effect on the Navy.

The public also has a vested interest in the proper functioning of the military commissions, where the entire Plaintiffs' Team can be safely present to defend their clients undistracted by well-founded fears for their health.  The public further has an interest in a military that does not unnecessarily endanger the health of its employees during non-combat operations.  An injunction would best comport with equitable principles because, on balance, the harm to Plaintiffs coupled with the harm to others using Camp Justice outweighs any potential harm to the Navy (if any harm would occur, which Plaintiffs deny) and warrants entry of an injunction.  Thus, the "balance of equities" in this case tips decidedly in favor of an injunction.  *See Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

## IV.    <u>CONCLUSION</u>

For the forgoing reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction against Defendants  (i) prohibiting Defendants from continuing to compel Plaintiffs (or anyone else on their Plaintiffs' Team, as defined above) from using any of the Contaminated Areas, either for living quarters, work or for any other purpose, and to (ii) requiring the Navy to provide, as may be reasonably required from time to time by Plaintiffs or others on their Plaintiffs' Team,

suitable housing and work facilities at Camp Justice, or elsewhere at the Guantánamo Bay Naval

Base, which are uncontaminated and otherwise safe for their intended use.

April 14, 2017                              Respectfully submitted,


s/ Daniel A. Small
Daniel A. Small (#465094)
Johanna M. Hickman (#981770)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
dsmall@cohenmilstein.com
jhickman@cohenmilstein.com


s/ Michael C. Davis
Michael C. Davis (#485311)
Margaret K. Kuhn (#1013495)
Venable LLP
575 7th Street, NW
Washington, DC 20004
Telephone:  (202) 344-4000
MCDavis@Venable.com
MKFawal@Venable.com

*Attorneys for Plaintiffs*