**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MAJ. MATTHEW SEEGER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case:  1:17-cv-639-RMC |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| DEFENSE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' APPLICATION FOR A**
**PRELIMINARY INJUNCTION AND**
**MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Defendants, the United States Department of Defense ("DoD"), Hon. Sean J. Stackley, in his official capacity as the Acting Secretary of the United States Navy ("Navy"), and Harvey Rishikof, in his official capacity as the Director, Office of the Convening Authority, Office of Military Commissions and Convening Authority ("OMC") (collectively "Defendants"), by and through undersigned counsel, respectfully submit the following opposition to Plaintiffs' Application for a Preliminary Injunction  ("Plaintiffs' PI Motion") (ECF No. 4), and move to dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Dated:  May 19, 2017

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney
D.C. Bar #415793

DANIEL VAN HORN
Chief, Civil Division
D.C. Bar #924092

By:     */s/ Jason T. Cohen*
        JASON T. COHEN
        ME Bar #004465
        Assistant United States Attorney
        Civil Division
        555 Fourth St., N.W.
        Washington, D.C. 20530
        Phone: (202) 252-2523
        Fax: (202) 252-2599
        Email: jason.cohen@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MAJ. MATTHEW SEEGER, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case:  1:17-cv-639-RMC |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| DEFENSE, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

I.    <u>**Introduction**</u>

Plaintiffs, four attorneys employed by the Department of Defense ("DoD") to defend Walid bin 'Attash, a detainee facing capital charges before a military commission at Camp Justice, Naval Station Guantanamo Bay ("NSGB"), Cuba, have brought a three-count Complaint under the Administrative Procedure Act ("APA"), alleging: (1) "[t]he Navy's decision that Camp Justice is safe and habitable, and Defendants' decision that Plaintiffs and other personnel must live and work in contaminated areas at Camp Justice" are arbitrary and capricious and should be set aside under 5 U.S.C. § 706(2)(A) (Count One); (2) Defendants have unreasonably delayed completing the risk assessment and implementing controls at Camp Justice, and should be compelled to act under 5 U.S.C. § 706(1) (Count Two); and (3) pursuant to 28 U.S.C. § 1651, the Court should issue a writ of mandamus requiring Defendants to complete the investigation and risk assessment at Camp Justice (Count Three). *See* ECF No. 1. On April 14, 2017, Plaintiffs moved for a preliminary injunction to both: (i) enjoin Defendants from compelling Plaintiffs and their trial team members from using any of the allegedly "contaminated areas" at Camp Justice for living quarters, work, or

any other purpose; and (ii) requiring Defendants to provide "suitable housing and work facilities" at NSGB which are uncontaminated and otherwise safe for use. Plfs' PI Motion at 1.

In opposition to Plaintiffs' preliminary injunction motion and in support of Defendants' motion to dismiss the Complaint, Defendants have attached five declarations:

(1) Dr. Paul B. Gillooly, Health Risk Assessor and Risk Communicator in the Environmental Program Department of the Navy and Marine Corps Public Health Center ("NMCPHC") and lead investigator for the NMCPHC Public Health Review ("PHR") of living quarters and workspace in Camp Justice, who explains the PHR process, describes the results and the risk management recommendations, and responds to the issues concerning the environmental investigations conducted and public health risk analysis prepared to address health risk concerns raised in Plaintiffs' motion and the accompanying Killen Report (ECF No. 4-5);

(2) Ms. Wendy A. Kelly, Chief, Operations Department, Office of Military Commissions ("OMC"), who describes OMC's housing policy, its housing needs, and the security restrictions that prohibit moving Plaintiffs to workspace outside Camp Justice;

(3) Captain David Culpepper, Commanding Officer ("CO") of NSGB, who addresses competition, among the various missions of NSGB and its tenants, for lodging space at NSGB and the potential harm to the Navy mission if he does not retain the flexibility to balance and prioritize the lodging needs of missions for NSGB and tenant commands;

(4) Ms. Sandra Greenwell, Navy Gateway Inns & Suites ("NGIS") Transient Lodging Director for Commander, Navy Region Southeast, which runs the transient housing at NSGB that is under Captain Culpepper's authority, who describes the bed capacity of NGIS facilities at NSGB, the demand that OMC puts on NGIS housing, and also that, in looking at the projected occupancy rate for Plaintiffs' upcoming hearings in May 2017 and July 2017, there is no availability; and

(5) Colonel Robert C. Moscati, Deputy Chief Prosecutor at OMC, who describes the potential harm to the prosecution case against the "9/11 defendants" caused by any delay in the proceedings because of the ongoing loss of witnesses and other evidence due to the passage of time.

These declarations, the attachments thereto, and the brief below demonstrate that Plaintiffs' claims should be dismissed pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for lack of jurisdiction and failure to state a claim upon which relief can be granted. Additionally, even if Plaintiffs' claims are actionable, Plaintiffs' request for injunctive relief should be denied as Plaintiffs have not satisfied the standard for this extraordinary relief. *See Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (noting that a preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion.").

## II.   Factual Background

### A.   The NMCPHC's Public Health Review Report

In July 2015, in response to a hotline complaint to the DoD Inspector General, Commander Navy Region Southeast requested that the NMCPHC conduct a Public Health Review ("PHR") of living quarters and workspaces in the area of Camp Justice, at NSGB. Gillooly Decl. ¶ 3.

Thereafter, a team of experts (*e.g.*, physicians, environmental scientists, engineers, toxicologists, industrial hygienists, water distribution experts, radiation health experts, and epidemiologists) reviewed the available information about Camp Justice and performed a detailed reconnaissance visit in August 2015. This included an industrial hygiene survey and a habitability survey of the Camp Justice buildings, tents, and trailers. Based on the data derived from the above efforts, the NMCPHC concluded that people could continue to live and work at Camp Justice pending a fuller investigation. *See* Plaintiffs' PI Motion Exh. 16, ECF No. 4-18.

From September 2015 through February 2016, the NMCPHC moved forward with additional sampling and analysis after determining during the initial phase that there were no immediate health concerns. This included a four-day visit, in September 2015, to carefully develop the Environmental Investigation ("EI") Plan to identify specific pathways of exposure, determining exposure scenarios, and media and locations to be sampled. Also during this visit, an outside environmental consultant, Resolution Consultants, conducted an Indoor Air Quality ("IAQ") Assessment of Camp Justice. In October 2015, NMCPHC personnel and Resolution Consultants conducted Phase 1 environmental sampling, collecting soil, tap water, and indoor air samples in and around the buildings at Camp Justice. The sampling and analysis was conservative and wide-ranging to ensure the capture of all potential chemicals of concern.

On February 23, 2016, the NMCPHC issued its "Preliminary Public Health Screening Risk Assessment Report for Camp Justice." The report summarized the above activities and compared the sampling results from those activities to EPA screening levels ("SLs") and OSHA permissible exposure limits ("PELs"), adjusted to address both environmental and occupational site-specific exposures. This screening risk assessment was considered preliminary because it did not yet address cumulative risk from all pathways of exposure and all individual chemicals of potential concern ("COPCs"), and certain data gaps still needed to be addressed. Although the preliminary assessment report recommended that some actions be implemented prior to issuing subsequent reports (*e.g.*, air conditioning/ventilation ("HVAC") modification in modular buildings to remediate airborne formaldehyde), the data indicated that it was safe for people to live and work at Camp Justice during this process.

On April 7, 2016, as part of the investigative process, Resolution Consultants issued an "Overseas Baseline Environmental Assessment Report," which was a more in-depth review of

information about past chemical use, storage, and disposal practices at Camp Justice. This included site reconnaissance, review of historical documents and environmental information, and interviews of individuals with knowledge of past and current practices, activities, and environmental conditions at Camp Justice. This report concluded that, "[b]ased on historical and environmental information reviewed . . ., the environmental conditions identified appear acceptable under the current and reasonably anticipated future uses at Camp Justice."

On April 11, 2016, Resolution Consultants completed its "Environmental Investigation Report" ("EIR"), which implemented the EI Sampling Plan developed in September 2015. This report contained information from previous assessments and site visits, as well as results from environmental sampling of indoor and outdoor air, soil, drinking water, and building materials.

From April 15 through 22, 2016, the NMCPHC and consultants Pioneer Technologies Corporation, Resolution Consultants, and Ambient Air Services, Inc., conducted a site visit to address several gaps identified in the previously issued reports. During this visit they resampled for mercury in the breathing zone of workers in AV-29, resampled for formaldehyde in modular buildings to verify the effectiveness of risk management actions taken (*e.g.*, HVAC modifications), resampled to further evaluate polyaromatic hydrocarbons in soil around AV-34, and sampled for polychlorinated biphenyls in AV-32.

From April 18 through 30, 2016, consultant Ambient Air Services, Inc., set up and conducted testing of air emissions from the Air Curtain Incinerators, which are used to burn municipal solid waste generated at NSGB. The NMCPHC and Pioneer Technologies also participated. Although the Air Curtain Incinerators were located approximately 8 kilometers from Camp Justice, the NMCPHC wanted to ensure a comprehensive health risk review process and approach to cover all potential impacts to Camp Justice residents.

From April 15 to April 23, 2016, Resolution Consultants conducted additional air sampling for formaldehyde to verify completed risk management actions (*e.g.*, HVAC modifications) taken by OMC were effective at reducing formaldehyde levels (approximately 70%) in modular buildings. It also sampled for mercury (Building AV-29), PCBs (Building AV-32), and for polyaromatic hydrocarbons in soil (near Building AV-34). Resolution Consultants issued its formaldehyde results report on May 6, 2016, and its report for the other analytes on May 24, 2016.

On March 3, 2017, after a very conservative, health-protective, aggressive, and comprehensive investigation of potential health concerns at Camp Justice, the NMCPHC issued its Final PHR Report and submitted it for security review prior to public release. The PHR Report found no evidence that the Camp Justice area was used as a dumping ground for fuel in the past or that the old runway was contaminated. It also found no evidence of complete exposure pathways (air, water, soil) for chemicals of potential concern ("COPC"). If there were any pathways, the Report concluded, they do not result in risks, including cumulative risks, outside the acceptable range for carcinogenicity and toxicity, derived from screening levels established by the Environmental Protection Agency ("EPA"), the Occupational Safety and Health Administration ("OSHA"), and other public health entities. Further, the PHR Report found insufficient evidence to connect the environmental and occupational conditions to the cancer types validated in five of 700 active-duty personnel stationed at Camp Justice between 2004 and 2016, based on a review of their medical records. The PHR Report noted that risk management actions (*e.g.*, HVAC modification) were recommended and taken to lower formaldehyde levels (ubiquitous in manufactured housing in the U.S.) in modular housing units. Follow up sampling in April 2016 confirmed that these actions were in fact effective to reduce the risks to acceptable levels.

As explained in the Gillooly Declaration, because Camp Justice is formally categorized as an "expeditionary camp," it is subject to less conservative environmental policies and standards as compared to a fixed installation. However, to ensure health protectiveness, the NMCPHC chose to apply the much more conservative EPA framework when conducting the risk assessment. Notwithstanding the less conservative requirements for expeditionary camps, the NMCPHC compared sampling results to EPA risk-based screening levels ("SLs"). In addition, the NMCPHC compared drinking water results to EPA maximum contaminant levels and indoor air sampling results to OSHA Permissible Exposure Levels. Although SLs are typically based on an assumed 25-year residential exposure, the NMCPHC adjusted exposure scenarios in its health risk assessment to more accurately reflect more realistic, yet conservative, residential and worker scenarios at Camp Justice (*i.e.,* 9 months, 3 years, and 6 years), as well as conservative use of EPA's 25-year assumption where appropriate.

### B.   Camp Justice and OMC Housing

Camp Justice is an enclave within NSGB solely devoted to the work of the OMC. Located within Camp Justice is a fenced-in area known as the Expeditionary Legal Complex ("ELC"), where the most intensive work of the OMC at NSGB occurs. The ELC is designed so that all of the primary trial participants can do their respective jobs, much of which involve highly classified information, in one appropriately secure location. There is no facility at NSGB other than the ELC that meets the OMC's very specialized workspace requirements. Nor are there any existing buildings at NSGB that could be converted to use as a sufficiently secure facility (*e.g.*, Secure Compartmented Information Facility, or SCIF) for an extended period, or where all of the various security requirements central to the work of the OMC could be met in one location.

Individuals from many different groups connected with this work require housing at NSGB, including members of the Office of the Chief Prosecutor ("OCP") and DOJ attorneys working with them, members of the Military Commissions Defense Organization ("MCDO"), the Military Judge and judicial staff, court administrative officers, witnesses, jurors, security personnel, up to 10 victim family members, representatives of up to 14 non-government organizations, and up to 60 members of the media. All housing must be provided within the confines of NSGB. There is no off-base housing option.

The housing available at NSGB for these individuals includes some under the direct control of the OMC, and some under the control of the Commanding Officer of NSGB but that OMC rents. All other housing on the base is controlled by NSGB, in the case of the Navy Lodge by the Navy Exchange Command, or Joint Task Force Guantanamo.

The housing under OMC's direct control within Camp Justice which is available at all times includes 100 beds in Containerized Housing Units ("CHUs"). Also referred to as "Cuzcos" or modular housing units, CHUs are air-conditioned trailers with two single bedrooms and a shared bathroom. OMC housing also consists of 360 beds in air-conditioned tents with plywood floors. Of these, 60 are twin beds in "improved" tents with partitions, and the other 300 are cots rather than beds. The CHUs and tents are located on the asphalt on what used to be an aircraft runway known as McCalla Field.

The OMC also pays NSGB for the annual rental of four transient-housing townhomes at East Caravella, two each for the prosecution and the defense trial teams. The OMC can also use 53 beds in Building AV-624, which is controlled by the Joint Task Force Guantanamo, on the Leeward side of the base (ELC is on the Windward side), to the extent the beds are available. These are in single rooms with dormitory-style bathrooms on each floor. Transportation between

the Leeward side and the Windward side of NSGB, where the ELC is located, is by ferry only. It takes approximately 25 minutes to travel from one side to the other.

The current OMC Housing Policy, issued on May 19, 2011, was intended to maximize the use of OMC housing and to ensure that this housing is provided based on defined guidelines for consistent application. Under this policy, members of the prosecution and defense trial teams are permitted to stay in the four townhomes. With that exception, the policy requires all "OMC personnel" to stay in the CHUs or the tents on Camp Justice. Contractors are also required to stay there, per the terms of their contracts. Capital defense "Learned Counsel" (*i.e.*, Defense team lead), such as Ms. Bormann, and consultants, are considered independent contractors, but they are exempt from this requirement.

The 2011 policy does not require any other individuals connected to the work of the OMC, such as the Military Judge, witnesses, in-court simultaneous translators, and victims and family members, to stay in OMC housing.  They have the option of requesting base housing through NSGB personnel.

An exception to the OMC Housing Policy was made in 2012 for the staffs of military judges. Exceptions have also been made in an ad hoc manner based upon requests, predominantly from the Military Commissions Defense Organization, for trial team members to stay in NSGB housing if available. Very limited exceptions have also been made on a case-by-case basis if justified due to a traveler's medical condition.  And, in 2015, the Convening Authority at the time, Paul Oostburg Sanz, asked the Commanding Officer of NSGB to allow OMC civilian personnel to use base housing if available.

### C.    Other Housing and Mission Demands at NSGB

All non-permanent housing at NSGB is managed by Navy Gateway Inns & Suites ("NGIS"), except for the Navy Lodge, and the housing controlled by the OMC and by Joint Task Force Guantanamo. NGIS has 202 beds for transient travelers (those in an official travel status) and leisure or Space Available ("Space A") travelers (those on leave or who otherwise pay their own expenses). Even without taking the demand for housing for the OMC missions into consideration, the estimated requirement for NGIS accommodations is 300 beds, which more than exceeds its 202 beds. So NGIS is often booked full, particularly during periods of high demand, such as when OMC hearings are in session.

Thus, NGIS often does not have a sufficient number of beds to accommodate all of the transient travelers at NSGB, and this is true even if one adds the beds that belong to the Navy Lodge. As a result, the NGIS Commanding Officer and his subordinate staff must try to balance the competing requirements to help ensure missions can occur as scheduled, and missions have often been delayed, modified, or canceled because of insufficient bed availability.

## III.    Legal Standards

### A.    Dismissal Pursuant to Rule 12(b)(1) for Lack of Jurisdiction

Pursuant to Rule 12(b)(1), a court must dismiss a claim when it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A motion to dismiss under Rule 12(b)(1) "presents a threshold challenge to the Court's jurisdiction," and thus "the Court is obligated to determine whether it has subject-matter jurisdiction in the first instance." *Curran v. Holder*, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (internal citation and quotation marks omitted). "[I]t is presumed that a cause lies outside [the federal courts'] limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), unless the plaintiff can establish by a preponderance of the evidence

that the Court possesses jurisdiction. *See, e.g., U.S. ex rel. Digital Healthcare, Inc. v. Affiliated Computer*, 778 F. Supp. 2d 37, 43 (D.D.C. 2011). When reviewing a Rule 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inference in the plaintiff's favor." *Id.* At the same time, "[t]he court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), *aff'd*, 346 F.3d 192 (D.C. Cir. 2003). "[T]he District Court may in appropriate cases dispose of a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) on the complaint standing alone." *Herbert v. Nat'l Acad. of Sciences,* 974 F.2d 192, 197 (D.C. Cir. 1992). The Court also, however, may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. *Id.*

Under Rule 12(b)(1), a party may move to dismiss a case on grounds of mootness. *Comm. in Solidarity with People of El Sal. v. Sessions,* 929 F.2d 742, 744 (D.C. Cir. 1991); *Super Sack Mfg. Corp. v. Chase Packaging Corp.,* 57 F.3d 1054, 1060 (Fed. Cir. 1995); *Am. Historical Ass'n v. Peterson,* 876 F.Supp. 1300, 1308 (D.D.C. 1995). Article III's case-or-controversy requirement prohibits courts from issuing advisory opinions or decisions based on hypothetical facts or abstract issues. *Flast v. Cohen,* 392 U.S. 83, 96 (1968). "The doctrine of mootness is a logical corollary of the case or controversy requirement." *Better Gov't Ass'n v. Dep't of State,* 780 F.2d 86, 90 (D.C. Cir. 1986). In cases where challenged conduct ceases and "there is no reasonable expectation that the wrong will be repeated, . . . it becomes impossible for the court to grant any effectual relief whatever to the prevailing party, and any opinion as to the legality of the challenged action would be advisory." *City of Erie v. Pap's A.M.,* 529 U.S. 277, 287 (2000). Accordingly, a court may not rule on the merits of a case in which the claim for relief is moot.

11

Courts must evaluate mootness "through all stages" of the litigation in order to ensure that a live controversy remains. *21st Century Telesis Joint Venture v. FCC,* 318 F.3d 192, 198 (D.C. Cir. 2003). As a result, "[e]ven where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Id.* (quoting *Clarke v. United States,* 915 F.2d 699, 701 (D.C. Cir. 1990)).

A case is moot when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *City of Erie,* 529 U.S. at 287 (internal quotations omitted). An intervening event may render a claim moot if (1) there is no reasonable expectation that the conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violations. *Pharmachemie B.V. v. Barr Labs., Inc.,* 276 F.3d 627, 631 (D.C. Cir. 2002); *Sellers v. Bureau of Prisons,* 959 F.2d 307, 310 (D.C. Cir. 1992). The burden of establishing mootness rests on the party raising the issue. *County of Los Angeles v. Davis,* 440 U.S. 625, 631 (1979); *Motor & Equip. Mfrs. Ass'n v. Nichols,* 142 F.3d 449, 458–59 (D.C. Cir. 1998).

**B.    Dismissal Pursuant to Rule 12(b)(6) for Failure to State a Claim**

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court should dismiss a claim if the plaintiff's complaint fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007) (clarifying the standard from *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its

face." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Twombly*, 550 U.S. at 570); *see also In re Sealed Case*, 494 F.3d 139, 145 (D.C. Cir. 2007).

Further, when evaluating a motion to dismiss under Rule 12(b)(6), a district court is generally required to deem the factual allegations in the complaint as true and consider those allegations in the light most favorable to the non-moving party. *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006). But where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557. Accordingly, a court "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

**C.**     **Standard of Review for Preliminary Injunction**

An injunction is an extraordinary remedy. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). It is the burden of the party seeking a preliminary injunction to show that it is entitled to one, not the burden of the other party to show that the movant is not entitled. *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 443 (1974).

A party seeking a preliminary injunction must show: (1) a substantial likelihood of success on the merits, (2) that it will suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction. *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C. Cir. 1995)). Before the Supreme Court's decision in *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008), courts weighed the preliminary injunction factors on a sliding scale, allowing a weak showing on one

factor to be overcome by a strong showing on another. *See Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360-61 (D.C. Cir. 1999). This Circuit, however, has suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a "more demanding burden" requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreplaceable harm. *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1293 (D.C. Cir. 2009) (instructing that "the movant has the burden to show that all four factors . . . weigh in favor of the injunction"). If the movant cannot demonstrate substantial likelihood of success on the merits, injunctive relief must be denied on that ground alone, without inquiry into the other factors. *McGinn, Smith & Co., Inc. v. Fin. Indus. Regulatory Auth.*, 786 F. Supp. 2d 139, 144-45 (D.D.C. 2011) (collecting cases).

### D.       The Administrative Procedure Act

The APA, 5 U.S.C. §§ 500-559, 701-706, permits a person who has suffered a specified legal wrong to seek judicial review of a final agency action, 5 U.S.C. §§ 702, 704. In permitting this limited review of final agency actions, the APA provides a waiver of sovereign immunity for certain types of action seeking relief other than money damages, including when a plaintiff alleges wrongful inaction by an agency or its officer in a suit for nonmonetary damages. 5 U.S.C. § 702. The APA waiver of immunity does not apply where another statute's waiver of sovereign immunity precludes the relief sought by the putative APA plaintiff. 5 U.S.C. § 702(2). Much of what agencies do is in anticipation of agency action rather than final agency action itself. *See, e.g., Fund for Animals v. BLM*, 460 F.3d 13, 19-20 (D.D. Cir. 2006). The APA waives sovereign immunity only for review of "final agency actions."

Under the APA, the scope of the permissible judicial review is the properly compiled administrative record generated by the agency during its decision-making process. *Caps v. Pitts*,

411 U.S. 138, 142 (1973). As such, evidence outside the administrative record cannot be cited and the record cannot be "supplemented" with information never presented to the agency. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). The APA authorizes a court to set aside agency action because, for example, it is arbitrary, capricious, an abuse of discretion, or not in observance with procedures required by law. *See* 5 U.S.C. § 706. "The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Lorion*, 470 U.S. at 744.

## IV.   The Complaint Should Be Dismissed and Plaintiff Has Not Shown Entitlement to Injunctive Relief

### A.   Dismissal on Mootness Grounds

The Second Cause of Action of the Complaint, which seeks a finding that Defendants have unreasonably delayed completing the risk assessment and implementing controls at Camp Justice, and Third Cause of Action, which seeks a writ of mandamus requiring Defendants to complete the investigation and risk assessment at Camp Justice, are both moot and should be dismissed. Defendants have, in fact, completed the investigation and risk assessment at issue, in the form of the Final PHR Report, and have implemented the non-administrative recommendations in that Report.

As explained in the Declaration of Dr. Paul B. Gillooly, the NMCPHC's "Final Public Health Review Report" for Camp Justice was completed on March 3, 2017, after an extremely comprehensive process that began in July 2015.[1] A copy of the PHR Report, including its eighteen

---

[1] In a "Frequently Answered Questions" document posted in 2016 on the NSGB website, which is dedicated to providing comprehensive information to the public about the PHR, including posting of environmental reports, the NMCPHC provided a time estimate of 18 months from August 2015 to complete the PHR process. Given the March 3, 2017, internal release date, and even adding the security review time, the NMCPHC has clearly moved deliberately to meet its original time estimate. *See*

appendices, is attached to the Gillooly declaration as Attachment A (filed under seal pursuant and subject to the Stipulated Protective Order). While copies have been provided to the Court and the Plaintiffs, note that the Report's public release is pending security reviews due to the sensitive nature of Camp Justice's operations. Thus, Plaintiffs' request for injunctive relief to compel completion of the PHR, whether articulated as a cause of action under the APA or as a petition for writ of mandamus, is moot and must be dismissed for lack of subject matter jurisdiction. *See, e.g., Building & Const. Trades Dep't, AFL-CIO v. Solis*, 600 F. Supp. 2d 25, 34 (D.D.C. 2009).

**B.      Dismissal for Failure to Allege a Final Agency Action or a Definite Nondiscretionary Action Unlawfully Withheld**

Assuming, *arguendo*, that the Court has jurisdiction over the Second and Third Causes of Action, all three should be dismissed for failure to state a claim upon which relief can be granted.[2]

With respect to the First Cause of Action, Plaintiffs have failed to allege final agency action. *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("If there was no final agency action . . ., there is no doubt that appellant would lack a cause of action under the APA."). The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent denial thereof, or failure to act." 5 U.S.C. § 551(13). For agency action to be final, it "must mark the consummation of the agency's decisionmaking process," and "must be one by which rights or

---

https://www.cnic.navy.mil/content/dam/cnic/cnrse/pdfs/ns_gitmo/GTMO_PHR_FAQ_FINAL_1 6AUG2016.pdf, "Q4."

[2] Any attempt by Plaintiffs to challenge the March 2017 NMCPHC PHR Report would likewise be unavailing as the report does not constitute final agency action. *See, e.g., Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006) (finding that a memorandum which permitted levees to be built but did not obligate construction of the levees was not a final agency action because it did not determine the substantive rights and obligations of the parties).

obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations and internal quotation marks omitted).

Just as in *Fraternal Order of Police v. Gates*, 602 F. Supp. 2d 104, 107-08 (D.D.C. 2009), Plaintiffs have not clearly identified the agency action at issue and connected it to any language in DoD or Navy documents that specifically authorizes the objectionable agency action. In *Fraternal Order*, the plaintiffs argued that subjecting Navy trainees to direct facial pepper spray was arbitrary and capricious because it could result in physical harms. *Id*. at 107. The district court held that the plaintiffs' reference to DoD and Navy regulations authorizing non-lethal weapons training generally, but not the training to which plaintiffs' objected specifically, was insufficient to "raise a right to relief above the speculative level." *Id*. at 108 (citing *Twombly*, 550 U.S. at 555). Similarly, Plaintiffs in this case refer to general DoD policies and regulations. *See* Plaintiffs' PI Motion at 12 (quoting DoD Directive 4715.1E ("comply with applicable [environmental safety and occupational health] laws, regulations, and DoD policies" and "protect the public from risk of death, injury, illness, or property damage because of DoD activities") and DoD Instruction 6055.05 ("[p]rotect DoD personnel from accidental death, injury, and illness caused by hazardous occupational or environmental exposures"). Plaintiffs provide, however, no citation or reference to any specific regulation, policy, or decision that, as they claim, "requir[es] Plaintiffs and others to live and work in dangerous, contaminated areas," Plaintiffs' PI Motion at 11. As a result, there is no final agency action, nor is there an administrative record on which such an action could have been based, and Plaintiffs have plainly failed to state a claim upon which relief can be granted.

With respect to the Second and Third Causes of Action, Plaintiffs have not cited to any legal requirements for precise, definite acts that DoD is required but has failed to take by any type of date-certain. *See Heckler v. Ringer*, 466 U.S. 602, 616 (1984) (courts will only compel the

performance of a "clear nondiscretionary duty"); *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 63–64 (2004) (courts are empowered to redress agency action "unlawfully withheld" only where the law makes "a specific, unequivocal command," and the requirement is for a "precise, definite act about which an official ha[s] no discretion whatever.") (internal quotations, alterations, and citations omitted). Rather, Plaintiffs have relied on general requirements to "provide a safe and healthful workplace for all personnel," Plaintiffs' PI Motion at 5, set forth in regulations which, by their very nature, recognize the military's broad discretion to balance operational goals with possible health risks. *See S. Utah Wilderness All.*, 542 U.S. at 66 ("General deficiencies in compliance . . . lack the specificity requisite for agency action.").

> ### C.   Denial of Injunctive Relief

> #### 1.   Plaintiffs are unlikely to succeed on the merits.

If the Court finds that it has jurisdiction and that Plaintiffs have stated claims upon which relief can be granted, Plaintiffs' request for a preliminary injunction should be denied because they have not demonstrated a likelihood of success on the merits. To the contrary, based on the record before the Court, it is highly likely that judgment will ultimately favor not Plaintiffs, but Defendants.

When reviewing final agency action under the APA, "the Court's role is limited to reviewing the administrative record." *Air Tramp. Ass'n of Am. v. Nat'l Mediation Bd.*, 719 F.Supp.2d 26, 32 (D.D.C. 2010) (citations omitted). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Select Specialty Hosp.–Bloomington, Inc. v. Sebelius*, 893 F.Supp.2d 1, 4 (D.D.C. 2012) (citations and internal quotation marks omitted).

Under the APA, the Court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). The hallmarks of such impermissible agency action are: (1) relying on factors which Congress did not intend for the agency to consider, (2) failing to consider an important aspect of the problem, (3) offering an explanation that runs counter to the evidence before the agency, and (4) offering an explanation that is so irrational that it could not be ascribed to a difference of view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.* Rather, agency action is normally "entitled to a presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

As noted above, the Court's review here would be complicated by the fact that Plaintiffs failed to properly identify a final agency action and, consequently, there is no clearly compiled administrative record. Nevertheless, the bulk of Plaintiffs' argument that the Defendants' actions were arbitrary and capricious rests on the general concerns raised in the report of Dr. Mark Killen, Exhibit 3 to Plaintiffs' PI Motion (ECF No. 4-5).[3] The Gillooly Declaration responds

---

[3] Plaintiffs have presented Mark A. Killen as an "environmental expert" and as "eminently qualified" to evaluate the public health risk review process followed in this case. This process used by the NMCPHC involved expertise in the following scientific disciplines: conducting epidemiological disease/cancer cluster studies, industrial hygiene, occupational and environmental medicine, preventative medicine, radiation health, public health risk calculation and environmental human health risk assessment, toxicology, and evaluation of the latest toxicological literature underlying regulatory standards and guidance. It appears that Dr. Killen's educational background is in civil engineering and in general environmental consulting, rather than in the specific subject matter disciplines directly related to public health risk assessment and epidemiology related to cancer and non-cancer effects of various potentially hazardous compounds. *See* ECF No. 4-5. Accordingly, Defendants reserve the right to challenge Dr. Killen's qualifications to opine on any of the issues relevant to this case.

comprehensively to all of the concerns raised in the Killen Report involving various chemicals and their potential exposure pathways at Camp Justice. *See* Gillooly Decl. ¶¶ 35-48. In sum, the NMCPHC took a conservative approach and used more stringent screening levels for Camp Justice than required. Its public health review of the area was complex, thorough, and comprised of multiple iterative steps. Ultimately, the NMCPHC's Final PHR Report concluded that there is no evidence that the old runway at Camp Justice was contaminated from prior use, no evidence that Camp Justice personnel are exposed to carcinogens or toxic substances above the acceptable risk ranges established by the EPA, OSHA, and other regulatory agencies, and no evidence that any verifiable cancer cases are linked to environmental or occupational exposure at Camp Justice. Even if the PHR Report is considered a final agency action, its findings and recommendations are well-founded, and it would not be the Court's place to second-guess the NMCPHC's expert analysis. *See Lee Memorial Health Sys. v. Burwell*, 206 F. Supp. 3d 307, 321 (D.D.C. 2016) (noting that APA review is narrow, as courts defer to the agency's expertise and must not substitute their judgment for that of the agency, and that a court may uphold agency action that is not fully explained if the agency's path may reasonably be discerned) (quotations and citations omitted); *Americans for Safe Access v. DEA*, 706 F.3d 438, 449 (D.C. Cir. 2013) (court should not "disturb the decision of an agency that has examine[d] the relevant data and articulate[d] . . . a rational connection between the facts found and the choice made") (internal quotation marks and citation omitted).

The Second and Third Causes of Action, as noted above, are moot. The NMCPHC completed the Final PHR Report in March and is merely awaiting security review prior to releasing it publicly. An order compelling completion of the health risk assessment is therefore unnecessary and mandamus unwarranted. In any event, the Court could only redress an agency action

"unlawfully withheld," and there is no specific, precise, definite action here that Defendants are required by law to take. *See Norton*, 542 U.S. at 63-64; *see also People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,* 797 F.3d 1087, 1097–99 (D.C. Cir. 2015). Plaintiffs have not identified any such legal requirement. If the agency had a clear duty to act, Congress did not prescribe a deadline for the action. The question would then become whether the agency's delay is unreasonable, *In re Core Commc'ns, Inc.,* 531 F.3d 849, 855 (D.C. Cir. 2008), and the analysis would center on "whether the agency's delay is so egregious as to warrant mandamus." *Am. Hosp. Ass'n v. Burwell,* 812 F.3d 183, 189 (D.C. Cir. 2016) (quoting *In re Core Commc'ns, Inc.,* 531 F.3d at 855). Each "unreasonable delay" case "must be analyzed according to its own unique circumstances." *Id.* (quoting *Air Line Pilots Ass'n v. Civil Aeronautics Bd.,* 750 F.2d 81, 86 (D.C. Cir. 1984)). The factors that courts should consider, though they are "hardly ironclad," were announced in *Telecommunications Research & Action Center v. FCC ("TRAC"),* 750 F.2d 70 (D.C. Cir. 1984). They include: any indication of the speed with which Congress expects the agency to proceed; the nature and extent of the interests prejudiced by delay, with particular concern for matters of "human health and welfare"; and the effect of expediting delayed action on agency activities of a competing or higher priority. *See TRAC,* 750 F.2d at 80; *see also Am. Hosp. Ass'n*, 812 F.3d at 189.

In this case, Defendants have moved deliberately and comprehensively to complete the public health review while applying conservative environmental and occupational or public health standards to ensure health protectiveness, and throughout the process, Defendants have implemented the PHR's recommendations and remediation measures. The likelihood of Plaintiffs' success on the merits, were the Court to reach them, is therefore insufficient to warrant a preliminary injunction.

### 2.        Plaintiffs cannot show an irreparable injury.

If a party cannot establish irreparable injury, injunctive relief may be denied without consideration of the other factors. *Dodd v. Fleming,* 223 F.Supp.2d 15, 20 (D.D.C. 2002). In order for Plaintiffs to satisfy this factor, they must establish that the threat of death or serious physical injury is real and imminent. *See Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005).

Plaintiffs argue that the mere detection and presence of potentially carcinogenic and/or toxic substances at Camp Justice warrants issuance of a preliminary injunction. But the NMCPHC investigative team carefully considered each substance identified by Plaintiffs (*i.e.*, formaldehyde, asbestos, benzo(a)pyrene, mold (*see* Plaintiffs' PI Motion at 18-19)), as well as over two hundred other chemicals of potential concern, and found that short-term and longer-term exposure to chemical substances detected in the environment at Camp Justice does not result in carcinogenic risks above the acceptable risk range or non-cancer health effects of concern. These findings are based on current toxicological research and standards established by the EPA, OSHA, and other authorities. In addition, the investigative team found that mold, asbestos, and formaldehyde exposures were effectively remediated, managed, or otherwise within acceptable risk levels.

Just as in *Virginia Sunshine Alliance v. Hendrie*, Plaintiffs' contention that they will suffer irreparable harm "is based upon speculation, speculation about dangers which have been considered by the agency and rejected as being an extremely remote possibility." 477 F.Supp. 68, 70 (D.D.C. 1979). Accordingly, Plaintiffs cannot show the irreparable injury that is requisite to injunctive relief.

Likewise, the cases relied on by Plaintiffs are readily distinguishable, as they arise under environmental or public health statutes with promulgated enforceable standards or specific statutory provisions describing the threshold for environmental liability. *See, e.g., Wilson v. Amoco*

*Corp.*, 989 F.Supp. 1159, 1171, 1177 (D. Wyo. 1998) (noting that "the primary focus shifts from irreparable harm to concern for the general public interest" because the case was brought under the Resource Conservation and Recovery Act and the Clean Water Act); *United States v. Power Eng'g Co.*, 10 F. Supp. 2d 1145, (D. Colo. 1998) (RCRA case, citing same modified standard for irreparable harm); *United States v. Conservation Chemical Co*., 619 F.Supp. 162, 195 (W.D. Mo. 1985) (CERCLA, same); *see also Doe v. Rumsfeld*, 297 F. Supp. 2d 119, 135 (D.D.C. 2003) (enjoining inoculations of anthrax vaccine because it was still an investigational drug used for an unapproved purpose prior to issuance of FDA reclassification rule); *City of McHenry v. Suvada*, 920 N.E.2d 1173 (Ill. App. Ct. 2009) (applying municipal housing code to an apartment building).

In contrast, the case before this Court does not pertain to the application of enforceable standards, but whether some alleged final decision was arbitrarily and capriciously made in relation to a public health risk assessment. Neither the assessment nor the risk-based standards incorporated into that risk assessment are required by statute. Rather, the NMCPHC public health review utilized the most stringent regulatory guidance available to conduct extremely conservative initial screening of risks, pending completion of the Final PHR Report, and then further utilized these guidance levels along with underlying scientific literature to support development of highly conservative site-specific risk exposure scenarios. This was a study not mandated by any statute or regulation, although a portion of the process was dedicated to preparing environmental study documents that informed the analysis and recommendations. Accordingly, the Court should not make the assumption that Plaintiffs' required showing of irreparable harm should be modified or alleviated in any way.

3. **An injunction would cause substantial harm to the government and would be adverse to the public interest.**

Plaintiffs cannot show that the threatened injury to Plaintiffs outweighs the damage that the entry of an injunction would cause.

The declarations of Captain David Culpepper, Sandra Greenwell, and Wendy Kelly establish the specific housing and workspace requirements for the military commissions, and the limited alternatives available at NSGB. As those declarations show, the volume of OMC housing outside Camp Justice is inadequate for the competing mission needs and the Navy has optimized its efforts to accommodate the OMC's mission requirements along with the competing mission demands of the Navy and its NSGB tenants. The OMC's fluctuating demands have significantly and adversely impacted the ability of the military to carry out essential functions. Contrary to Plaintiffs' unsupported conclusion that housing and other facilities are readily available (*see* Plaintiffs' PI Motion at 20-21), there is simply no way to consistently provide Plaintiffs housing outside of Camp Justice without at the same time negatively impacting other military missions that must be executed at NSGB, and no way to provide adequate alternative workspace.

Moreover, the attendant delay in the prosecution of accused alien unprivileged enemy belligerents charged with carrying out the September 11, 2001, attacks, which would inevitably follow if the Court enjoined the Defendants from providing Plaintiffs with housing and workspace in the only area of NSGB outfitted and equipped to handle the case's specialized security and personnel requirements, would substantially harm the prosecution.[4] *See generally* Moscati Decl. Testimonial evidence would be lost, making it more difficult for the prosecution to prove its case-

---

[4] The declarations from non-plaintiff individuals representing other detainees attached to Plaintiffs' PI Motion, *see* ECF Nos. 4-8, 4-9, 4-12, 4-13, 4-14, 4-15, and 4-16, demonstrate that granting Plaintiffs' PI motion is likely to have far-reaching effects, and cause significant delays, in all the military commission cases.

in-chief or present its strongest sentencing case should the accused individuals be convicted, and

institutional knowledge would be lost as individuals are reassigned or retire. *Id.* ¶¶ 2, 9. In addition,

said delay would run counter to the strong interest that the victim family members and the public,

as well as the accused, have in seeing that justice is done and that it is done expeditiously.

## V.  <u>Conclusion</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs'

Complaint and deny Plaintiffs injunctive relief. A proposed order is attached.

Dated:  May 19, 2017  Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney
D.C. Bar #415793

DANIEL VAN HORN
Chief, Civil Division
D.C. Bar #924092

By:  */s/ Jason T. Cohen*
JASON T. COHEN
ME Bar #004465
Assistant United States Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C. 20530
Phone: (202) 252-2523
Fax: (202) 252-2599
Email: jason.cohen@usdoj.gov

### EXHIBIT LIST

**Exhibit 1**     Declaration of Dr. Paul B. Gillooly

     Attachment A     Navy and Marine Corps Public Health Center, *Final Public Health Review Report*, 03 March 2017 (filed separately under seal)

     Attachment B     2013 Habitability Assessment Report for Bldgs ELC-3, AV-29, and AV-34

**Exhibit 2**     Declaration of Wendy A. Kelly

     Attachment A     Summary of Remediation Actions

     Attachment B     OMC Housing Policy, May 19, 2011

**Exhibit 3**     Declaration of Captain David Culpepper, USN

**Exhibit 4**     Declaration of Sandra Greenwell

**Exhibit 5**     Declaration of Colonel Robert C. Moscati

     Attachment A     Military Commission Order ("AE 299E"), March 2, 2017

     Attachment B     Military Commission Ruling ("AE 422E"), July 17, 2016

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAJ. MATTHEW SEEGER, *et al.*,      ) | |
|            ) | |
|       Plaintiffs,          ) | |
|            ) | |
| v.            ) | Case: 1:17-cv-639-RMC |
|            ) | |
| UNITED STATES DEPARTMENT OF      ) | |
| DEFENSE, *et al.*,          ) | |
|            ) | |
|       Defendants.       ) | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

THIS CAUSE comes before the Court upon Defendants' Motion to Dismiss Plaintiffs'

Complaint.

UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being

otherwise fully advised in the premises, it is hereby

ORDERED AND ADJUDGED that, for the reasons stated in the Motion, the Motion is

GRANTED.  Plaintiffs' Complaint is DISMISSED.  Any pending motions are hereby DENIED

AS MOOT.  The Clerk of Court is instructed to CLOSE this case.

DONE AND ORDERED in Chambers in Washington, District of Columbia, this ___ day

of _____, 2017.

_____
ROSEMARY M. COLLYER
UNITED STATES DISTRICT JUDGE