# EXHIBIT B

1           If I am understanding correctly, when you
2    were retained in the other cases of non-testifying
3    experts, you were not asked to evaluate a health
4    assessment report, were you?
5        A    I was not.
6        Q    Other than the work you've done in this
7    case, do you have any knowledge or information about
8    Guantanamo Bay and Camp Justice?
9        A    No.
10           MR. COHEN:  All right.  Why don't we take a
11   5- or 10-minute break here.
12           (A brief recess was taken.)
13           MR. COHEN:  Back on the record.  And I
14   don't have any further questions.  I'm not going to
15   take the full three hours.
16           So do you have any follow-up questions,
17   Mr. Davis?
18           MR. DAVIS:  Yes.  I wish I would have known
19   that before the break so I could get myself organized.
20   Yes.  I do have a few follow-up questions.
21                     EXAMINATION
22           BY MR. DAVIS:
23       Q    Dr. Killen, you were asked a number of
24   questions before and shown some EPA guidance where it
25   says that EPA, quote, unquote, may consider it to be an

Page 73

1  unacceptable risk or require remediation if a hazard of
2  1 is exceeded.
3            Do you remember that line of questioning?
4       A   Yes.
5       Q   Can you explain why you believe remediation
6  is required here, notwithstanding the use of the term
7  "may" in those documents that counsel for the
8  defendants showed you?
9       A   Well, they apply CERCLA at this site.  And
10 they went through the risk calculations, and the hazard
11 index ranged from .7 to 5, I believe, or 5.1, something
12 like that.  In the Cusco's (phonetic), the values
13 ranged in the range between, I believe, 4 and 4-1/2 and
14 3.9.  So all well above 1.
15           And under that process, if you take the --
16 if you follow EPA guidance and EPA procedures -- and
17 again, as I said, as a practical matter, if it's above
18 1, EPA considers that action is required.  In this
19 case, it's well above 1.  And therefore, I'm very
20 confident that if EPA were to participate in this site,
21 that they would require remediation.
22           Also, another concern of mine was that the
23 data collection component for the site was incomplete
24 because they only took, really, one sampling of that
25 and made that the basis.

Page 74

1              It's not typical for EPA to allow or under
2  the CERCLA process, a single event to represent the
3  conditions.  Typically, they would require at least at
4  a minimum, seasonal four events, one each quarter.
5              And in addition to that, the other concern
6  that I had was of the hundred Cusco's (phonetic)
7  present, they only sampled 16 of them.  And that's a
8  very small picture, particularly when you saw that the
9  concentration varied widely, as high as 60.
10             So I think those are the reasons why I --
11 and also, it's not just the formaldehyde.  There are
12 other -- the HI is a cumulative number.  It is
13 considering other exposures to the workers -- or the
14 people staying -- residents staying there.  And as I
15 mentioned before, that they've undermeasured that.
16 They didn't measure all the places you're supposed to
17 measure.  Therefore, they haven't identified all the
18 risks.
19        Q    Counsel for the defendants asked you
20 questions about World Health Organization and other
21 studies that Dr. Gillooly referred to this morning in
22 his testimony.
23             Can you explain whether those studies have
24 any impact on your conclusion that the levels of
25 formaldehyde and other chemicals requiring remediation

1  are unsafe?

2       A      Well, two things.  One, again, CERCLA

3  process, EPA, that was applied.  They calculated --

4  they went through the -- they calculated -- and by the

5  way, they calculated cancer risks greater than 10 to my

6  6.  For residential areas, it's my understanding that

7  also requires remediation.

8             But those other studies, you know, that he

9  represented, you know, are not -- he didn't provide a

10 rigorous process in that.  But -- and even if he had,

11 he still ended up under EPA interpretation still has a

12 hazard number greater than 1.  And we didn't see what

13 the impact of those numbers were on it.

14            I'm curious -- you know, maybe that

15 number -- I wouldn't be surprised if that number is

16 still above 1.  We don't know, but it doesn't matter.

17 If you follow the EPA process and you say that's what

18 you're going to do and you apply it, then -- and you

19 come up with the number of a hazard index of 5, you

20 know, my understanding is you need to do something.

21            And I'm actually concerned because, like I

22 said, they haven't even considered all the health

23 risks, either cancerous or noncancerous, at the site

24 because they didn't complete all of their samples.  So

25 the number could actually be higher.  So it makes me

Page 76

```
 1   more concerned.
 2        Q     Dr. Killen, are you aware of any EPA
 3   guidance or experience with EPA that you've had where
 4   EPA has allowed the responsible party for contamination
 5   to come in and use studies like World Health
 6   Organization studies or other studies that they claim
 7   post-date EPA's analysis of what may pose a risk and to
 8   overrule the hazard industry numbers?
 9        A     The only place I've ever seen -- well,
10   first of all, potential simple answer is, no, I have
11   not.  Where there is not already a screening level
12   published and you have to create one, I've seen them --
13   except using studies to create one when there's not an
14   already existing one.  I've never seen a case where
15   there is an existing standard that they've allowed the
16   people to override it.
17        Q     Have you ever been involved with a site
18   that had a hazard indices of 5 or more where
19   remediation wasn't required by either EPA or its state
20   counterparts?
21        A     No.
22        Q     What about 3 or 4?
23        A     Never.
24        Q     What about 1 or more?
25        A     Never.
```

```
 1        Q     Do you think that's for a good reason?
 2        A     I believe EPA is very concerned, especially
 3   in residential areas, with the health, and they're
 4   going to take an abundance of caution to make sure
 5   people are protected.  That's the reason for the
 6   process.  So, you know, they clearly feel very strongly
 7   about that.  So as a practical matter, that's how they
 8   treat it.
 9        Q     Counsel for the defendants asked you about
10   various statutes or regulations, OSHA, HUD regulations,
11   TSCA, et cetera, that had to do with formaldehyde or
12   wood products containing formaldehyde or perhaps to
13   modular homes.
14              Do any of those statutes have any bearing
15   on the conclusions you've expressed in your report and
16   your declarations that Camp Justice is not safe and
17   remediation is required?
18        A     No, they don't.
19        Q     Can you explain why you believe they're
20   inapplicable?
21        A     Again, this is CERCLA site, and they follow
22   the EPA, CERCLA process.  And as a result of the
23   process, they calculated cancer risk and noncancer risk
24   above the acceptable level.
25              For residential, cancer risks, greater than
```