## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| MATTHEW SEEGER, *et al.*, | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | )     **Civil Action No. 17-639 (RMC)** |
|  | ) |
| UNITED STATES DEPARTMENT | ) |
| OF DEFENSE, *et al.*, | ) |
|  | ) |
| Defendants. | ) |

_____ )

## MEMORANDUM OPINION

Major Matthew Seeger of the United States Army, Michael Schwartz, Cheryl Bormann, and Edwin Perry are lawyers employed by the United States Department of Defense (DoD) who represent detainees before a military commission at U.S. Naval Station Guantanamo Bay, Cuba (NSGB). They bring this action under the Administrative Procedure Act (APA), 5 U.S.C. §§ 500 *et seq* (2012). They allege that DoD, the U.S. Navy, and the Director of the Office of Military Commissions and Convening Authority have failed to investigate adequately environmental hazards, including airborne formaldehyde and other carcinogens, present at Camp Justice, where Plaintiffs are assigned to work and in some cases sleep while at Guantanamo Bay. They further allege that Navy's investigation into these alleged hazards was incomplete and flawed, rendering arbitrary and capricious DoD's conclusions that Plaintiffs can continue safely to live and work at Camp Justice. Plaintiffs ask the Court to require further investigation of the alleged hazard mitigation, as well as alternative living and working facilities until that is done, for which they seek a preliminary injunction until this litigation concludes.

Because the issuance of a Final Report, which is now public, renders Plaintiffs' complaint of unreasonable delay moot, the Court will dismiss Counts Two and Three. However, because Defendants' orders that Plaintiffs live and work in the allegedly contaminated areas are final actions subject to review under the APA, the Court will deny Defendants' Motion to Dismiss Count One. Plaintiffs' Motion for a Preliminary Injunction will be denied because Plaintiffs have not adequately demonstrated that they are likely to succeed on the merits or that they are likely to suffer irreparable harm if a preliminary injunction is not granted.

## I. BACKGROUND

### A. Camp Justice and Potential Environmental Hazards

Camp Justice is a complex at NSGB that was built in 2007 on the site of a former airfield. It serves as the location of the Office of Military Commissions Office of the Convening Authority (OMC). *See* Compl. ¶ 19 [Dkt. 1].[1] Within Camp Justice is a fenced area called the Expeditionary Legal Complex (ELC) which includes a Secure Compartmented Information Facility (SCIF), at which most of the intensive work of the OMC occurs due to the classified nature of the underlying information. The ELC is comprised of several structures: a sheet metal structure (ELC-1) that contains a courtroom and office areas; three trailers (ELC-3, ELC-4, ELC-5) that function as office spaces; and three CONEX shipping containers (ELC-8, ELC-9, ELC-10). *See* Ex. 17, Motion for Preliminary Injunction, Indoor Air Quality Assessment Report [Dkt. 4-19] at 1-4. Camp Justice includes three additional workspaces outside the ELC: Buildings

---

[1] "The Office of the Convening Authority is responsible for the overall management of the military commissions process, including logistics and personnel support. The Convening Authority is empowered to convene military commissions, refer charges to trial, negotiate pre-trial agreements, and review records of trial." Office of Military Commissions Organization Overview, http://www.mc.mil/ABOUTUS/OrganizationOverview.aspx (last visited Mar. 29, 2018).

AV-29 and AV-34, which are fixed structures, and AV-32, a former hangar. *See id*. at 1-3. Most of Plaintiffs' work is done in the SCIF, which is inside prefabricated structures that Plaintiffs allege to be contaminated. *See* Tr. of Prelim. Inj. Hr'g (PI Tr.) [Dkt. 30] at 18 (testimony of Major Seeger regarding structures of ELC). Plaintiffs also have dedicated office space in AV-34, outside the ELC, but that is a less convenient space, and Plaintiffs use it less frequently than spaces within the ELC, because classified documentation cannot be taken outside the SCIF. *Id.*

Personnel housing units under OMC's direct control within Camp Justice are primarily located in Containerized Housing Units, also known as CHUs or "Cuzcos." Fifty of the Cuzcos provide housing; they are air-conditioned trailers, each with two single bedrooms and a shared bathroom, comprising 100 beds total. OMC can also house personnel in 360 beds in air-conditioned tents with plywood floors. Of these, 60 beds are in "improved" tents with partitions and the other 300 are cots rather than beds. Both the Cuzcos and the tents are located on what used to be an aircraft runway called McCalla Field, made of asphalt. OMC also rents four nearby transient-housing townhomes from the NSGB Commanding Officer, two each for prosecution and defense trial teams (predominately used during trial). Other convenient on-base housing options include 202 beds managed by Navy Gateway Inns & Suites (NGIS), as well rooms at the Navy Lodge. *See* Defs.' Opp'n to Pls.' Appl. for a Prelim. Inj. and Mot. to Dismiss (Mot. to Dismiss) [Dkt. 10] at 8-10 (describing the on-base housing options). While some Plaintiffs have stayed in these facilities during work trips, availability is not guaranteed and demand can sometimes outstrip capacity.

In addition, OMC can use 53 beds, to the extent they are available, in Building AV-624, a permanent structure on the opposite, or leeward, side of Guantanamo Bay, that is, the physical water inlet for which the Naval Station is named, from the ELC. Transportation to AV-

624 is relatively inconvenient, because access is by ferry only and takes approximately 25 minutes. Plaintiffs argue that their ability to work would be severely hindered if they were forced to stay on the leeward side of the bay, in particular because much of their work must be done in or near the SCIF, and ferry service is limited. *See* PI Tr. at 32 (Plaintiffs' counsel arguing that "[i]t's not the New York Subway. So for folks who are working very long days, it cuts down on the amount of time they can work while they're there.").

OMC's Housing Policy, issued on May 19, 2011, requires "all OMC personnel" and contractors to stay in the Cuzcos or tents at Camp Justice. *See* Mot. to Dismiss at 9. Although the lead counsel representing detainees who are charged with capital crimes are considered contractors, they are exempt from the requirement that they stay in the Cuzcos or tents, under an exception in the policy that permits members of prosecution and defense trial teams to stay in the four townhouses. *Id.* Other limited exceptions have been made on a case-by-case basis and "in an ad hoc manner based upon requests," including requests from the Military Commissions Defense Organization for trial team members to stay in other NSGB housing when available. *Id.*[2] Members of trial teams who are also enlisted military are not eligible for these exceptions. In practice, Ms. Bormann, Mr. Schwartz, and Mr. Perry have stayed in preferred "hard housing," such as the Navy Lodge, for all or most of their trips to NSGB since 2014; Major Seeger, as an Army officer, is always required to stay in the Cuzcos. PI Tr. at 44-47. To receive a housing assignment, the prospective traveler submits a request to OMC, which then assigns housing based on the request, availability, and other demands. Plaintiffs allege that the Navy "assigns a lower priority to providing hard housing to military

---

[2] Other individuals connected to the work of the OMC, "such as the Military Judge, witnesses, in-court simultaneous translators, and victims and family members," are not required to stay in OMC housing and have the option of requesting base housing through NSGB personnel. *Id.*

commissions personnel than to other individuals residing at the Naval Station, such as base contractors, visitors, and other temporary personnel."  Compl. at ¶ 27.

At the heart of their case, Plaintiffs complain that Camp Justice is contaminated with cancer-causing and otherwise hazardous chemicals and other materials including formaldehyde, benzo(a)pyrene, asbestos, lead-based paint, and mold.  During a discovery teleconference on June 23, 2017, Plaintiffs' attorneys indicated that the primary hazard at issue is airborne formaldehyde, which allegedly leaches out of materials in modular units at Camp Justice.  Plaintiffs report, and Defendants do not contest, that the Environmental Protection Agency (EPA) has classified formaldehyde as a "probable human carcinogen."  Pls.' Mem. in Support of Mot. for Prelim. Inj. (Mot. PI) [Dkt. 4-1] at 6.

**B.  The Navy's Investigation into Environmental Hazards at Camp Justice**

Following an initial complaint about potential environmental hazards, the Navy undertook a multi-step process, comprising repeated site visits and several reports prepared both internally and by external consultants.  Beginning in August 2015, the Navy conducted a "preliminary investigation" at Camp Justice, including a review of available documents concerning prior use, a walk-through, and air sampling; it concluded that "the buildings, tents, and trailers where people live and work are habitable for occupancy." Mot. PI, Ex. 16, NMCPHC, Public Health Report for Camp Justice (Aug. 21, 2015) [Dkt. 4-18] at 4.  While the Navy did not find any immediate health risks, it did determine that there were "data gaps," particularly related to exposure to carcinogens, which did not render the buildings uninhabitable but did warrant further environmental sampling and analysis.  *Id.*

The Navy and Marine Corps Public Health Center (NMCPHC) continued to investigate.  In October 2015, it conducted sampling at Camp Justice and tested the samples for

known toxins including formaldehyde.  The samples in question were taken in workspaces—

Buildings AV-29 and AV-32 and spaces in the ELC—and in 16 of the 50 Cuzcos used as living

spaces.  *See* Mot. for PI at 6-7; Mot. PI, Ex. 3, Expert Report of Dr. Mark A. Killen (Killen

Report) [Dkt. 4-5] at 9.[3]  DoD characterizes this stage of testing as incorporating various

"conservative" measures of potential harm such as "EPA screening levels . . . and OSHA

permissible exposure limits," or PELs.  Mot. to Dismiss at 4.  Some samples tested at higher

concentrations than these "conservative" screening levels, although the Final Report stated that

they were all under the minimum "likely to be a human carcinogen" established by the World

Health Organization (WHO).  NMCPHC, Final Public Health Review Report, Camp Justice,

Naval Station Guantanamo Bay, Cuba (Mar. 3, 2017) (Final Report) [Dkt. 14] at 61.

  As the Final Report acknowledges, the WHO standard is significantly less

stringent than EPA standards.  *Id.* at 60-61.  The Navy contends that the EPA standard for

noncancer risks—7.8 parts per billion (ppb)—is so very low that any measurement of

formaldehyde that shows a concentration lower than 7.8 ppb establishes essentially no risk, while

measurements above 7.8 may or may not indicate risk.  *Id.* at 60.  According to the Final Report,

WHO standards establish that any indoor-air formaldehyde value under 100 ppb is "considered

safe for the entire population against sensory irritation," and that any value under 80 ppb is "not

likely to be a human carcinogen."  *Id.* at 61.  "Indoor air concentrations of formaldehyde at

---

[3] Diagrams, included in one of the reports prepared for the Navy by consulting experts, report indicate that air samples were taken from 16 of the 50 Cuzcos, each from one of the two sleeping areas in each Cuzco.  *See* NMCPHC, Final Public Health Review Report: Camp Justice, Naval Station Guantanamo Bay, Cuba (Mar. 3, 2017) [Dkt. 14], App'x L, Resolution Consultants Supplemental Environmental Investigation for the Formaldehyde Sampling Results (May 6, 2016) (May 2016 Resolution Supplemental Formaldehyde Results) [Dkt. 14-47] at 12-13.  In his report, Plaintiffs' expert states that "84 CUZCOs located at Camp Justice were never tested"; it would have been more accurate to say that 34 out of the 50 Cuzcos, or 84 out of the 100 Cuzco bedrooms, were not tested.  Killen Report at 9.

Camp Justice ranged from 1.9 to 61 ppb and the average concentration was 15.4 ppb." *Id.* at 61. In other words, the values were well below WHO levels for noncancer and cancer risks, but averaged above the EPA screening levels.

The Navy insists that tests showing screening levels in excess of initial EPA standards did not establish a clear risk, but was only a signal that further investigation was warranted. Indeed, the record demonstrates that the Navy undertook further investigation and remediation measures following the initial testing. Plaintiffs' expert, Dr. Mark A. Killen, who holds degrees in civil, agricultural, and chemical engineering and is a licensed environmental engineer, characterized these initial results as exceeding "the EPA nine month resident cancer exposure risk." Killen Report at 9.

Resolution Consultants, a contractor hired by the Navy to examine air quality in the Cuzcos, issued an "Indoor Air Quality Assessment Report" in January 2016. Mot. PI, Ex. 17, Indoor Air Quality Assessment Report (Jan. 12, 2016) [Dkt. 4-19]. In this January 2016 assessment, the consultants recommended asbestos sampling, cleaning ceiling light covers and a closet ceiling and wall where excessive moisture or suspected microbial growth had been observed, actions to reduce moisture and humidity levels, and an inspection of heating, ventilation, and air conditioning (HVAC) systems to address low airflow. *Id.* at 22-23 (chapter 4.0). Plaintiffs complain that the Navy "has never suggested in any of its subsequent reports that it has taken any of the recommended steps." Mot. PI at 13.

Shortly thereafter, in February 2016, NMCPHC published the results of a "preliminary public health screening risk assessment," which had found that levels of certain toxins measured in indoor air in certain structures, including some Cuzcos, "were of potential concern and warranted further evaluation." Final Report at 6. The toxins of potential concern

included formaldehyde. *Id.* Specifically, the Navy had concluded that formaldehyde levels in the Cuzcos were "of potential concern" because, although below applicable limits set by the Occupational Safety and Health Administration (OSHA) for U.S. workplaces, further study was needed to "take into consideration risks related to multiple constituents and pathways of exposure." Final Report App'x H, NMCPHC Preliminary Public Health Screening Risk Assessment Report for Camp Justice (Feb. 23, 2016) (February 2016 Navy Preliminary Assessment) [Dkt. 14-32] at 4. The February 2016 Navy Preliminary Assessment recommended certain actions, which were taken, to improve HVAC systems in modular buildings in order to remediate airborne formaldehyde; their experts determined that formaldehyde levels had been reduced and did not pose a health risk to occupants of the structures in question. *See* PI Tr. at 40-41. The Navy had previously concluded that it was safe for people to live and work at Camp Justice in the meantime. *See* Final Report at 26.

On April 7, 2016, Resolution Consultants issued its "Overseas Baseline Environmental Assessment Report," which assessed the site's historic use as an airfield and concluded that environmental conditions at Camp Justice were acceptable for its current uses. Mot. to Dismiss at 4-5. On April 11, 2017, Resolution Consultants completed its "Environmental Investigation Report" (EIR), which included the results of extensive environmental sampling and site visits. *Id.* at 5. Resolution Consultants also reported the results of follow-up air sampling of formaldehyde levels in May 2016. *See* May 2016 Resolution Supplemental Formaldehyde Results. Based on these and other testing results, Defendants' expert Dr. Paul B. Gillooly, the Navy's experienced Health Risk Assessor and an expert in industrial hygiene and occupational safety, concluded that there was "[n]o evidence that there are complete exposure pathways (air, water[,] soil) resulting in risks to carcinogens above the

acceptable risk range established by the [EPA]." Mot. to Dismiss, Ex. 1, Declaration of Paul B. Gillooly (Gillooly Decl.) [Dkt. 10-1] at 11.

Finally, in March 2017, NMCPHC completed its Final Public Health Review Report, which was filed with the Court under seal on May 25, 2017, and is now public. *See* Final Report.[4] The Report assessed the historic uses of the Camp Justice location, analyzed environmental sampling, and included a review of relevant medical records of personnel who have been stationed at Camp Justice since 2004. Taking these findings and risk factors into account, the Navy's Final Report concluded that "[c]urrent and future potential cancer risks related to environmental sources within Camp Justice . . . were within the [EPA] acceptable risk range of 1E-06 to 1E-04 (e.g., 1 in 1,000,000 to 1 in 10,000). The cumulative cancer risk for Camp Justice for all [chemicals of potential concern] ranged from 1.2E-07 to 6.1E-05." Final Report at 7.

The Final Report further noted that sampling conducted in April 2016, during the course of the investigation, confirmed that HVAC modifications and other recent risk-management actions had effectively reduced formaldehyde exposure risks. *See* Final Report at 28; *see generally* Final Report App'x F, Status of Previous Public Health Review Risk Management Recommendations (Feb. 2017) (App'x F Status Report) [Dkt. 14-30] (describing the recommendations and modifications made to date). The Navy also determined that formaldehyde levels in the Cuzcos were comparable to those considered typical by the Centers for Disease Control and Prevention (CDC) for similar housing structures, such as mobile homes constructed of the same materials, in the United States. *See* PI Tr. at 40-41; Final Report at 59.

---

[4] The Final Report was ultimately released to the public and is available at https://www.cnic.navy.mil/regions/cnrse/installations/ns_guantanamo_bay/om/environmental_support/Guantanamo_Bay_PHR.html (last visited Mar. 27, 2018).

### C. Procedural Background

Plaintiffs bring the following causes of action in their Complaint:

Count One: Plaintiffs allege that DoD violated the APA by arbitrarily and capriciously deciding that Camp Justice is safe and habitable, based on an inadequate investigation.

Count Two: Plaintiffs allege that DoD violated the APA by unreasonably delaying the completion of an adequate risk assessment and also delaying the implementation of adequate controls to address environmental contamination and other unhealthy conditions at Camp Justice.

Count Three: Plaintiffs ask the Court to issue a writ of mandamus requiring Defendants to complete the investigation and risk assessment and implement appropriate remediation measures at Camp Justice.

Compl. ¶¶ 129-39.[5]  Plaintiffs allege that the Navy's investigation and conclusions violate Navy and DoD Directives, Instructions, and other internal policies and guidelines, in particular DoD Instruction (DoDI) 6055.01, which governs DoD's safety and occupational health program.  *See* Compl. ¶ 66.

Related to these allegations, Plaintiffs ask the Court to:  (1) declare that Defendants' decisions regarding the safety and habitability of Camp Justice are arbitrary and capricious and set them aside; (2) order Defendants to conduct a thorough and timely investigation and risk assessment; (3) order Defendants to implement appropriate remediation on a timely basis; (4) enjoin Defendants from assigning Plaintiffs to live or work at Camp Justice until—after a proper investigation, risk assessment, and appropriate remediation—it is found to be safe and habitable; (5) retain jurisdiction to monitor and enforce compliance; and (6) award attorneys' fees and costs.  Compl. at 38.

---

[5] The Complaint lists these claims as the first, second, and third "Cause of Action."  For the sake of verbal economy, this Opinion will refer to them as Counts One, Two, and Three throughout.

Plaintiffs filed their Complaint on April 11, 2017, and, three days later, moved for a preliminary injunction to require provision of alternative accommodations pending the outcome of this lawsuit. *See* Mot. PI.[6] At the Court's hearing on Plaintiffs' motion for a preliminary injunction on July 26, 2017, the Court requested supplemental briefing on its subject-matter jurisdiction. *See* 7/27/2017 Minute Order (setting schedule for supplemental briefing). The parties filed supplemental briefs on jurisdiction. The Motion to Dismiss and Motion for a Preliminary Injunction are ripe for review. Because briefing on the Motion to Dismiss was completed before the hearing on the Motion for a Preliminary Injunction, the Court considers both motions in this Opinion.[7]

## II.      LEGAL STANDARDS

### A.  Motion to Dismiss

#### 1.  Rule 12(b)(1)—Lack of Subject-Matter Jurisdiction

##### a.  Federal-Question Jurisdiction

The APA does not confer subject-matter jurisdiction on a district court. Rather, a court has subject-matter jurisdiction over an APA claim if (1) the claim alleges a violation of another statute, which in turn confers jurisdiction, or (2) the claim raises a federal question under 28 U.S.C. § 1331. *Califano v. Sanders*, 430 U.S. 99, 105-06 (1977). The Court sought

---

[6] Defendants moved to dismiss the Complaint and opposed Plaintiffs' motion for a preliminary injunction. Mot. to Dismiss [Dkt. 10]. Plaintiffs opposed. Pls.' Opp'n to Defs.' Mot. to Dismiss (Opp'n) [Dkt. 26]. Defendants replied. Defs.' Reply to Opp'n to Mot. to Dismiss (Reply) [Dkt. 29]. As requested by the Court, both parties further briefed jurisdiction. *See* Pls.' Brief Regarding Subject-Matter Jurisdiction (Pls.' Juris. Br.) [Dkt. 32]; Defs.' Response to Pls.' Supplemental Br. on Jurisdiction (Defs.' Juris. Br.) [Dkt. 34].

[7] The Court apologizes to the parties for the delay in this Opinion due to illness that prevented an earlier decision.

supplemental briefing on subject-matter jurisdiction, which has clarified its jurisdiction for the record.

The federal-question statute provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and thus it "confer[s] jurisdiction on federal courts to review agency action." *Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009) (quoting *Califano*, 430 U.S. at 105); *see also Megapulse, Inc. v. Lewis*, 672 F.2d 959, 966 n.30 (D.C. Cir. 1982) ("Even though the APA itself technically grants no jurisdiction, power to review any agency action under the APA exists under 28 U.S.C. § 1331.") (citing *Califano*, 430 U.S. at 97); *Robbins v. Reagan*, 780 F.2d 37, 42 (D.C. Cir. 1985) ("Section 1331 vests jurisdiction to review agency action in the district court."). The D.C. Circuit has held that "[i]t is clear that the APA 'suppl[ies] a generic cause of action in favor of persons aggrieved by agency action.'" *Trudeau v. FTC*, 456 F.3d 178, 188 (D.C. Cir. 2006) (quoting *Md. Dep't of Human Res. v. Dep't of Health & Human Servs.*, 763 F.2d 1441, 1445 n.1 (D.C. Cir. 1985)). Thus, while many APA claims are brought pursuant to a separate substantive statute, a court may alternatively have jurisdiction under Section 1331 over a claim under the APA, based on allegations that an agency action was arbitrary and capricious or that an agency took action without observing procedures required by law. *See, e.g.*, *Trudeau*, 456 F.3d at 185 (finding that Section 1331 "is an appropriate source of jurisdiction" for a cause of action based on the APA itself, for a "nonstatutory action, independent of the APA," or for a constitutional claim).

### b. Standing

Section 702 of the APA provides standing to sue to one "'suffering legal wrong because of agency action.'" *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967) (quoting 5

U.S.C. § 702).  Soon after the APA became law, the term "legal wrong" became the subject of

scrutiny and explication in the courts.  In 1955, the United States Circuit Court for the District of

Columbia Circuit explained that "legal wrong" is a "term of art" which "means such wrong as

particular statutes and the courts have recognized as constituting grounds for judicial review."

*Kansas City Power & Light Co. v. McKay*, 225 F.2d 924, 932 (D.C. Cir. 1955) (holding that

plaintiff power company did not have standing to sue because it would not suffer a "legal wrong"

as a consequence of a federally-supported power program likely to increase competition).  The

*Kansas City Power* court cited the APA legislative history to note that the courts have a

"continuing role . . . in determining . . . who is entitled to judicial review."  *Id.*  The D.C. Circuit

has characterized a "legal wrong" as "the invasion of a legally protected right."  *Pennsylvania R.*

*Co. v. Dillon*, 335 F.2d 292, 294 (D.C. Cir. 1964).

Although in some cases a "legally protected right" is one that has been bestowed

by statute, as in *Pennsylvania Railroad*, *see id.* at 295, other legally cognizable rights may also

warrant review.  Thus, the D.C. Circuit has recognized a "so-called nonstatutory or common-law

type of review" under the APA, whereby "[i]f a party can show that he is 'suffering legal wrong'

. . . he should have some means of judicial redress."  *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d

859, 865 (D.C. Cir. 1970) (quoting S. Doc. No. 248, 79th Cong., 2d Sess. 37-38 38 (1946)).

Such a legal wrong includes an agency's basing its "decisions on arbitrary or capricious abuses

of discretion," so that "one who makes a prima facie showing alleging such action on the part of

an agency . . . has standing to sue" under the APA.  *Id.* at 869; *see also Whitzell v. Astrue*, 589 F.

Supp. 2d 100, 109 (D. Mass. 2008) ("Although [the relevant statute] does not give this Court

jurisdiction to adjudicate the merits of the complaint, [plaintiff] is correct to seek review from

this Court because she has nowhere else to turn. . . . In the absence of clear and convincing

evidence that the congressional intent was to the contrary, courts ought not restrict access to such review." (internal quotation marks and citation omitted)).

### 2. Rule 12(b)(6)—Failure to State a Claim

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "If as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations,'" then the court must dismiss the claim. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

There are exceptions to the "basic presumption of judicial review to one 'suffering legal wrong because of agency action.'" *Abbott Labs.*, 387 U.S. at 140 (quoting 5 U.S.C. § 702). An APA challenge to an agency's refusal to take enforcement action, as opposed to an affirmative final action, is presumptively unreviewable. *See Heckler v. Chaney*, 470 U.S. 821, 832-33 (1985). A separate, substantive statute may explicitly preclude judicial review. The APA itself also contains statutory exceptions under which judicial review is precluded. Section 701(a)(2) of the APA excepts from review matters that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). While this exception is "very narrow," *Hi-Tech Furnace Systs., Inc. v. FCC*, 224 F.3d 781, 788 (D.C. Cir. 2000), it applies where "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830. In the D.C. Circuit, such a defense is addressed under Rule 12(b)(6) (failure to state a claim) and not Rule 12(b)(1) (subject-matter jurisdiction). *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011) ("A complaint seeking review of agency action 'committed to agency discretion by

law' has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6), not under the jurisdictional provision of Rule 12(b)(1)." (citations omitted)).[8]

## B. Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). *Winter* involved a challenge to the Navy's intention to conduct mid-frequency active sonar exercises, involving ships, submarines and aircraft, in the waters off Southern California. Plaintiffs sought an injunction until the Navy prepared an environmental impact statement due to the presence of multiple species of marine mammals in the area. The lower courts that decided *Winter* before it reached the Supreme Court had concluded that a preliminary injunction was warranted. Because plaintiffs had demonstrated a strong likelihood of success on the merits of their claim, their showing that there was a "possibility" of irreparable harm was sufficient to satisfy the second prong. *Id.* at 20-21. The Supreme Court disagreed, emphasizing that "[o]ur frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22. The "possibility" of irreparable harm, cited by the Ninth Circuit below, was too lenient. *Id.* Further, the Court emphasized the need to consider the public interest and the defendant's interest. *Id.* at 26-27.

---

[8] *Sierra Club* resolved inconsistent precedent as to the applicable Rule. *See Sierra Club*, 648 F.3d at 854; *see also Oryszak*, 576 F.3d at 525-26; *Trudeau*, 456 F.3d 178, 183-84; *contra Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1030 (D.C. Cir. 2007), *abrogated by Sierra Club*, 648 F.3d 848.

In the past, the D.C. Circuit has generally followed a "sliding scale" approach to analyzing the four factors that determine whether to grant a preliminary injunction: "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009). However, in light of *Winter*, the D.C. Circuit has suggested, without deciding, that "*Winter* could be read to create a more demanding burden, although the opinion does not squarely discuss whether the four factors are to be balanced on a sliding scale." *Id.* at 1292. Further, the D.C. Circuit has opined that *Winter* could be read "to suggest if not to hold" that a likelihood of success is an independent, free-standing requirement for a preliminary injunction. *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (citing *Davis*, 571 F.3d at 1296).

While the Fourth Circuit has read *Winter* to preclude the sliding-scale approach to preliminary injunctions, its decision was vacated on other grounds and different Circuits have not agreed. *See Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1130-35 (9th Cir. 2011); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-38 (2d Cir. 2010); *Hoosier Energy Rural Elec. Coop. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)).

Whatever the viability of the "sliding scale" approach to the factors for a preliminary injunction, it has long been held that the four factors are not equal. "Whether a sliding-scale analysis still exists or not, courts in our Circuit have held that a failure to show a likelihood of success on the merits alone is sufficient to defeat the motion." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 83 (D.D.C. 2017) (denying plaintiffs'

motion for a preliminary injunction only for failure to show likelihood of success on the merits). Without a probability of success, "'the Plaintiff's purported injuries, no matter how compelling, do not justify preliminary injunctive relief.'" *Apotex, Inc. v. Sebelius*, 700 F. Supp. 2d 138, 140 (D.D.C. 2010) (quoting *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999)).

Beyond likelihood of success, the likelihood of irreparable injury is also a critical showing before a preliminary injunction will issue. *See Winter*, 555 U.S. at 22. This Court concludes that *Chaplaincy of Full Gospel Churches v. England* is abrogated to the extent it adopted a lesser injury threshold than *Winter*. *See* 454 F.3d 290, 297 (D.C. Cir. 2006) (holding that a movant must show "at least some injury for a preliminary injunction to issue"). *Winter* emphasizes that the basis for injunctive relief must be demonstrated irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 88 (1974); *Gomez v. Kelly*, 237 F. Supp. 3d 13, (D.D.C. Feb. 27, 2017) (adopting the higher standard because the purpose of preliminary relief is "to preserve the status quo pending resolution of the underlying litigation") (internal quotation marks and citations omitted).

### III.     ANALYSIS

#### A.  Motion to Dismiss

##### 1.  Rule 12(b)(1)—Lack of Subject-Matter Jurisdiction

###### a.  Federal-Question Jurisdiction

Because the APA does not confer jurisdiction, Defendants argue that the Court should dismiss this case for lack of subject-matter jurisdiction. According to this argument, Plaintiffs' claims cannot proceed because they are not based upon a statutory predicate, separate from the APA, and because DoDI 6055.05 and other internal guidance that Defendants have

allegedly violated do not confer legally enforceable duties. Plaintiffs counter that the Court has subject-matter jurisdiction because their claims raise a federal question under 28 U.S.C. § 1331. Plaintiffs argue that, even without a separate statutory predicate, the Court has subject-matter jurisdiction where the Navy's action is alleged to be arbitrary and capricious or taken without observing procedures required by law.

The Court agrees with Plaintiffs that their allegations establish federal-question jurisdiction under Section 1331, even absent allegations of a non-APA statutory violation. *See Heckler*, 470 U.S. at 825 (before holding that there is a presumption against reviewability under the APA of an agency's refusal to act, noting as an initial matter that the district court had subject-matter jurisdiction pursuant to Section 1331); *Trudeau*, 456 F.3d at 185 (finding that the federal-question statute "is an appropriate source of jurisdiction" for a cause of action based in the APA itself, for a "nonstatutory action, independent of the APA," or for a constitutional claim).

Defendants cite *Steenholdt v. FAA*, which suggests a different conclusion: "If no 'judicially manageable standard' exists by which to judge the agency's action, meaningful judicial review is impossible and the courts are without jurisdiction to review that action." 314 F.3d 633, 638 (D.C. Cir. 2003). *Steenholdt*, however, has been abrogated, insofar as it holds this question to be jurisdictional. *See Sierra Club*, 648 F.3d at 854. The Court need not belabor the point: Plaintiffs' allegations establish subject-matter jurisdiction pursuant to the federal-question statute.

**b.      Standing**

A plaintiff must also establish a "legal wrong" in order to bring a claim under the APA for a non-statutory violation. 5 U.S.C. § 702 ("A person suffering legal wrong because of

agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."). Defendants argue that Plaintiffs fail to establish that "the interest [they] seek to vindicate falls within a statute's zone of interest." Defs.' Juris. Br. at 2. The "zone of interests" test, however, is relevant to claims by plaintiffs who were "adversely affected or aggrieved by agency action *within the meaning of a relevant statute*." 5 U.S.C. § 702 (emphasis added); *see, e.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990); *Nat'l Fed'n of Fed. Emps. v. Cheney*, 883 F.2d 1038 (D.C. Cir. 1989). Courts have found a "legal wrong" sufficient to establish standing under the APA where "the courts have recognized" other grounds for judicial review. *Kansas City Power*, 225 F.2d at 932; *see also Scanwell Labs.*, 424 F.2d at 865 (recognizing a "nonstatutory or common-law type of review" under the APA for a party who has suffered a "legal wrong").

The allegations of the Complaint make a prima facie showing of such a legal wrong: Plaintiffs allege that DoD orders or effectively forces them to live and work in areas contaminated with harmful substances, and they charge that doing so results from arbitrary and capricious decision-making and also violates DoDI 6055.05 and other policies binding on Navy. For purposes of establishing a right to review, these allegations are sufficient to establish prudential standing.

### c. Mootness

Defendants also argue that Counts Two and Three in Plaintiffs' Complaint are moot due to intervening events since the Complaint was filed on April 11, 2017. Count Two alleges that DoD violated the APA by unreasonably delaying the completion of its risk assessment and the implementation of controls to address environmental hazards; Count Three seeks a writ of mandamus requiring completion of the investigation, risk assessment and

implementation. Defendants argue that these allegations are no longer "live" because DoD has completed its assessment and appropriate implementations, as described in the Final Report and expert declarations. Defendants add that when they filed the Final Report under seal on May 19, 2017, and subsequently published it online, the delay of which Plaintiffs complained was fully remedied.

A defendant moving for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction may argue that the claim in question is moot, which means that "'the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997); *see also 21st Century Telesis Joint Venture v. FCC*, 318 F.3d 192, 198 (D.C. Cir. 2003). The party asserting mootness carries a "heavy burden," *Honeywell Int'l, Inc. v. NRC*, 628 F.3d 568, 576 (D.C. Cir. 2010), and must show that events have occurred which prevent the court from granting the relief sought. *See Burlington N. R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1988). A court may dismiss a claim as moot if intervening events "have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles*, 440 U.S. at 631.

Defendants argue that Counts Two and Three are moot because the relief sought therein—completion of an investigation and risk assessment and implementation of appropriate remediation and controls—is final. DoD highlights the facts that the Final Report was completed on March 3, 2017, and submitted for internal security review; it was provided to the Court on May 19, 2017 under seal, and subsequently released to the public. The Final Report details the

process that DoD and its experts undertook, over almost two years, to investigate the alleged environmental hazards, including multiple rounds of sampling and analysis. *See* Final Report at 3-7 (detailing the investigations, reports, and remedial measures taken); *see also* Final Report App'x A, Public Health Review Actions-to-Date (Feb. 2017) [Dkt. 14-1]. DoD emphasizes its mitigation efforts, subsequent follow-up testing, and conclusions, as detailed in the Final Report; steps it took to implement appropriate controls, *see generally* App'x F Status Report, and other materials, such as expert declarations, that demonstrate completion of the implementation phase.

Plaintiffs argue that Counts Two and Three are not moot because the investigation, risk management process, and other activities on which DoD relies do not satisfy the processes set forth in DoDI 6055.05, and are thus incomplete and unreasonably delayed. *See* Opp'n at 8-9. Specifically, Plaintiffs allege that DoD has not yet "completed" three final "stages" required by DoDI 6055.05: "Step 3: developing controls and making risk decisions; Step 4: implementing controls; and Step 5: supervising and evaluating the results." Opp'n at 9. In response, Defendants argue that these remaining stages are only broad categories of requirements that are inherently discretionary. Defendants contend that they have already conducted the analyses they believe to be sufficient, and that the Final Report establishes the adequacy of the remediation that has been implemented. They also argue that no additional "controls" need be developed or implemented because no further "unacceptable risks were found." Reply at 4. According to DoD, the results of its investigation and analysis have already been documented in the Final Report, and DoD has supplied additional expert declarations in this litigation to support its determinations that further mitigation is not necessary to protect those who live and work at Camp Justice from an unacceptable risk of environmental harm. *See* Mot. to Dismiss, Exs. 1-5 (expert declarations) [Dkts. 10-1 - 10-5].

Plaintiffs' argument does not overcome the fact that the actions sought in their Complaint have been undertaken and, to the extent demanded, completed. When a plaintiff has received the relief sought but considers the outcome wrong, a charge of unreasonable delay is no longer live and review lies in the APA's protection against arbitrary and capricious action. *See Bldg & Constr. Trades Dep't, AFL-CIO v. Solis*, 600 F. Supp. 2d 25 (D.D.C. 2009). The instant Complaint alleges unreasonable delay as to both the risk assessment and the implementation of controls; it seeks a writ of mandamus to require these actions. Compl. ¶¶ 135, 139. However, the Final Report constitutes the Navy's final act as to the risk assessment and implementation of what it considers appropriate measures to address potential hazards. Given this development, Plaintiffs' arguments now relate to the adequacy of these actions, not to delay.

Plaintiffs resist this conclusion by citing two D.C. Circuit cases on unreasonable delay, both of which found that the claims at issue were not moot. *See Kifafi v. Hilton Hotels Ret. Plan*, 701 F.3d 718 (D.C. Cir. 2012); *True the Vote, Inc. v. Internal Revenue Serv.*, 831 F.3d 551 (D.C. Cir. 2016). Neither case supports Plaintiffs' argument here because both involved the voluntary cessation of the challenged conduct, not the fulfillment of a plaintiff's demands for relief. In a case of voluntary cessation, the defendant is still "free to return to its old ways" and cannot be said to have "irrevocably eradicated the effects of the alleged violation." *True the Vote*, 831 F.3d at 561 (internal quotation marks and citations omitted). In contrast, the "alleged violation" here was unreasonable delay in analyzing the risk and implementing controls. There is no longer any danger that DoD will continue to delay its risk assessment and related implementation, because these activities have been completed, whether or not to Plaintiffs' satisfaction.

Plaintiffs further argue that Defendants' actions are incomplete because they have not implemented all recommendations from the Final Report, "such as the implementation of an operations and management program for asbestos-containing materials." Opp'n at 11. Citing *True the Vote*, Plaintiffs argue that even if these claims are "nearly moot," they are still subject to review. Opp'n at 11 (citing *True the Vote*, 831 F.3d at 561). Defendants counter that all necessary steps to mitigate the alleged health risks (such as changes to heating, ventilation, and air conditioning) have been taken, and that any remaining recommendations are discretionary. In light of the record evidence, DoD has resolved the allegations of delay advanced by Plaintiffs, that is, delay in completing a risk assessment and delay in implementing "controls to address environmental contamination and other unhealthy conditions." Compl. ¶ 135. Plaintiffs' ongoing allegations relate to the adequacy of DoD's investigation and remediation measures, not to unreasonable delay. The Motion to Dismiss will be granted as to Counts Two and Three and those claims will be dismissed as moot.

### 2. Rule 12(b)(6)—Failure to State a Claim

Count One alleges that the decision that Camp Justice is safe and habitable, and the requirement that Plaintiffs live and work in allegedly contaminated areas, are based on an inadequate investigation and implementation of mitigating controls and are therefore arbitrary and capricious and an abuse of the Navy's discretion in violation of Section 706(2).

### a. Actions "Committed to Agency Discretion by Law"

Defendants argue that the challenged actions are "committed to agency discretion by law" and are therefore unreviewable by the Court, even under the APA. *See* 5 U.S.C. § 701(a)(2). Plaintiffs respond that Defendants failed to raise this defense in their Motion to Dismiss and that the Court should not consider it now. Plaintiffs are correct that the question of

agency discretion is an affirmative defense that does not go to the Court's jurisdiction, but they do not cite any authority for the suggestion that Defendants' failure to raise the issue in their Motion to Dismiss precludes the Court from determining whether the claims are reviewable and as to which Plaintiffs have had a full opportunity to object. Indeed, under Federal Rule of Civil Procedure 12(h)(1), failure to state a claim upon which relief can be granted is not a defense that can be waived if a party fails to include it in a responsive pleading or other papers filed with the Court. *See* Fed. R. Civ. P. 12(h), (b)(2)-(5) (providing that a party waives the defenses of lack of personal jurisdiction, improper venue, insufficient process, and insufficient service of process by failing to make them by motion, but that failure to state a claim may be raised by a motion under Rule 12(c)). Moreover, although the question is not jurisdictional, it is a "threshold" question: the Court cannot review an action that is outside the Court's authority to review. *See Heckler*, 470 U.S. at 829 (discussing the "'threshold question' of whether the agency's action was at all reviewable" (quoting *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 410 (1971))).

Defendants characterize the administrative action at issue as the Navy's refusal to take action—a category of administrative action that is presumptively unreviewable. *See Heckler*, 470 U.S. at 831. DoD further argues that its actions were "[o]perational military decisions" that "fall very much within this 'presumptively unreviewable' category." Defs.' Juris. Br. at 8. Without further elaboration, the Court cannot agree with this characterization of the nature of the claims at issue. Plaintiffs challenge the *adequacy* of DoD's investigation and remediation efforts, not its decision to exercise enforcement discretion. Because Count Three does not complain of a refusal to act, its allegations are not presumptively unreviewable.

As to the argument that the Navy engaged in "operational military decisions" that are presumptively unreviewable, DoD provides no legal or factual analysis to establish that the

healthy maintenance of Camp Justice falls within an "operational military" category. Plaintiffs are appointed counsel and DoD employees who are required, by virtue of their appointments, to live and work at times on an operating base. Only Major Seeger is in the military forces. Certainly, the Navy retains discretion to manage NSGB, but DoD does not connect its operational mission to Camp Justice or to Plaintiffs' allegations of serious environmental hazards, which, at this point, the Court assumes are true. *See Twombly*, 550 U.S. at 572.

Defendants also argue that the challenged actions are "committed to agency discretion" by law because there are no judicially manageable standards by which to judge them. This argument is based on *Heckler*, which held that a claim is unreviewable if "no judicially manageable standards are available for judging how and when an agency should exercise its discretion." *Heckler*, 470 U.S. at 830. In these circumstances, the argument amounts to stuff and nonsense. The "arbitrary and capricious" standard of the APA is well established. Further, judicially manageable standards are not limited to statutory terms but also "may be found in formal and informal policy statements and regulations" because "[i]t is well settled that an agency, even one that enjoys broad discretion, must adhere to voluntarily adopted, binding policies that limit its discretion." *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987) (citing *Vitarelli v. Seaton*, 359 U.S. 535, 539 (1959); *Service v. Dulles*, 345 U.S. 363, 372 (1957)).

In determining whether administrative policies or internal statements establish judicially manageable standards, courts look to whether statements "[impose] rights or obligations on the respective parties" and whether an agency intended to transform a pronouncement into a binding norm. *Id.* (citing *American Bus Ass'n v. U.S.*, 627 F.2d 525, 529 (D.C. Cir. 1980); *Doe v. Hampton*, 566 F.2d 265, 281-82 (D.C. Cir. 1977)); *see also Steenholdt*, 314 F.3d at 638 ("In determining whether agency statements create such a standard, the Court

inquires whether the statements create binding norms by imposing rights or obligations on the respective parties."). Such intent is "ascertained by an examination of the provision's language, its context, and any available extrinsic evidence." *Doe v. Hampton*, 566 F.2d at 281. Plaintiffs allege, and DoD denies, that Defendants failed to follow internal policies and procedures that have the force and effect of binding norms. Specifically, Plaintiffs cite DoDI 6055.05, which articulates, as a risk management principle, that Commanders "[a]ccept no unnecessary risks" in the context of occupational and environmental health; DoDI 6055.05 also requires the Navy and the Convening Authority to investigate the nature and extent of health hazards, develop controls and make risk decisions, and, in Plaintiffs' summary, "determine which risks are acceptable and unacceptable by balancing operational benefits against the potential for adverse health effects (*i.e.*, severity and likelihood of occurrence)." Compl. ¶ 123. Plaintiffs emphasize that DoDI 6055.05 specifies the categories of actions that military commanders should take to assess risks, implement controls, and monitor implementation.

Plaintiffs additionally rely on other directives, underlying documents, and "applicable regulatory standards" that they argue set forth factors that DoD should have taken into account in making its DoDI-mandated determination, including:

- DoD Directive (DoDD) 4715.1E, which Plaintiffs characterize as requiring DoD to implement an Environment, Safety, and Occupational Health management system, *see* Compl. ¶¶ 66, 123(a);

- DoDI 6055.01, which governs DoD's safety and occupational health program, *see* Compl. ¶ 66;

- EPA standards that Plaintiffs allege Defendants acknowledge apply (for example, by using those standards in the Final Report), *see, e.g.*, Opp'n at 7-8 n.2;

- Instructions from the Chief of Naval Operations (OPNAVIST) that govern safety and occupational health and require that,

among other things, identified hazards must be promptly abated, *see* Compl. ¶¶67-69;

- Navy guidance, including the Navy's Industrial Hygiene Field Operations Manual, *see id.* ¶ 70-71, and the Navy Policy on the Use of Background Chemical Levels, *see id.* ¶¶ 72, 85, 92.

These policies and procedures, Plaintiffs contend, establish DoD's intent to bind its personnel to certain steps to address environmental hazards that were not followed at NSGB.

Defendants argue that these directions "very clearly commit the protection of DoD personnel" to the Navy's discretion. Defs.' Juris. Br. at 6. In support, DoD cites a handful of DoDD and DoDI provisions, but these are insufficient, on a motion to dismiss, to demonstrate that none of the Directives, Instructions, or other documents cited by Plaintiffs "create[s] binding norms by imposing rights or obligations on the respective parties." *Steenholdt*, 314 F.3d at 638. Indeed, while the materials cited by Defendants allow for discretion in aspects of system implementation and in the authority of commanders to make health-related risk/benefit determinations, none suggests that the Navy has full discretion to ignore them. On its face, DoDI 6055.05 appears to require that the Navy and Convening Authority take certain steps to assess risks, weigh them, establish controls, and consult other materials to make risk assessments and mitigate harms as necessary. *See Doe v. Hampton*, 566 F.2d at 281 (providing that the language of a document can provide evidence of intent that the document binds agency action). Certainly, there are discretionary aspects to these requirements, and it may be that DoD's various investigations, reports, and mitigation activities satisfied the requirements that do apply—but those questions cannot be resolved on a motion to dismiss, where the Court must accept all of Plaintiffs' allegations as true. *See Twombly*, 550 U.S. at 572.

b.        **Final Agency Action**

Finally, Defendants argue that Plaintiffs have failed to challenge a "final agency action" by which APA review might be available. Count One challenges DoD's assignment of Plaintiffs to sleep in Cuzcos at Camp Justice during work trips, as well as the determination that the Camp Justice facilities are safe and habitable.  Compl. ¶ 131.  Defendants argue that Count One should be dismissed for failure to state a claim under Rule 12(b)(6), because Plaintiffs' allegations do not identify a final action by Defendants and therefore fail to state an APA claim.

Final agency action is clearly required before judicial review.  *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.").  "The District Court's authority to review the conduct of an administrative agency is limited to cases challenging 'final agency action.'"  *Reliable Automatic Sprinkler Co., Inc. v. CPSC*, 324 F.3d 726, 731 (D.C. Cir. 2003). The APA defines an "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof."  5 U.S.C. § 551(13).  "This list is expansive," and is "'meant to cover comprehensively every manner in which an agency may exercise its power.'"  *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 478 (2001)).

To be deemed final, an agency action "must 'mark the consummation of the agency's decisionmaking process,' *i.e.*, it is not 'merely tentative or interlocutory.' . . .  Second, 'the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'"  *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  This is a "pragmatic" and "flexible" inquiry.  *Safari Club*, 842 F.3d at 1289 (quoting *Nat'l Ass'n of Home Builders v. U.S.*

*Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005)). The possibility that a decision may later be revised based on new information does not render "an otherwise definitive decision nonfinal." *Safari Club*, 842 F.3d at 1289 (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1814 (2016)).

The first question raised by Defendants' argument is what action or actions Plaintiffs actually challenge in their lawsuit. Count One of the Complaint describes the actions at issue as "[t]he Navy's decision that Camp Justice is safe and habitable, and Defendants' decision that Plaintiffs and other personnel must live and work in contaminated areas at Camp Justice." Compl. ¶ 131. In brief, Plaintiffs characterize their complaint as a challenge to DoD's "flawed and incomplete risk management process and the resulting orders to live and work at Camp Justice." Opp'n at 8. Plaintiffs also reference "DoD's repeated orders assigning Plaintiffs to live and work at Camp Justice," and suggest that these orders provide evidence that DoD "determined that Camp Justice was safe and habitable and that personnel should continue to live and work there." *Id.* at 13. Finally, Plaintiffs describe the "agency actions" in question as "DoD's repeated, health-threatening orders that the Plaintiffs live and work in contaminated areas of Camp Justice, DoD's failure to protect the Plaintiffs from environmental hazards, and DoD's determination that Camp Justice is safe and habitable." Opp'n at 14. For purposes of determining whether Plaintiffs have challenged "final agency actions," the Court interprets these passages collectively as a challenge to two categories of agency action: (1) DoD's assignment of Plaintiffs to live and work in contaminated areas at Camp Justice during work trips, and (2) DoD's "determination" that Camp Justice safe and habitable.

### i. Did DoD's Assignment of Plaintiffs to Allegedly Contaminated Accommodations Constitute Final Agency Action?

The Complaint alleges that "[e]ach time military commissions hearings are scheduled at Camp Justice, the legal teams and support personnel request travel arrangements from the Convening Authority and receive orders from the Convening Authority assigning them to specific housing." Compl. ¶ 26. At the hearing on their motion for a preliminary injunction, Plaintiffs acknowledged that only Major Seeger, as an Army officer, is required without exception to stay in the allegedly contaminated Camp Justice housing; the non-military Plaintiffs may stay in preferable hard housing such as the townhouses or nearby hotel rooms, subject to availability which has usually been arranged. *See* PI Tr. at 44-46.[9]

Plaintiffs complain further that their support staff, such as legal assistants who accompany them to NSGB for detainee hearings, are inconvenienced and endangered by the housing assignments, which impedes Plaintiffs' work by limiting or interfering with their ability

---

[9] DoD counsel proffered, without contradiction, that Plaintiff Michael Schwartz stayed on-base for a total of 29 days in 2016, always staying at the Navy Lodge or NSGB housing; from January-July 2017 he stayed at the Navy Lodge for seven days and in Cuzcos for four days. PI Tr. at 44. Plaintiffs Cheryl Bormann and Edwin Perry have traveled to NSGB numerous times since 2014 and 2015, respectively, and both have always stayed in "hard housing": Ms. Bormann stayed at either the Navy Lodge or NSGB "hard housing" during her four days on-base in 2014, 46 days in 2015, 40 days in 2016, and 22 days in January-July of 2017, and as of July 2017 she had received "hard housing" assignments for her remaining work trips in 2017; Mr. Perry stayed in the Navy Lodge or NSGB "hard housing" for a total of 21 days in 2015, 56 days in 2016, and 21 days in January-July 2017, and also had hard housing reservations for the remainder of his 2017 trips as of July 2017. *Id.* at 44. As an Army officer, Major Seeger stayed in Cuzcos for a total of 18 days in 2015, 63 days in 2016, and 23 days in January-July 2017, with no option of requesting hard housing even if available. *Id.* at 46. Defendants do not challenge Mr. Schwartz's, Ms. Bormann's, or Mr. Perry's standing on the grounds that they have stayed in "hard housing" for all or the vast majority of their time on-base. Because Plaintiffs' allegations are based on the potential harm of both living and working in allegedly contaminated housing, and because the operative housing policy does not guarantee "hard housing" to Plaintiffs and apparently prioritizes their right to preferable housing below the needs of other visitors to NSGB, the Court does not find any impediments to these Plaintiffs' standing on such grounds.

to bring support staff.  *See* Compl. ¶ 29.  Plaintiffs also complain that the work they are assigned requires them to spend the majority of their working hours on base in allegedly contaminated areas because the SCIF and designated defense workspaces convenient to the SCIF have been built in hazardous containerized housing.  *See* Compl. ¶ 30.

Defendants respond that Plaintiffs do not cite "any specific regulation, policy, or decision" that requires them to live and work in the allegedly contaminated areas, so that "there is no final agency action, nor is there an administrative record on which such an action could have been based."  Mot. to Dismiss at 17.  In support, Defendants cite *Fraternal Order of Police v. Gates*, which held that a challenge to the Navy's exposure of trainees to pepper spray failed to state a claim, because those plaintiffs had been "less than clear as to which agency action is at issue" and had failed to "connect the [challenged] training to the language of the DoD and Navy documents" cited in their complaint.  602 F. Supp. 2d 104, 107-08 (D.D.C. 2009).

Defendants' reliance on *Fraternal Order* is unpersuasive.  The *Fraternal Order* court found that the right to relief was "speculative," *Twombly*, 550 U.S. at 555, because the plaintiffs had not identified the precise agency actions challenged, leaving the Court to "guess." *Fraternal Order*, 602 F. Supp. 2d at 108.  Here, however, there is no need to guess which actions Plaintiffs challenge or what law and policies upon which they rely.  Defendants are mistaken when they argue that Plaintiffs fail to point to any decision that requires Plaintiffs to stay at Camp Justice.  Plaintiffs' pleadings, which the Court accepts as accurate in this procedural posture, clearly allege that there is a procedure in place whereby attorneys and other visiting personnel submit housing requests for upcoming work trips, and that the Convening Authority orders them to specific housing.  Further, the nature of their work as attorneys requires them to

work in the SCIF where relevant documents are available and classified briefs can be prepared but which is allegedly contaminated.

It is well established that "a completed universe" of orders can establish a final agency action subject to APA review: less central to the analysis than the format of the orders is whether "the scope of the controversy has been reduced to manageable proportions, and its factual components fleshed out, by concrete action that harms or threatens to harm the complainant." *Lujan*, 497 U.S. at 873. Particularly when viewed within the "pragmatic" and "flexible" framework of the inquiry into "final agency action" and the acceptance given to a plaintiff's fact allegations, the Complaint adequately alleges final agency action. *Nat'l Ass'n of Home Builders*, 417 F.3d at 1279. The orders are a "consummation of the agency's decisionmaking process," imposing on Plaintiffs the requirement that they work, and possibly stay, in the facilities of which they complain. *Safari Club*, 842 F.3d at 1289. That decision in turn places Plaintiffs' health at risk, according to their pleadings. The housing orders and necessary work areas are clearly connected to the alleged policy violations, and the Court concludes that Plaintiffs have alleged final agency action sufficient to state a claim.

### ii. Did DoD's Determination that Camp Justice Is Safe and Habitable Constitute Final Agency Action?

Plaintiffs allege that DoD's "determination that Camp Justice is sufficiently safe and habitable to live and work there" is final agency action, because "there is no indication that Defendants will alter their position regarding the environmental contamination at Camp Justice." Opp'n at 15; *see also* Compl. ¶ 8 ("Defendants' decision to require Plaintiffs and other personnel to live and work [at Camp Justice] should be set aside as arbitrary and capricious."). Plaintiffs allege that DoD's repeated orders assigning Plaintiffs to live and work at Camp Justice are evidence of a final decision. Opp'n at 12. Plaintiffs also allege that Defendants "fail[ed] to

properly complete the risk management process required by DoD Instruction 6055.05 . . . and to determine whether the operational benefits of requiring personnel to live and work there outweigh the risk to those individuals' health." *Id.* DoD's limited response argues that DoDI 6055.05 and other "[i]nternal guidelines" are "insufficient to connect agency action to specific regulatory authorization or to raise a right to relief above the speculative level." Reply at 7 (citing *Fraternal Order*, 602 F. Supp. 2d at 107-08).[10]

Plaintiffs argue that the decision that Camp Justice is safe and habitable is "concrete" and "reviewable" because the orders and assignments to live and work in allegedly contaminated housing and work space "operate as a *de facto* risk management decision" that violates DoDI 6055.05. Opp'n at 13. As the Court found above, Navy undertook a "decisionmaking process" which "consummate[ed]" in the issuance of the Final Report. *Bennett*, 520 U.S. at 178.

What is less clear is whether any of the allegedly flawed investigation, risk assessment, mitigation, and Final Report constitute final agency action. Such a study does not fit the statutory definition of agency action, that is, "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13). Even if the Final Report were "definitive," it is the resulting order, not the preceding study that has a "'direct and immediate . . . effect on the day to day business' of the party challenging the agency action." *Reliable Automatic Sprinkler*, 324 F.3d at 731 (quoting *FTC v. Standard Oil Co. of Cal.*, 449

---

[10] Defendants also cite *Schweiker v. Hansen*, 450 U.S. 785 (1981), for the proposition that internal guidelines "do not create an actionable duty for an agency." Reply at 7. While an accurate point, reference to *Schweiker* is curious because that case did not analyze any APA questions, much less whether agency action is final, and there is no shortage of Supreme Court and D.C. Circuit cases more squarely considering the question. Plaintiffs allege that the Navy at NSGB was required to abide by the various directives and instructions they cite, and Defendants do not overcome those allegations.

U.S. 232, 239 (1980)). Applied here, it is Navy's orders, whether explicit or functional, that are the means through which it "may exercise its power." *Whitman*, 531 U.S. at 478. As the D.C. Circuit noted in *Fund for Animals*, "[m]uch of what an agency does is in anticipation of agency action. Agencies prepare proposals, conduct studies, . . . and engage in a wide variety of activities that comprise the common business of managing government programs." 460 F.3d at 19-20. In the context of potential harms to Plaintiffs, the determination that the areas in question are safe and habitable is such an anticipatory step, while the housing orders and necessary location of work assignments are the final actions on which Plaintiffs' claim is based.

**B. Preliminary Injunction**

First, the Motion for a Preliminary Injunction will be denied as moot as to Counts Two and Three, because those claims do not survive DoD's Motion to Dismiss.

Second, as *Winter* recently emphasized, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Since *Winter* was decided, the D.C. Circuit has twice declined to abandon the sliding-scale approach. *See Sherley*, 644 F.3d at 393 ("We need not wade into this circuit split today."); *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009) ("We need not decide whether a stricter standard applies."). Recognizing the Circuit's silence, this Court nonetheless concludes that *Winter* makes clear that a plaintiff must make, at the least, a strong showing on likelihood of success on the merits and irreparable harm, or he cannot obtain preliminary injunctive relief.

**1. Likelihood of Success on the Merits**

Plaintiffs argue that they have demonstrated a likelihood of success on the merits because "[t]here is simply no reasonable or rational justification for requiring Plaintiffs and

others to live and work in dangerous, contaminated areas, particularly where, as here, uncontaminated alternatives exist," which renders the Navy's orders arbitrary and capricious. Mot. PI at 11 (citing 5 U.S.C. § 706(2)(A)). Plaintiffs cite DoDD 4715.1E, which charges DoD components with ensuring compliance with applicable "laws, regulations, and DoD policies," and which Plaintiffs take to include environmental safety and occupational health laws and policies, such as EPA standards for environmental health and safety. Mot. PI at 12. Plaintiffs contend that the Navy violated these policies by failing to address "data gaps"; conducting insufficient "additional environmental sampling"; failing to address moisture and microbial growth; and inadequately mitigating risks posed by formaldehyde and benzo(a)pyrene identified in sampling. More generally, Plaintiffs allege that the investigation itself was inadequate. Their summary allegation is that the Navy's orders that Plaintiffs "continue to live and work in contaminated areas at Camp Justice . . . materially deviate from the Navy's own regulations, policies, and guidance (as well as recommendations from its own consultants)." *Id.* at 12.

DoD's response emphasizes the process and reasoning behind its determination that the facilities at Camp Justice are habitable without undue risk:

> NMCPHC's Final PHR Report concluded that there is no evidence that the old runway at Camp Justice was contaminated from prior use, no evidence that Camp Justice personnel are exposed to carcinogens or toxic substances above the acceptable risk ranges established by the EPA, OSHA, and other regulatory agencies, and no evidence that any verifiable cancer cases are linked to environmental or occupational exposure at Camp Justice. [The Report's] findings and recommendations are well-founded, and it would not be the Court's place to second-guess the NMCPHC's expert analysis.

Mot. to Dismiss at 20 (citing *Lee Mem'l Health Sys. v. Burwell*, 206 F. Supp. 3d 307, 321 (D.D.C. 2016)).

Plaintiffs raise particular concern regarding the February 2016 Navy Preliminary Assessment, which the Navy characterizes in the Final Report as a "preliminary public health screening risk assessment." Final Report at 6. Plaintiffs charge that Navy had concluded in February 2016 that "formaldehyde and benzo(a)pyrene found in the samples exceeded the screening levels [NMCPHC] had established for a 9-month active duty military worker." Mot. PI at 13; *see also* Final Report at 6-8. The Court recognizes that formaldehyde is of particular concern to Plaintiffs. Indeed, based on the prominent placement of discussions of formaldehyde levels and remediation, this appears to be an issue of great concern in the Final Report as well.[11] However, the Final Report provides significant detail, beyond the February 2016 Navy Preliminary Assessment, that undercuts Plaintiffs' likelihood of success.

The Final Report states that "[t]he results of the preliminary public health screening risk assessment [*i.e.*, the February 2016 Navy Preliminary Assessment] indicated that mercury and formaldehyde concentrations in indoor air, and arsenic and benzo(a)pyrene concentrations in soil were of potential concern and warranted further evaluation at specific locations in Camp Justice," although the mercury and formaldehyde levels measured in indoor air were within the acceptable OSHA range.[12] Final Report at 6. As Defendants' counsel explained at oral argument, the concentrations at that time warranted further evaluation because they exceeded EPA screening standards set forth in the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, commonly known as the Superfund), 42

---

[11] Because formaldehyde is the most serious potential hazard of which Plaintiffs complain, the Court's analysis on the Motion for a Preliminary Injunction focuses on formaldehyde exposure. Plaintiffs have raised other issues of concern but none satisfies the standards for a preliminary injunction.

[12] OSHA sets Permissible Exposure Limits, or PELs, which are enforceable regulatory standards for determining allowable exposures in U.S. workplaces. *See* Gillooly Decl. at 12.

U.S.C. § 9601 *et seq.* *See* PI Tr. at 38-39.   Contrary to Plaintiffs' contention that DoD has

"conceded" that "EPA CERCLA risk guidance must be used," PI Tr. at 26, Defendants argue

that CERCLA guidelines do not impose requirements on an overseas base such as NSGB, but

were only "borrow[ed]" for use as a benchmark during the investigation prior to the Final

Report.  *Id.* at 38-39.

       The Final Report concluded that "[c]umulative cancer risks were within the

[EPA] acceptable risk range of 1E-06 to 1E04 (i.e., 1 in 1,000,000 to 1 in 10,000)" for "Adult

Resident/Workers Inside Camp Justice."  Final Report at 41.  The Final Report stated that, after

"engineering controls" including HVAC modifications, formaldehyde levels in "almost all

modular buildings" decreased by an average of 63 percent.  *Id.* at 8.  It also reported that the

"concentrations of formaldehyde detected in indoor air at Camp Justice were within the range of

concentrations considered 'Low' to 'Mid' by the CDC for typical concentrations observed in

manufactured homes" in the United States.  *Id.* at 42.  The Final Report recommended new

procedures to document modifications and monitor the functionality of HVAC systems going

forward, and suggested that the Navy "consider sampling formaldehyde annually during the

summer to verify and demonstrate that engineering controls are effective at keeping

formaldehyde levels at their current reduced levels."  *Id.* at 13.  Although Plaintiffs' expert, Dr.

Killen, expressed his concern regarding identified toxins and possible exposure pathways, *see*

Killen Report at 1, Navy experts reviewed the same data and concluded that the detected

formaldehyde levels, and historical use and effects of the area, did not indicate an unacceptable

risk.  *See, e.g.*, Gillooly Decl. at 7-11 (discussing the iterative process of repeated formaldehyde

sampling and mitigation efforts).

Plaintiffs further challenge DoD's conclusions because its samples came from only 16 of the 100 Cuzco sleeping spaces, and because they did not test and re-test all of them. *See, e.g.*, Killen Report at 10 ("[I]n a serious deviation from appropriate testing protocol and methodology, not all CUZCOSs appear to have been sampled, even though formaldehyde was detected in <u>all</u> locations that were sampled."). Dr. Killen does not explain in sufficient detail to counter the Final Report why it is methodologically unsound to sample some but not all of a collection of nearly identical structures situated in close proximity. Notably, the subsequent HVAC modifications, shown in later sampling to have been effective in reducing formaldehyde exposure, was implemented in all of the Cuzcos used for sleeping.

Plaintiffs' motion does not sufficiently demonstrate that DoD's conclusion was an unreasonable risk assessment or that DoD wholly disregarded the broad guidelines set forth in DoDI 6055.05 and the other relevant policies. The investigation into potential hazards was apparently considered with competing needs. DoD considered factors such as housing demand, convenience to the ELC, and other reasons to assign legal team members to live and work in the contested housing.

Plaintiffs' motion does not show a likelihood of success on the merits. DoD appears to have examined the relevant data and articulated "'a rational connection between the facts found and the choice made.'" *Americans for Safe Access v. DEA*, 706 F.3d 438, 449 (D.C. Cir. 2013) (quoting *MD Pharm. Inc. v. DEA*, 133 F.3d 8, 16 (D.C. Cir. 1998)). The Court concludes that Plaintiffs have not shown that they are likely to succeed on the merits, such that the extraordinary remedy of a preliminary injunction is warranted.

## 2. Irreparable Injury

The Court finds that Plaintiffs also have failed to demonstrate irreparable injury. Such harm must be "certain, great, actual, and imminent." *Mylan Labs. Ltd. v. FDA*, 910 F. Supp. 2d 299, 313 (D.D.C. 2012) (citing *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). While the alleged harm—risk of cancer—is no doubt "great," the record does not show that it is currently "certain," "actual," or "imminent." DoD has made important upgrades, including HVAC modifications in modular buildings and additional actions in the Cuzco living quarters. *See* App'x F Status Report at 21-22. The fact that these upgrades have been made, and have been shown to mitigate potential harms, lessens the likelihood of irreparable harm.

## 3. Balance of Equities and Public Interest

Plaintiffs contend that the equities and the public interest favor granting their requested injunction. These two factors merge when relief is sought against the government. *United States Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 163 (D.D.C. 2015) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Plaintiffs cite the "significant risk due to the exposures summarized herein" and the "readily available" alternative facilities at NSGB. Mot. PI at 20. They also cite the public interest in the proper functioning of the Military Commissions. *Id.* at 21. Through declarations from persons with relevant experience and knowledge, the Navy responds that the Military Commissions have specific housing and workspace requirements, due to the specialized security requirements for its cases, and that there are no other facilities at NSGB that would meet those requirements. *See* Mot. to Dismiss, Exs. 2-4 (declarations of Wendy A. Kelly; Capt. David Culpepper, USN; and Sandra Greenwell). The Navy argues that if it were required to house all lawyers for detainees in hard housing and

provide new work facilities, the operations of the base would be affected for its personnel and its mission.

"In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter,* 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. 531, 542 (1987)). The parties present their arguments in abbreviated form and without sufficient detail for the Court to perform the balancing of interests as required before an injunction can be issued. Plaintiffs have therefore failed to demonstrate that the current balance of equities and the public interest favor issuance of an injunction.

## CONCLUSION

For the reasons discussed above, Plaintiffs' motion for a preliminary injunction will be denied. Defendants' motion to dismiss will be granted as to Counts Two and Three and denied as to Count One. A memorializing Order accompanies this Memorandum Opinion.


Date: March 30, 2018


_____/s/_____
ROSEMARY M. COLLYER
United States District Judge